UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

|                                          |                                                                         |
|------------------------------------------|-------------------------------------------------------------------------|
|                                          | No. CV-04-0025-FVS                                                      |
| IN RE METROPOLITAN SECURITIES LITIGATION | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS |

**THIS MATTER** is before the Court on four motions to dismiss brought by the various Defendants.  In view of this procedural posture, the Court must accept all factual allegations set forth in the complaint as true for the purposes of the present order.  *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).  The following statement of facts is accordingly drawn from the pleadings.

**BACKGROUND**

This is a class action brought by investors against the former accountants, the Qualified Independent Underwriter, and certain officers and directors of Metropolitan Mortgage & Securities Company ("Metropolitan"), Summit Securities ("Summit"), and their subsidiaries.  The Plaintiffs allege that Metropolitan and Summit were affiliated securities companies.  Both owned a number of subsidiaries, collectively referred to as the "Met Group."  After the collapse of Metropolitan and Summit in 2004, their securities became virtually worthless.  SCAC ¶ 12.  This suit followed.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 1

**Procedural History**

The present action is a consolidation of two previously filed actions, *Hall et al. v. Metropolitan Mortgage & Securities Co. Inc., et al*, CV-04-28-FVS and *Cauvel et al. v. Metropolitan Investment Securities Company, Inc. et al*, CV-04-25-FVS.  When the Court consolidated the cases on August 11, 2004, it appointed Keith Cauvel, Arthur Becker, Venus Hafford Weber, Eva Drauhn, George Saylor, Becklyn Wilkey, and Floyd Bodner (collectively, "the Saylor Group") as Lead Plaintiffs for the proposed class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).  (Ct. Rec. 121.)  By the same order, the Court appointed Hagens Berman LLP and Gordon Thomas Honeywell Malanca Peterson & Daheim LP as Co-Lead Counsel.  *Id.*

The First Amended Complaint[1] ("FAC") in *Cauvel,* Ct. Rec. 11, named as Defendants Metropolitan, Summit, Metropolitan Investment Securities, Inc. ("MIS"), Ernst & Young, LLP, and a number of former Metropolitan and Summit officers and directors.  It alleged claims under Section 10(b) of the Securities and Exchange Act of 1934 ("the Exchange Act" or "the 1934 Act") and Sections 11, 12, 15, and 20 of the Securities Act of 1933 ("the Securities Act" or "the 1933 Act").  (Ct. Rec. 11.)  Following the consolidation of *Cauvel* with *Hall*, on December 17, 2004, the Plaintiffs moved to file an amended complaint.  (Ct. Rec. 150.)  The Plaintiffs attached their proposed Consolidated and Amended Class Action Complaint ("CAC") to the motion to amend.  The Court granted the motion on January 20, 2005, Ct. Rec. 178, and

---

[1]The original Complaint, Ct. Rec. 1, in *Cauvel* was amended prior to the filing of the Defendants' Answer.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 2

the Plaintiffs filed the CAC on March 11, 2005.  (Ct. Rec. 209.)  The CAC named Pricewaterhousecoopers, LLP and Roth Capital Partners, LLC as Defendants for the first time.  The CAC dropped the claim previously asserted under the 1934 Act, and instead alleged a claim under Washington State's Securities Act ("WSSA").

On October 6, 2006, the Court approved a partial settlement that dismissed a number of Defendants.  (Ct. Rec. 406.)  The Court also granted the Plaintiffs permission to file a second consolidated and amended complaint.  (Ct. Rec. 404).  The Plaintiffs filed their Second Consolidated and Amended Class Action Complaint ("SCAC") on October 10, 2006.

The SCAC asserts a total of thirteen claims.  Pursuant to Section 11 of the 1933 Act, the Plaintiffs allege that, as a result of the Defendants' negligence, certain registration statements issued by Metropolitan and Summit contained material misrepresentations and omissions.  The Plaintiffs bring an additional Section 11 claim against Metropolitan and Summit's former auditors and underwriter, alleging that the misrepresentations in the registration statements amounted to fraud.  SCAC ¶¶ 758-782.  Pursuant to Section 12 of the 1933 Act, the Plaintiffs allege that the Met Group's former officers and directors sold securities using prospectuses that contained misrepresentations.  Pursuant to Section 15 of the 1933 Act, the Plaintiffs allege that the Met Group's former officers and directors exercised control over the parties responsible for the Section 11 and Section 12 violations.  Finally, pursuant to Washington State's Securities Act, the Plaintiffs allege that all of the Defendants made

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 3

false statements in connection with the sale of securities.

The Plaintiffs propose to certify two different classes. The Federal Claims Class would bring only federal claims and consist of all persons who purchased investment debentures and preferred stock from Metropolitan and investment certificates and preferred stock from Summit pursuant to nine registration statements (the "Registration Statements") that became or were effective from February 13, 2001 to December 15, 2003 ("the Class Period"). SCAC ¶ 40. The State Claims Class would bring only state law claims and consist of all persons who purchased investment debentures and preferred stock from Metropolitan and investment certificates and preferred stock from Summit pursuant to the Registration Statements that became or were effective during the Class Period *but which were not listed or authorized for listing on the National Market System of the NASDAQ market system*." SCAC ¶ 40 (emphasis added). Class certification is not before the Court at this time.

**The Met Group's Business Practices**

The Plaintiffs allege that Metropolitan focused on buying high risk home mortgages after its founding in 1953. SCAC ¶ 43. In 1973, Metropolitan Investment Securities, Inc. ("MIS"), a broker-dealer, was formed as a wholly owned subsidiary of Metropolitan. SCAC ¶ 46. Metropolitan later expanded into other areas of business, including insurance. SCAC ¶ 48. Summit was created as another wholly owned subsidiary in 1990. SCAC ¶ 49. Summit became a "near mirror image" of Metropolitan after it was acquired by National Summit Corporation in 1994. SCAC ¶ 50.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 4

Metropolitan and Summit originally focused on different business activities. Metropolitan was primarily involved in residential mortgage loans and selling various kinds of receivables, while Summit's primary areas of business were commercial lending and property development. SCAC ¶ 55. Metropolitan's earnings in the mid-1990s could not keep pace with its rapid growth, however, and Metropolitan became "very thinly capitalized." SCAC ¶ 85. As a result, Metropolitan changed its practices to reflect those of Summit in 2000. SCAC ¶ 56.

Functioning as "a single enterprise focused on commercial lending," Metropolitan and Summit aggressively pursued commercial lending, writing $20-$30 million dollars in commercial loans every month during much of 2001 and 2002. SCAC ¶¶ 86-87. In an effort to increase this amount to $100 million a month, the companies engaged in increasingly risky ventures. SCAC ¶¶ 88-90. The SCAC describes sixteen "representative transactions" to illustrate the Met Group's practices. ¶¶ SCAC 455-619.

With its commercial real estate investments generating little return, the Met Group was unable to pay the significant annual rates of return on its securities, leading it to issue yet more securities as a source of cash. SCAC ¶ 148. The Met Group thus became wholly dependant on cash acquired from the sale of securities. SCAC ¶ 130. Its practices required both unqualified financial statements from the Met Group's auditors and continual regulatory approval. SCAC ¶ 130. During the time period identified by the proposed class, the Met Group made nine securities offerings. MIS acted as the sales brokerage for

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 5

all of these sales.

**Efforts to Evade State Regulation**

In 1995, the Securities Division of the Washington State Department of Financial Institutions ("DFI") conducted an audit and examination of the Met Group that disclosed numerous regulatory violations, unsound business practices, and conflicts of interest. SCAC ¶ 62.  DFI and the Met Group subsequently entered into a Memorandum of Understanding ("MOU") that imposed special requirements on the Met Group.  By 1998, the Met Group was disregarding the terms of the MOU.  SCAC ¶ 63.

In late 1999, Metropolitan "sought to escape the supervision of the Washington State regulators" by "listing its debentures on a national securities exchange for the express purpose of achieving preemption as a 'covered security' under federal law."  SCAC ¶¶ 64-65. Metropolitan accordingly listed its debentures on Tier I of the Pacific Stock Exchange.  SCAC ¶ 66.  In January 2002, Metropolitan listed its preferred stock, Series E-7, on the American Stock Exchange.  SCAC ¶ 72.  "Thus Metropolitan was able to achieve complete preemption of regulation by the DFI."  SCAC ¶ 73.

**The Collapse**

On December 31, 2002, Metropolitan filed its Annual Report (Form 10-K) with the SEC.  The report explained that the IRS intended to disallow certain tax benefits Metropolitan had claimed based on its involvement in the Foreign Leverage Investment Program ("FLIP").  The report further indicated that Metropolitan could lose up to $28 million if, following an audit, the IRS ultimately disallowed the FLIP

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 6

transaction's tax benefits.  The report also stated that a complete review had not taken place at the time of the report and Metropolitan could not "reasonably estimate a loss, if any, associated with this transaction."  Metro. Mortgage & Sec. Co., Annual Report (Form 10-K), at 28 (December 31, 2002).

In October 2002 and March 2003, the Met Group sought SEC approval for two new securities offerings, one for Metropolitan and the other for Summit.  SCAC ¶¶ 131-132.  In investigating the registration statements underlying the securities, the SEC observed a number of concerning practices, SCAC ¶ 134, and denied approval for both proposed offerings.  SCAC ¶ 133.  Following the SEC's lead, the Met Group's qualified independent underwriter, as well as its auditor, also took a closer look at the Met Group's practices.  SCAC ¶ 135. The underwriter withdrew its approval of pricing and yield determinations for all currently offered Met Group Securities on July 17, 2003.  SCAC ¶ 136.

Around the same time, the National Association of Securities Dealers ("NASD") began investigating MIS, eventually resulting in a $500,000 fine and a prohibition on further marketing of securities. SCAC ¶¶ 137, 139.  On July 7, 2003, Metropolitan filed a Current Report, Form 8-K, with the SEC, revealing that MIS, "the sole broker dealer responsible for the offer and sale of [Metropolitan's] preferred stock and debt securities," had received a "Wells letter" from NASD.  The Wells letter notified MIS that NASD had made a preliminary determination to recommend sanctions against it.  The July 7 report explained that MIS would be given an opportunity to respond

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 7

to NASD's allegations and that MIS was cooperating with NASD in an
attempt to resolve the matter.  The report further explained that
sanctions, if ultimately imposed, could have an adverse effect on
MIS's ability to sell Metropolitan's securities, which could, in turn,
have an adverse effect on Metropolitan.  Metro. Mortgage & Sec. Co.,
Current Report (Form 8-K), Item 5 (July 7, 2003).

On November 3, 2003, Metropolitan and Summit's boards of
directors suspended monthly payments on all preferred stock and
announced the penalties NASD had imposed upon MIS.  SCAC ¶ 143.  The
following day, Metropolitan filed a Current Report that revealed two
facts relevant to the motions presently before the Court.  First, the
report revealed that MIS had settled the issues raised in NASD's Wells
letter by entering into a Letter of Acceptance, Waiver, and Consent
("AWC") with NASD.  Under the AWC, MIS agreed to pay a fine of
$500,000, make restitution to certain investors, and "agreed not to
sell securities to its affiliates until it has revised its systems,
supervision, training, and written procedures with respect to those
sales."  Metro. Mortgage & Sec. Co., Current Report (Form 8-K), Item 5
(November 4, 2003).

Second, the November 4 report disclosed that Metropolitan had
suspended dividend payments in order to "conserve liquidity."  While
Metropolitan's projected cash needs for the next three months totaled
$10 million, the company's available cash only amounted to $7 million.
Most significantly, the report explained,

> Because the company is currently unable to sell securities
> publicly, which sales historically have been significant
> sources of liquidity, the company is exploring other options

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO
DISMISS- 8

> to improve its liquidity position.  No assurance can be
> given that these efforts will be successful.

*Id.*

Summit issued a similar Current Report on November 4, 2003.  This report revealed that Summit, like Metropolitan, was suspending dividend payments on its preferred stock in order to "conserve liquidity."  It also contained identical language warning investors of the historical importance of securities sales and the uncertainty of Summit's cash flow position.  Summit Sec. Inc., Current Report (Form 8-K), Item 5 (November 4, 2003).

On December 15, 2003, Metropolitan filed another Current Report, Form 8-K, revealing that MIS had ceased operations.  The report stated, "MIS will no longer have the ability to sell [Metropolitan's] securities which in the past have been a significant source of revenue."  Metro. Mortgage & Sec. Co., Current Report (Form 8-K), Item 5 (July 7, 2003).

Unable to sell additional securities, the Met Group's "liquidity problems intensified" and it began considering the possibility of bankruptcy.  SCAC ¶¶ 139-140.  On January 20, 2004, the Met Group's independent auditor withdrew its 2001 and 2002 opinions on the Met Group's financial statements.  SCAC ¶ 144.  Metropolitan and Summit filed for bankruptcy on February 4, 2004.  SCAC ¶ 147.

**The Accountant[2] Defendants**

Pricewaterhousecoopers, LLP ("PwC") served as the Met Group's independent auditor and accountant from 1994 until June 12, 2001.  In this capacity, PwC prepared and certified Metropolitan and Summit's financial statements for fiscal year 2000.  PwC consented to being named as the party that prepared and certified the financial statements attached to the Registration Statements.  SCAC ¶ 36.

Ernst & Young, LLP ("EY") served as Metropolitan and Summit's independent auditor and accountant from June 12, 2001, until January 22, 2004.  In this capacity, EY prepared and certified financial statements for fiscal years 2001 and 2002, and quarterly statements for fiscal year 2003.  EY consented to being named as the party that prepared and/or certified the financial statements attached to the Registration Statements.  SCAC ¶ 37.

The SCAC alleges that PwC and EY negligently violated their duties under Generally Accepted Auditing Standards ("GAAS") and Generally Accepted Accounting Principles("GAAP") by issuing unqualified audit opinions that enabled Metropolitan and Summit to sell securities.  SCAC ¶ 150.  The SCAC further alleges that the Accountant Defendants certified Metropolitan and Summit's year-end financial statements.  These certifications were materially false.  SCAC ¶¶ 708, 716.

---

[2]Both of the Defendants described in this section also served as Metropolitan and Summit's independent auditor during part of the Class Period.  For the sake of simplicity, this order refers to them as "the Accountant Defendants."

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 10

**Roth Capital Partners**

Roth Capital Partners ("Roth") is an investment banking firm.  Roth served as Metropolitan and Summit's Qualified Independent Underwriter ("QIU") from 1998-2003.  SCAC ¶ 630.  As the QIU, Roth was required to undertake the responsibilities and liabilities of an underwriter prescribed by Section 11 of the Securities Act of 1933.  One such responsibility is to exercise due diligence by verifying the accuracy of the Met Group's registration statements and prospectuses.  SCAC ¶ 632.

The SCAC alleges that Roth performed its due diligence negligently.  As a result, Roth failed to detect a number of misrepresentations and omissions in the Met Group's registration statements.  Roth also negligently approved prices and dividend schedules for the Met Group's securities that understated the risks of the securities.  SCAC ¶ 643.

**Koa Timber Transaction**

One of the representative transactions alleged in the SCAC of particular import to the present motions is the "Koa Timber Transaction."  Pursuant to the "Timber Harvest Agreement," Metropolitan, Summit, and Old Standard Life Insurance, a Summit subsidiary, loaned a total of $11.85 million to one Kyle Dong to enable him to acquire and begin logging 13,000 acres of forested land in Hawaii known as the Hilo property.  The Hilo property was worth only $9.1 million and most of it was located in a Conservation District.  Dong did not have the permit necessary to begin logging.  SCAC ¶¶ 456-493.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 11

Pursuant to the Timber Harvest Agreement, Metropolitan purchased the right to harvest the timber on the Hilo property from Dong for $2.5 million.  The same day, Dong reacquired the right from Metropolitan for $18 million to be paid over five years.  Metropolitan then sold the Timber Harvest Agreement to Summit for $13.2 million. Dong defaulted on his second payment, to be made on November 1, 2000. In August of 2001, Summit brought suit to recover the amounts due. SCAC ¶ 627.  Dong counterclaimed, alleging that the Timber Harvest Agreement was void and unenforceable "as part and parcel of securities fraud."  Declaration of Brian D. Buckley, December 6, 2006, Ex. A ¶ 201.

The SCAC alleges that, although PwC was aware of Dong's default and his failure to obtain a permit, PwC's consolidated financial statements for Metropolitan for 2000 did not disclose either of these facts.  The consolidated financial statements for Summit for 2000 indicated that the Timber Agreement was acquired for fair market value.  For these and other reasons, "Financial reporting for the Koa Transaction violated numerous GAAP, GAAS and SEC provisions."  SCAC ¶ 493.

The SCAC further alleges that EY was familiar with the Met Group's accounting in the Koa transaction, that EY negligently failed to conduct an investigation of the transaction in connection with its 2001 audit, and that EY did not revise PwC's 2000 financial statements.  SCAC ¶ 491.

**FLIP Transaction**

In support of their argument that PwC was negligent in performing

its accounting and auditing duties, the Plaintiffs cite PwC's promotion and approval of Metropolitan's participation in an offshore investment scheme called the Foreign Leverage Investment Program ("FLIP").  The primary purpose of the FLIP transaction was to serve as a tax shelter.  SCAC ¶ 275.  Although PwC should have known that the FLIP transaction was illegal, PwC "induced" Metropolitan to invest in the FLIP transaction in 1998.  SCAC ¶ 274.  Metropolitan garnered significant tax benefits from the FLIP transaction for the tax year that ended on December 31, 2000.  Following an audit in 2003, Metropolitan entered into a settlement agreement with the IRS that disallowed 80% of the tax savings from the FLIP transaction.  SCAC ¶ 295.

**DISCUSSION**

**I.    OVERVIEW**

Although the SCAC is deficient in a number of respects, it would be inappropriate to dismiss an action of this complexity prior to granting the Plaintiffs an opportunity to correct the deficiencies identified by the Defendants.  The Plaintiffs will accordingly be permitted to file a Third Consolidated and Amended Complaint.

However, amendment can cure neither the bar imposed by a statute of repose, nor the force of federal preemption.  Consequently, the Plaintiffs' Section 11 claims against Roth and PwC must be dismissed to the extent that they rely upon the Registration Statements that became effective prior to November 14, 2001.  Likewise, the Plaintiffs' WSSA claim must be dismissed to the extent that it relies upon the seven securities that are preempted by the Securities

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 13

Litigation Uniform Standards Act of 1998.

**II.   SUBJECT MATTER JURISDICTION**

The Plaintiffs allege both federal and state causes of action. The Plaintiffs' federal claims arise under the Securities Act of 1933, 15 U.S.C. § 77a *et seq*.  The Court has jurisdiction to hear these claims pursuant to 28 U.S.C. § 1331.

The Court has discretion to exercise supplemental jurisdiction over the Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. Section 1367 provides that, when a federal district court has subject matter jurisdiction over a claim, the court also has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III."  In this case, the Plaintiffs' state law claims form part of the same case or controversy as the Plaintiffs' Securities Act claims because all of the claims arise from the purchase of the Met Group's securities between February 13, 2001 and December 15, 2003.

**III. LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a trial court may dismiss a complaint that fails to state a claim upon which relief can be granted.  Such dismissal is proper "only when there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Siaperas v. Mont. State Comp. Ins. Fund*, 480 F.3d 1001, 1003 (9th Cir. 2007).  For the purposes of a 12(b)(6) motion, all factual allegations set forth in the complaint are taken as true and construed in the light most favorable to the

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 14

plaintiff.  *Epstein*, 83 F.3d at 1140.  The Court must give the plaintiff the benefit of every inference that reasonably may be drawn from well-pleaded facts.  *Tyler v. Cisneros*, 136 F.3d 603, 607 (9th Cir. 1998).

"Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."  *Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955, 1969, 167 L. Ed. 2d 944, 945 (2007)(internal citations omitted).  However, the Court is not required to accept as true conclusory allegations, legal characterizations, unreasonable inferences, or unwarranted deductions of fact.  *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403 (9th Cir. 1996).  "In practice, a complaint must . . . contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory."  *Twombly*, 127 S. Ct. at 1969, 167 L. Ed. 2d at 944 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)(ellipsis and emphasis in original).

As a general rule, the Court "may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).  There are, however, two exceptions to the rule that consideration of extrinsic evidence converts a Rule 12(b)(6) motion into a motion for summary judgment.  First, the Court may consider "material which is properly submitted as part of the complaint" or material upon which the complaint necessarily relies.  *Lee*, 250 F.3d at 688.  Second, under Federal Rule of Evidence 201, the Court may take judicial notice of

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 15

"matters of public record." *MGIC Indem. Corp. V. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

**IV.  SUFFICIENCY OF THE PLEADINGS**

   **A.  Failure to Comply with the "Short and Plain Statement" Requirement of Rule 8**

   EY argues that the SCAC fails to conform to the "short and plain statement" requirement of Federal Rule of Civil Procedure 8.  Under the notice pleading requirements of the Federal Rules of Civil Procedure, a complaint in a civil suit must contain "a short and plain statement of the claim."  Fed. R. Civ. P. 8(a)(2).  "The 'short and plain statement' must provide the defendant with 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'"  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346, 125 S. Ct. 1627, 1634, 161 L. Ed. 2d 577, 588 (2005)(citing *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80, 85 (1957)).  A complaint whose length and disorganization require opposing counsel and the court to "root around for actionable claims" does not satisfy Rule 8's pleading requirements.  *In re Splash Tech. Holdings Secs. Litig.*, 160 F. Supp. 2d 1059, 1073 (N.D. Cal. 2001).  *See also Wenger v. Lumisys*, *Inc.*, 2 F. Supp. 2d 1231, 1243 (N.D. Cal. 1998)(dismissing a complaint alleging securities fraud that "requir[ed] a laborious deconstruction and reconstruction of a great web of scattered, vague, redundant, and often irrelevant allegations" for failure to comply with Rule 8).

   While the Court recognizes the hard work Plaintiffs' counsel no doubt expended in drafting the SCAC, the SCAC nevertheless fails to satisfy the "short and plain statement" requirement of Rule 8.  Like

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 16

the complaint dismissed in *Wenger*, the SCAC,

> "repeats many allegations three or four times . . . does not indicate which among the [many] pages of statements are alleged to be false, does not follow each allegedly false statement with factors showing it was false [. . . and] merely throws the statements and the alleged "true facts" together in an undifferentiated clump and apparently expects the reader to sort out and pair each statement with a supposedly relevant "true fact."

2 F. Supp. 2d at 1243.  These problems are described more fully in the Court's discussion of Rule 9(b) below.

Moreover, the SCAC's length and organization make it even more cumbersome and time-consuming than the complaints dismissed in *Splash* and *Wenger*.  While the complaint in *Splash* was 124 pages, and that in *Wenger* 86 pages, the SCAC "tips the scales" at 317 pages in length. It appears that the Plaintiffs, blessed with the wealth of facts disclosed in the Bankruptcy Examiner's report, felt the need to incorporate as many facts as possible into the complaint.  The purpose of a complaint is not, however, to inform the opposing party of every fact underlying the plaintiff's claims.  The proper time for such detailed revelation is discovery.  A complaint need only set forth sufficient facts to notify the opposing party of the claims against it and the factual basis of those claims.  Factual allegations will, of course, be lengthier and more detailed when a plaintiff's claims must be alleged with particularity.  As explained below, however, even complaints alleging fraud must be more "user-friendly" than the SCAC.

The Plaintiffs will be permitted to amend their complaint in order to conform with the requirements of Rule 8.  The Court recognizes that this task will be both challenging and burdensome.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 17

However, the American legal system places this burden on the party seeking relief, rather than the party responding to a claim.  Nor is it appropriate for a trial court to effectively involve itself in the drafting process by puzzling out the details of a plaintiff's claims.

### B. Applicability of Rule 9(b) to Strict Liability Claims

EY argues that the Plaintiffs' negligence claims brought under Section 11 should be dismissed for failure to comply with the pleading standards of Rule 9(b).  Rule 9(b) requires a complaint alleging fraud to "state with particularity the circumstances constituting fraud or mistake."  A Section 11 claim that sounds in fraud must satisfy the particularity requirements of Rule 9(b).  *In re Daou Sys.*, 411 F.3d 1006, 1027 (9th Cir. 2005); *In re Stac,* 89 F.3d at 1405.  A Section 11 plaintiff can not escape the requirements of Rule 9(b) by virtue of a general disclaimer that a claim is based on negligence rather than fraud.  *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1278 (11th Cir. 2006); *In re Stratosphere Secs. Litig.*, 1 F. Supp. 2d 1096, 1104 (D. Nev. 1998); *In re Stac,* 89 F.3d at 1405 n. 2.

A Section 11 claim sounds in fraud when it alleges "a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003).  When the facts underlying a negligence claim are also "said to be part of a fraud claim," the negligence claim sounds in fraud.  *Wagner*, 464 F.3d at 1278.  Similarly, the Ninth Circuit has held that a Section 11 claim sounds in fraud if it "makes a wholesale adoption" of the facts underlying a fraud claim.  *Daou*, 411 F.3d at 1028.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 18

The Court finds that the Plaintiffs' Section 11 strict liability claims sound in fraud.  Apart from their references to the Defendants' states of mind, the SCAC's fraud and strict liability counts are virtually identical.  *Compare* SCAC ¶¶ 706-713 (Count VII) *with* SCAC ¶¶ 766-773 (Count XII).  As the case law cited above indicates, the Plaintiffs' express denial that the strict liability claims rest on allegations of fraud are irrelevant; only the content of the claims matters.  While the Plaintiffs argue that the SCAC alleges facts in support of the fraud claims that do not go to the negligence claims, the Plaintiffs' "underlying allegations of negligence" allege facts very similar to those alleged in their "Additional Factual Allegations Sounding in Fraud."  *Compare* SCAC ¶¶ 58, 64 *with* SCAC ¶¶ 737-740 *and* SCAC ¶¶ 149-152, 265-267 *with* SCAC ¶¶ 741-747.  Consequently, the Plaintiffs' strict liability claims must be pleaded with particularity pursuant to Rule 9(b).

### C.    Failure to Allege Fraud With Particularity

Roth and EY argue that the SCAC does not allege the claims sounding in fraud with sufficient particularity to satisfy the pleading requirements of Rule 9(b).  In order to allege fraud with particularity, the complaint must both identify the allegedly fraudulent statement and explain why it was false when made.  *In re Glenfed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547-48 (9th Cir. 1994).  Identifying a statement involves setting forth such facts as the statement's contents, the time and place at which it was made, and the party who made it.  *Id.; In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 839 (N.D. Cal. 2000).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 19

A complaint is deficient for the purposes of Rule 9(b) when it relies on "shotgun" or "puzzle" pleading. *Id.* at 1554. "Shotgun pleadings are those that incorporate every antecedent allegation by reference into each subsequent claim for relief or affirmative defense." *Wagner*, 464 F.3d at 1279. Similarly, puzzle pleadings are those that require the defendant and the court to "match the statements up with the reasons they are false or misleading." *Autodesk*, 132 F. Supp. 2d at 842. *See also Wagner*, 464 F.3d at 1280 (holding that a complaint failed to satisfy Rule 9(b) because "the factual particularity of the first 175 paragraphs is not connected to the otherwise generally pled claim in any meaningful way); *Autodesk*, 132 F. Supp. 2d 833 (dismissing complaint, in part, because of puzzle pleading); *In re Petsmart, Inc. Sec. Litig.,* 61 F. Supp. 2d 982, 996 (same).

In this case, the SCAC fails to satisfy the particularity requirements of Rule 9(b) because it relies upon both shotgun and puzzle pleading. As Roth and EY argue, it is difficult and laborious to determine which portions of the Registration Statements are allegedly false and which false statements are attributed to any particular defendant. Like the complaint in *Glenfed*, the SCAC "often rambles through long stretches of material quoted from defendants' public statements . . . unpunctuated by any specific reasons for falsity." 42 F.3d at 1553. *See* SCAC ¶¶ 75-77, 78, 81.

The SCAC is also comparable to the *Glenfed* complaint in that "the organization of the complaint often makes the nature of the fraud difficult to define and certainly makes the complaint difficult to

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 20

respond to." 42 F.3d 1554. The Plaintiffs' response to EY's motion to dismiss is illustrative, as the Plaintiffs explain that EY's misrepresentations are identified at Paragraphs 766-768, the Plaintiffs' exposition of the GAAS and GAAP standards can be found at Paragraphs 148-185, and the explanation of how EY allegedly violated those standards appears some 400 paragraphs later, at Paragraphs 515-51.

Finally, as in *Wagner*, the SCAC fails to connect its factual allegations to the elements comprising the Plaintiffs' various claims. The Plaintiffs' 317 page complaint sets forth 624 paragraphs of factual allegations prior to reaching the claims for relief. SCAC at 271. Each of the Plaintiffs' claims for relief then incorporates the factual allegations without specifying which ones support any particular elements of the claim. SCAC ¶¶ 668, 675, 684, 687, 694, 703, 706, 714, 722, 730. "No further reference is made to the previous allegations in the complaint, leaving the reader to wonder which prior paragraphs support the elements of the fraud claim." *Wagner*, 464 F.3d at 1279.

Where a complaint contains puzzle pleading, the Ninth Circuit has recommended that the plaintiff should be required to "streamline and reorganize the complaint before allowing it to serve as the document controlling discovery." *Glenfed*, 42 F.3d at 1554. *See also Wagner*, 464 F.3d at 1280 (holding that the proper remedy for shotgun pleadings is to, *sua sponte*, order repleading pursuant to Rule 12(e)). Accordingly, the Plaintiffs will be permitted to amend their complaint to comply with Rule 9(b).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 21

**V.    SECTION 11 OF THE SECURITIES ACT OF 1933**

Section 11 of the Securities Act of 1933 provides a private cause of action for investors who purchase securities pursuant to a registration statement containing a material misstatement or omission. 15 U.S.C. § 77k(a).  A Section 11 claim has two elements.  First, the plaintiff must prove that the registration statement contained a misstatement or an omission.  Second, the plaintiff must prove that the misstatement or omission was material.  *Daou,* 411 F.3d at 1027; *Kaplan v. Rose*, 49 F.3d 1363, 1371 (9th Cir. 1994).  It is unnecessary to allege scienter in order to state a cause of action under Section 11.  As a result, parties subject to suit under Section 11 may be held liable, not only for fraudulent statements or omissions, but also under a theory of strict liability.  *Daou*, 411 F.3d at 1027.

**A.    Standing**

**1.    Necessity of Tracing Securities**

The Individual Defendants argue that the Plaintiffs lack standing because the SCAC does not allege that any of the Lead Plaintiffs purchased securities pursuant to the Registration Statements at issue. Section 11 confers standing to sue on any person who purchases a security pursuant to a registration statement that misrepresents or omits a material fact.  *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1039 (S.D. Cal. 2005); *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1077 (9th Cir. 1999).  An investor who purchases securities on the secondary market after the expiration of the registration statement must directly trace the securities to the registration statement at issue.  *Lee v. Ernst & Young*, 294 F.3d 969,

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 22

977 (8th Cir. 2002); *Hertzberg*, 191 F.3d at 1080 n.4.

While it is not necessary to prove that the securities are traceable at the pleading stage, traceability must be alleged in the complaint. *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 286 (3d Cir. 1992). It is sufficient, however, if a plaintiff generally alleges that he or she purchased securities pursuant to the registration statement or statements at issue. *Id.*; *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1171 (C.D. Cal. 2003); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 208 (S.D.N.Y. 2003). Traceability is also sufficiently alleged where the complaint seeks relief on behalf of a proposed class comprised of investors who purchased securities pursuant to the allegedly false registration statement. *In re Immune Response*, 375 F. Supp. 2d at 1039.

As the Plaintiffs point out, the SCAC explicitly limits recovery for each of its Section 11 claims to those Plaintiffs who acquired securities pursuant to the Registration Statements. SCAC ¶¶ 688, 707, 715, 723, 759, 767, 755. At this stage of the litigation, the Plaintiffs need do no more in order to allege standing.

In view of the fact that standing is a jurisdictional issue, the Defendants have asked the Court to set a deadline by which the Plaintiffs must trace the securities purchased by the Lead Plaintiffs. This request is reasonable and will be granted. As the Defendants have argued, each proposed class representative in a class action must have standing in his or her own right. *Lilley v. Charren*, 936 F. Supp. 708, 716 (N.D. Cal. 1996). Accordingly, before they may a file a motion for class certification, the Plaintiffs must file an amended

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 23

certification for each proposed class representative tracing the representative's securities to one or more of the Registration Statements at issue.

### 2.    Standing to Sue Ness

Ness argues that the Plaintiffs do not have standing to bring a Section 11 claim against him because he does not fall into any of the categories specified in Section 11(a).  Section 11 provides a cause of action against certain types of individuals, including those who signed the registration statement, the directors of the issuing company, and the underwriters of the securities.  15 U.S.C. § 77k(a).

The SCAC alleges that Ness signed Summit's Registration Statements filed in 2001 and Metropolitan's Registration Statements filed in 2002.  SCAC ¶ 23.  The SCAC does not plead that Ness signed the other Registration Statements.  Nor does it allege any other relationship that would subject him to liability for misrepresentations or omissions he did not actually sign. Accordingly, only Section 11 claims based on the following Registration Statements may be brought against Ness: 1) Summit Investment Certificates, Series B, effective February 13, 2001; 2) Summit Preferred Stock, Seris R & T, effective February 13, 2001; 3) Metropolitan Investment Debentures, Series III and III-A, effective April 29, 2002; and 4) Metropolitan Preferred Stock, Series E-7, effective August 13, 2002.

### B.    Statute of Repose

PwC and Roth argue that the Plaintiffs' Section 11 claims against them are time barred by the statute of repose to the extent that these

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 24

claims are based on the first seven Registration Statements.  Pursuant to Section 13 of the Securities Act, no action may be brought under Section 11 more than three years after the security at issue was "bona fide offered to the public." 15 U.S.C. § 77m.  As a statute of repose, rather than a statute of limitations, this time limit is not subject to equitable tolling.  4 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 1056 (3d ed. 2002); *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363, 111 S. Ct. 2773, 2782, 115 L. Ed. 2d 321, 336 (1991).  The date on which a security was bona fide offered to the public is a question of fact.  In the case of registered securities, courts generally treat the date of the security's registration as the date on which the period of repose begins to run.  *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 99 (2d Cir. 2004).

The Registration Statements challenged by PwC and Roth became effective between February 13, 2001, and February 13, 2002.  According to PwC and Roth, these Registration Statements all predate the filing of the CAC, the first pleading to name PwC and Roth as Defendants, by more than three years, as the CAC was filed on March 11, 2005.  The Plaintiffs respond that the statute of repose does not bar their claims for three reasons.  First, the Plaintiffs argue that the CAC was effectively filed on December 17, 2004, when they sought leave to file it.  Second, the Plaintiffs argue that the Sarbanes-Oxley Act extended the statute of repose for securities claims alleging fraudulent conduct.  Finally, the Plaintiffs argue that Metropolitan's Preferred Stock, Series E-7 was not bona fide offered to the public

until December 17, 2004.

### 1.    Effective filing date of the CAC

As a general rule, a civil action does not commence until the complaint is filed with the court.  Fed. R. Civ. P. 3.  Where an amended pleading adds a new defendant to the action, the amended pleading does not relate back to the filing of the original complaint unless the defendant "should have known that, but for a mistake concerning identity, the action would have been brought against it." *Louisiana-Pacific Corp. v. ASARCO, Inc.*, 5 F.3d 431, 434 (9th Cir. 1993).  The Plaintiffs do not suggest that their failure to name PwC and Roth at an earlier date was due to mistaken identity. Consequently, the Plaintiffs' complaint against PwC and Roth was not filed for the purposes of the statute of limitations until the Plaintiffs filed the CAC.

However, it is well established, for the purpose of calculating the statute of limitations, that an amended pleading is effectively filed when the motion to amend is filed.  *Mayes v. AT & T Info. Sys., Inc.*, 867 F.2d 1172, 1173 (8th Cir. 1989).  *See also Buller Trucking Co. v. Owner Operator Indep. Driver Risk Retention Group, Inc.*, 461 F. Supp. 2d  768, 777 (D.C. Ill. 2006)(citing cases).  The rationale underlying this rule is twofold.  First, as PwC and Roth have argued, parties have "no control over when a court renders its decision regarding the proposed amended complaint." *Moore v. Indiana*, 999 F.2d 1125, 1131 (7th Cir. 1993).  In addition, when a motion to amend is accompanied by the proposed amended pleading, the motion to amend notifies the defendant of the impending claim.  *Id*.  Consequently, a

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 26

plaintiff's delay in filing the amended pleading after the court has granted permission does not necessitate dismissal of the claims if the delay did not prejudice the defendant. *Bradley v. Armstrong Rubber Co.*, 46 F. Supp. 2d 583, 586-87 (S.D. Miss. 1999).

When the Plaintiffs filed their motion to amend, they also filed their proposed CAC. Both Roth and PwC received copies of the CAC at that time, with the result that they were put on notice of the claims against them. While PwC and Roth are correct in stating that the Plaintiffs' delay in filing the CAC defeats one purpose underlying the *Mayes* exception, the purpose of a statute of repose is to protect potential defendants by providing them with timely notice. PwC and Roth received this notice prior to the expiration of the statute of repose. They have neither argued nor demonstrated that they were otherwise prejudiced by the Plaintiffs' delay in filing the SCAC. The reasoning of the *Bradley* court applies equally to this case. Thus, the Court finds that the FAC was effectively filed on December 17, 2004.

### 2. Length of statute of repose

On July 30, 2002, Congress passed the Sarbanes-Oxley Act ("Sarbanes-Oxley") amending the residual statute of limitations for federal claims. Section 804 of Sarbanes-Oxley provides a two year statute of limitations and a five year statute of repose for "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws." 28 U.S.C. § 1658 (b). "The Securities laws" refers to, among other laws, the 1933 Act and

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 27

the Securities and Exchange Act of 1934.  15 U.S.C. 78c(a)(47).

Neither the Supreme Court nor the Ninth Circuit has determined whether the statute of repose and the statute of limitations set forth in Section 804 apply to claims brought under Section 11 of the 1933 Act.  All of the district courts who have addressed the question have held that Section 13 continues to provide the statute of repose and the statute of limitations for Section 11 claims.  *In re Alstrom Sec. Litig.*, 406 F. Supp. 2d 402, 413 (S.D.N.Y. 2005)(citing cases).  This Court finds the reasoning of its fellow courts persuasive.

The courts that have held that Section 804 does not apply to Section 11 claims have primarily rested their conclusion on the plain language of Section 804.[3]  Noting that Section 804 applies only to claims involving fraud, the courts have reasoned that fraud is not a required element of a Section 11 claim.  *In re Alstrom*, 406 F. Supp. 2d at 412; *First Energy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 601 (N.D. Ohio 2004).  The courts have also observed that the language of Section 804 mirrors that of Section 10(b) of the 1934 Securities and

---

[3]Section 804 provides, in pertinent part:
. . . a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), may be brought not later than the earlier of--
(1) 2 years after the discovery of the facts constituting the violation; or
(2) 5 years after such violation.
15 U.S.C. 1658(b).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 28

Exchange Act.[4]  In contrast, Section 11[5] does not contain any of the words found in Section 804.  *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 431, 442-43 (S.D.N.Y. 2003); *In re Global Crossing,* 313 F. Supp. 2d at 197.  Finally, the *Alstrom* court observed that Section 804 amended the residual statute of limitations for federal claims.  This statute does not apply when the statute of limitations for a claim is "otherwise provided by law."  28 U.S.C. 1658(a).  Section 13 explicitly provides the limitation periods for Section 11 claims.  As the residual statute amended by Section 804 does not apply to Section 11 claims, there is no reason to assume that Section 804 itself would apply to Section 11 claims.

The courts have also considered the legislative history of Sarbanes-Oxley.  Section 804 was intended to provide longer limitation periods for Section 10(b) claims by legislatively reversing the Supreme Court's decision in *Lampf.*  The *Lampf* decision clarified that the limitation periods set forth in Section 13 of the 1933 Act apply

---

[4]  Section 10(b) provides, in pertinent part, "It shall be unlawful . . . to use or employ, in connection with the purchase or sale of any security . . . manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. 78j(b).

[5] Section 11 provides, "In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue [specified individuals]."  15 U.S.C. 77k(a).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 29

to claims brought under Section 10(b) of the 1934 Act. *Global Crossing*, 313 F. Supp. 2d at 197 n. 6 (citing 148 Cong. Rec. S7418, 7420(2002)). In addition, the Senate Judiciary Committee stated that Section 804 was not "intended to conflict with existing limitations periods for any express private rights of action under the federal securities laws." *In re Alstrom*, 406 F. Supp. 2d at 415 (citing S. Rep. No. 107-146(2002)).

While most of the decisions cited above involved Section 11 claims premised on negligence or strict liability, rather than fraud, the *Alstrom* court addressed the reach of Section 804 in the context of a Section 11 claim that did sound in fraud. *Id.* at 411. In spite of the more rigorous pleading standard applied to fraud claims, the *Alstrom* court concluded that Section 13, rather than Section 804, provides the statute of repose for Section 11 claims. The court reasoned that applying different limitation periods to Section 11 claims based on whether or not they sound in fraud would create uncertainty for potential defendants. It would also give future plaintiffs the power to determine, through skillful drafting, the limitation periods applied to their claims. *Id.* at 417.

Of the Courts of Appeals, only the Fifth Circuit has addressed Section 804's applicability to Section 11. In *Margolies v. Deason*, 464 F.3d 547, 549 (5th Cir. 2006), the Fifth Circuit stated that the plaintiff's Section 11 claim "involved fraud such that [it was] the type of clai[m] that fell within the confines of [Sarbanes Oxley]." However, the *Margolies* decision rests on the retroactivity of Sarbanes-Oxley. Consequently, the court's reference to Section 804 is

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 30

mere dicta.  *Id*. at 553.  Moreover, the entirety of the Fifth Circuit's discussion of Section 804's applicability to Section 11 claims consists of the single sentence cited above.  For these reasons, the Court finds the *Margolies* decision unpersuasive.

The Court holds, in conformity with the weight of well-reasoned authority, that Section 804 of Sarbanes-Oxley does not apply to claims brought under Section 11.  The Plaintiffs' claims against Roth and PwC based on Registration Statements that became effective before November 14, 2001 are barred by the statute of repose and shall be dismissed.

### 3.  Post-effective amendment of Series E-7

As stated above, the statute of repose for registered securities generally begins to run upon the effective date of the registration statement for the securities purchased.  15 U.S.C. § 77m.  However, when the registration is a "shelf registration" under SEC Rule 415, the filing of a "post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein[.]" 17 C.F.R. § 229.512(a)(2)(1990).  In such cases, the post effective amendment is treated as an "initial bona fide offering," and the period of repose commences on the date of the post-effective amendment.  17 C.F.R. § 229.512(a)(2); *In re American Continental Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F. Supp. 1424, 1452 (D. Ariz. 1992); *Guenther v. Cooper Life Sci.*, 759 F. Supp. 1437, 1440 (D.C. Cal. 1990).

Rule 415 permits an issuer to file a registration statement and then put the securities described in it "on a shelf" for up to three years.  The issuer may then offer the securities on a continuous or

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 31

delayed basis.  17 C.F.R. § 230.415.  To ensure that investors
purchasing securities pursuant to such a "shelf offering" have
accurate information, "the SEC requires issuers of shelf-offerings to
amend the prospectus 'to reflect [...] any facts or events arising
after the effective date of the registration statement [...] which,
individually or in the aggregate, represent a fundamental change in
the information set forth in the registration statement.'"  *Finkel v.*
*Stratton Corp.*, 962 F.2d 169, 174 (2nd Cir. 1992)(citing 17 C.F.R. §
229.512(a)(1)(ii)).  The restarting of the limitations periods upon
the filing of a post-effective amendment is limited, however, to
securities "offered pursuant to" or "offered in" the amendment.  17
C.F.R. § 229.512(a)(2); *Guenther*, 759 F. Supp. at 1440; *Finkel*, 962
F.2d at 174.

The Defendants argue that the limitation periods only restart if
the amendment itself offers additional securities.  This misinterprets
*Guenther* and *Finkel*.  Guenther demonstrates that, even when an
amendment does not offer additional securities, the statute of repose
will be calculated from the date of the amendment as long as the
plaintiffs can trace their purchase to a defective amendment.
*Guenther*, 759 F. Supp. at 1441 n.2.  *Guenther* further explains that a
defective amendment only restarts the limitation periods for those who
purchased their stock after the effective date of the amendment, since
it would have been impossible for those who purchased their securities
on an earlier date to rely on the defective amendment.  *Id.*

*Finkel* is in accord.  In *Finkel*, all of the relevant securities
were sold prior to the filing of the post-effective amendment.  962

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO
DISMISS- 32

F.2d at 171.  Consequently, no securities could be offered after, or "pursuant to," the amendment.  *Id*. at 174.  The filing of the amendment therefore did not restart the statute of repose.

In this case, any claims based upon securities purchased prior to the post-effective amendment of December 20, 2001, are barred by the statute of repose.  Claims based upon securities purchased after the post-effective amendment survive the motion to dismiss because the Plaintiffs allege that they purchased securities "pursuant to or traceable to" the November 14 Registration Statement "as amended" by the December 20 amendment.  SCAC ¶ 723.

The Defendants further argue that Rule 415 is inapplicable to the December 20 amendment because it merely added exhibits to the original Registration Statement; it did not fundamentally change the mix of information.  The exhibits included such documents as the "Amended and Restated Statement of Rights Designations and Preferences of series E-7 Preferred Stock," the "Statement of ratio of earnings to fixed charges and preferred stock dividends," and Roth's agreement to serve as the QIU.  At this point in time, the Court can not say as a matter of law that none of the documents was material.

Accordingly, those claims based upon purchases of securities prior to the post-effective amendment of December 20, 2001 are barred by the statute of repose and will be dismissed.  The Plaintiffs may continue to pursue their claims based upon securities purchased after December 20, 2001, provided that they trace these securities to a defective Registration Statement or amendment as required in Section V.A of this order.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 33

**C.    Statute of Limitations**

In addition to the three year statute of repose, Section 13 also imposes a one year statute of limitations on Section 11 claims.  15 U.S.C. § 77m.  The limitations period begins to run when the plaintiff "discover[s] the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  *Id.*  The statute of limitations is thus triggered by either "'actual notice' - the discovery of the untrue statement or omission - or 'inquiry notice' - when discovery should have been made by the exercise of reasonable diligence."  *In re Infonet Servs. Corp. Secs. Litig.*, 310 F. Supp. 2d 1106, 1113 (C.D. Cal. 2003).  The Defendants bear the burden of proving the statute of limitations defense.  *In re Immune Response*, 375 F. Supp. 2d at 1027.

The Defendants argue that the Plaintiffs' claims are barred by the statute of limitations for two reasons.  First, Roth argues that the Plaintiffs failed to plead compliance with the statute of limitations.  Second, PwC, Roth, and the Individual Defendants argue that the Plaintiffs received inquiry notice of the facts underlying their claims over a year before they filed their first complaint in this action.

**1.    Duty to plead compliance with the statute of limitations**

Section 13 requires the Plaintiffs to "affirmatively plead sufficient facts in [the] complaint to demonstrate conformity with the statute of limitations."  *Toombs v. Leone*, 777 F.2d 465, 468 (9th Cir. 1985).  This requirement has led another district court to conclude,

the complaint must set forth: (1) the time and circumstances

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 34

of the discovery of the fraudulent statement; (2) the reasons why it was not discovered earlier (if more than one year has lapsed); and (3) the diligent efforts which plaintiff undertook in making or seeking such discovery.

*In re Chaus Sec. Litig.*, 801 F. Supp. 1257, 1265 (S.D.N.Y. 1992).

The Plaintiffs make three arguments in response, all of which are unavailing. First, the Plaintiffs argue that the Ninth Circuit overruled *Toombs* by implication in *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* when it refused to dismiss a complaint that did not plead compliance with the statute of limitations. This argument is unpersuasive because the plaintiff's duty to plead compliance with the statute of limitations was not before the *Livid* court. *See* 403 F.3d 1050, 1058-61 (9th Cir. 2005).

Second, the Plaintiffs argue that the SCAC alleges timeliness. It is true that the SCAC alleges that no class member "knew or in the exercise of reasonable care could have known of the facts concerning the inaccurate and misleading statements and omissions herein" at the time they received the various Registration Statements. SCAC ¶¶ 673, 680, 692, 699, 712, 720. However, this conclusory language falls short of alleging compliance with the statute of limitations, not only because it contains no facts, but also because it refers only to the time at which the securities were acquired.

Finally, the Plaintiffs argue that a reasonably diligent investor could not have learned of the facts underlying their claims against PwC and Roth until January 2004 or later. In support of this argument, the Plaintiffs rely exclusively on a declaration from counsel submitted with their responsive briefing. Consideration of

this declaration by the Court would convert at least two of the four motions to dismiss into motions for summary judgment.  The Court declines to subject itself and the parties to this more demanding standard at this point in the litigation.

Accordingly, the Court finds that the Plaintiffs have failed to plead compliance with the statute of limitations.  The Plaintiffs will be permitted, however, to amend the SCAC to make the necessary allegations.

### 2.  Inquiry notice

The Ninth Circuit has adopted the two-step, "inquiry-plus-reasonable-diligence test," to determine when inquiry notice triggers the statute of limitations in a securities action.  *Betz v. Trainer Wortham & Co., Inc.*, No. 05-15704, 2007 U.S. App. LEXIS 23253, at *16 (9th Cir. Oct. 4, 2007).  First, when, if at all, did the investor's duty to investigate arise?  Second, when would "a reasonably diligent investor have discovered the facts underlying the alleged fraudulent activity?"  *Berry v. Valence Tech., Inc.*, 175 F.3d 699, 704 (9th Cir. 1999).  The statute of limitations does not actually begin running until the investor should have discovered the fraud.  *Betz*, 2007 U.S. App. LEXIS 23253, at *17-18.

The Defendants have undertaken a heavy burden in asking this Court to dismiss the Plaintiffs' claims on the basis of inquiry notice.  *Betz*, 2007 U.S. App. LEXIS 23253, at *20-21; *Gray v. First Winthrop Corp.*, 82 F.3d 877, 881 (9th Cir. 1996).  An investor's duty to investigate arises when the available information "raise[s] a sufficient suspicion of fraud to cause a reasonable investor to

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 36

investigate the matter further." *Berry*, 175 F.3d at 704.  The Ninth Circuit has cautioned against broad interpretations of this standard, explaining that information does not trigger inquiry notice unless it is "sufficiently probative of fraud-- sufficiently advanced beyond the stage of a mere suspicion . . . to incite the victim to investigate." *Betz*, 2007 U.S. App. LEXIS 23253, at *17 (citing *Fujisawa Pharm. Co. v. Kapoor*, 115 F.3d 1332, 1335 (7th Cir. 1997)).  Moreover, inquiry notice is a question of fact only appropriate for resolution by the Court "when uncontroverted [facts] irrefutably demonstrate[] plaintiff discovered or should have discovered the [wrongful] conduct." *Gray*, 82 F.3d at 881.

   a)   Contents of the FAC

   PwC and Roth argue that the allegations in the FAC reveal that the Plaintiffs were aware of the facts related to PwC and Roth on January 30, 2004, the date they filed the FAC.  It is true that a plaintiff is deemed to be on inquiry notice of claims against defendants named for the first time in an amended pleading if the plaintiff's initial pleading demonstrates awareness of these later claims.  *Ingenito v. Bermec Corp.*, 441 F. Supp. 525, 554 (S.D.N.Y. 1977).  This argument is unavailing because, as explained above, the CAC was effectively filed on December 17, 2004.  The Plaintiffs are thus correct that the FAC was filed less than one year before the CAC and any statements it contains do not demonstrate the existence of inquiry notice.

   b)   SEC filings

   PwC, Roth, and the Individual Defendants argue that four

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 37

categories of Metropolitan and Summit's SEC filings gave the
Plaintiffs inquiry notice.  This argument fails to satisfy either
prong of the inquiry-plus-reasonable-diligence test.  First, the Court
can not say, as a matter of law, that the information cited by the
Defendants would necessarily lead a reasonable investor to search for
potential misrepresentations or omissions in the Registration
Statements.  Second, even if the documents cited by the Defendants had
triggered the Plaintiffs' duty to investigate, the Defendants have not
shown when, if at all, the Plaintiffs would have discovered the facts
underlying their claims in the exercise of reasonable diligence.

First, Roth argues that the four Current Reports (Form 8-K) filed
between July 7, 2003 and December 15, 2003,[6] revealed "dire
information" about the companies that would have alerted a reasonable
investor to the possibility of misstatements or misrepresentations in
the Registration Statements.  While the facts underlying this claim,
namely the contents of the reports, are uncontroverted, the
information disclosed in the reports falls short of "irrefutably
demonstrating" that the Plaintiffs should have discovered the alleged
wrongdoing.  While a reasonable investor reading the reports might
become aware of the possibility that MIS had engaged in misconduct,
the reports do not suggest that Metropolitan or Summit engaged in
fraud or other wrongful practices.  The November 4 and December 15

---

[6]Roth also cites reports filed with the SEC between December
29, 2003, and February 3, 2004.  These potential sources of
inquiry notice are irrelevant because they became available to
the public less than one year before the filing of the SCAC on
December 17, 2004.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO
DISMISS- 38

reports do reveal that MIS's inability to sell securities created a liquidity crisis for the companies. A reasonable investor reading these later reports might accordingly learn that Metropolitan and Summit were dependent, to some extent, on the sale of securities. It is possible that a reasonable investor confronted with evidence of this dependence might have become suspicious enough to investigate the companies' accounting practices and corporate structure. However, the Court can not say, as a matter of law, that a reasonable investor would necessarily have done so.

Even if the Court were to find that the reports did trigger the investors' duty to investigate, the Defendants have failed to show that the Plaintiffs could have discovered enough information to file the SCAC on or before December 16, 2003. The 2003 Current Reports cited by Roth were filed on November 4, November 4, and December 15, 2003. If these reports had placed the Plaintiffs on inquiry notice, the Plaintiffs would have had, at most, 41 days[7] to investigate the companies' liquidity problems, hire an attorney, and file a complaint. Given the brevity of this time period, the Defendants could probably not have met this burden even if they had attempted to do so.

Second, PwC argues that Metropolitan's Annual Report (10-K) for fiscal year 2002 gave the Plaintiffs inquiry notice concerning the FLIP transaction. *Id.* The Court is not persuaded that a disagreement with the IRS over a tax benefit would necessarily cause a reasonable investor to suspect that Metropolitan was either engaging in fraud or

---

[7]The cut-off date, for statute of limitations purposes, is December 17, 2003.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 39

relying on a negligent accountant.  A reasonable investor might be
sufficiently alarmed by a possible $28 million loss to investigate, or
she might deem it prudent to await the outcome of the IRS audit.  A
reasonable investor might also find reassurance in Metropolitan's
statement that it could not estimate any loss associated with the
audit.  Whether Metropolitan's Annual Report for 2002 contained
sufficient storm warnings to trigger inquiry notice is thus a factual
question inappropriate for resolution on a motion to dismiss.

Third, PwC argues that the Registration Statements themselves
warned the Plaintiffs of the factors that caused the companies'
collapse.  In support of this argument, PwC cites the risk factors
disclosed in the Registration Statements.  This argument goes to the
sufficiency of the risk factors identified in the Registration
Statements.  It is therefore properly dealt with in the context of the
bespeaks caution doctrine, discussed in Section V.G.1 below.

Finally, PwC and the Individual Defendants argue that information
in the public domain gave the Plaintiffs inquiry notice regarding the
Koa transaction.  They site Summit's Annual Report for 2001, which
discusses the details of the Timber Harvest Agreement.  It also notes,
"As of December, 2001, the total amount of default, together with late
charges, was $3,075,000."  As the Individual Defendants argue, HFP's
default for over $3 million within six months of payments becoming due
could have made an investor suspect that Summit had not fully
disclosed the risks of this transaction in the two Registration
Statements that became effective on February 13, 2001.  One the other
hand, a reasonable investor might believe that the default of a single

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO
DISMISS- 40

commercial borrower was unsurprising in light of the fact that Summit's "principal business activity involved commercial developing and property development."  SCAC ¶ 55.  Thus the Court can not say, as a matter of law, that HFP's default would have caused a reasonable investor to investigate further.

Turning to the second step of the inquiry-plus-reasonable-diligence test, the Individual Defendants argue that the Plaintiffs would have discovered the factual basis for their claims if they had conducted any investigation into Summit's state court action against HFP.  Specifically, HFP's counterclaim in the Hawaii suit disclosed all of the facts underlying the Plaintiffs' claims based on the Koa Timber Transaction.  The Plaintiffs respond that the contents of the counterclaim were unavailable because Hawaii court files may only be accessed in person.  While it is true that a "reasonable investor is presumed to have information available in the public domain," *Whirlpool Fin. Corp. v. GN Holdings*, 67 F.3d 605, 610 (7th Cir. 1995), information that can only be obtained by personally traveling to Hawaii can hardly be considered "public domain."  Thus, the Defendants have failed to demonstrate that any reasonably diligent investor could have discovered the facts surrounding the Koa transaction.

In view of the foregoing, the Court is not persuaded that any of the documents cited by the Defendants triggered the Plaintiffs' duty to investigate.  Nor is the Court persuaded that the Plaintiffs could have discovered the facts underlying their claims at an earlier date in the exercise of reasonable diligence.  Dismissal on the basis of the statute of limitations is therefore denied.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 41

**D.    Identification of Affirmative Statements**

Section 11 provides that an investor may bring a claim when a registration statement "omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a)(emphasis added).  Accordingly, in order to state a cause of action under Section 11 based on an omission, the Plaintiffs "must allege how the alleged omitted fact negates the truth of or renders misleading the statements actually made."  *Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.*, 114 F. Supp. 2d 316, 624 (D.N.J. 2000).  *See also Zucker v. Quasha,* 891 F. Supp. 1010, 1014 (D.N.J. 1995)(explaining, "to state a cause of action, a plaintiff must identify 'an affirmative statement that is made misleading by the material omission.'"); *In re Union Carbide Class Action Sec. Litigation*, 648 F. Supp. 1322, 1326 (S.D.N.Y. 1986)(dismissing a Section 11 claim "because the complaint fails to identify any oral statement or statement made in a prospectus that is made misleading by one of the omissions").

The SCAC alleges that Roth failed to disclose the fact that the Met Group's subsidiaries would be unable to provide the parent companies with the assets necessary to repay investors.  SAC ¶¶ 634(a), 659.  The SCAC further alleges that Roth failed to disclose that the Met Group's ability to raise funds might be impaired by the actions of regulatory agencies.  ¶¶ 634(b), 660.  The SCAC does not, however, identify any affirmative statement in the Registration Statements that was rendered misleading by the alleged omissions.  The

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 42

Plaintiffs have thus failed to state a claim upon which relief can be granted against Roth.  They will be permitted, however, to amend the SCAC to identify the affirmative statements, if any, rendered misleading by the alleged omissions.

**E.    Necessity of Alleging Reliance**

PwC argues that all Plaintiffs who purchased their securities after December 30, 2002, must be dismissed from this action because the SCAC does not allege reliance.  As a general rule, a Section 11 plaintiff need not allege reliance.  *Alpern v. UtiliCorp United*, 84 F.3d 1525, 1541 (8th Cir. 1996).  However, a plaintiff must allege reliance if he or she acquired the securities after the issuance of an earning statement that covered a 12-month period "after the effective date of the registration statement."  15 U.S.C. 77k(a).  Because security offerings generally do not extend beyond 12 months, *Joseph v. Wiles*, 223 F.3d 1155, 1159 (10th Cir. 2000), this exception applies primarily to so-called "aftermarket purchasers."  *See Lee*, 294 F.3d at 977 (explaining that alleging reliance is "a requirement for certain aftermarket purchasers").

As PwC has observed, the earliest Registration Statements underlying the Plaintiffs' claims became effective on February 13, 2001.  On December 31, 2002, Metropolitan and Summit issued earning statements that covered the 12-month period from September 30, 2001-September 30, 2002.  Consequently, the Plaintiffs would need to allege reliance if any of them had acquired their securities through aftermarket trading.  However, the Plaintiffs allege that there was no "market" for Metropolitan and Summit's securities.  The Court must

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 43

accept this allegation as true for the purposes of the present motion. Dismissal on the basis of failure to allege reliance is therefore denied at this time.

**F.   Materiality of PwC's 2000 Audit to Later Registration Statements**

PwC argues that its FY 2000 audit opinion was immaterial, as a matter of law, to claims based on Registration Statements that became effective after 2001.  A statement or omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the total mix of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 2132, 48 L. Ed. 2d 757, 766 (1976).  The materiality of a statement is a mixed question of fact and law that requires "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."  *Id.* Accordingly, judicial determination of materiality is only appropriate where "reasonable minds could not differ" on the statement's import. *In re Heritage Bond Litig.*, 289 F. Supp. 2d 1132, 1146 (C.D. Cal. 2003); *Abromson v. American Pac. Corp.*, 114 F.3d 898, 904 (9th Cir. 1997).

In this case, the parties' argumentation demonstrates that reasonable minds could differ as to the materiality of PwC's audit report.  PwC has argued that no reasonable investor would have relied on its FY 2000 audit report in purchasing securities after December,

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 44

2001, because the 2000 information was stale by that time.  In response, the Plaintiffs have explained that the FY 2000 report remained material in 2002 because a company's income trend over a number of years is important to investors.  Moreover, Metropolitan restructured in 2000, making information about that particular year an instructive baseline.  This issue of materiality is inappropriate for resolution as a matter of law.

**G.  Disclosure of Alleged Misrepresentations and Omissions in SEC Filings**

**1.  Bespeaks caution doctrine and PSLRA safe harbor**

The Individual Defendants argue that the bespeaks caution doctrine renders three of the misrepresentations cited by the Plaintiffs inactionable.  Under the bespeaks caution doctrine, now codified in the Private Securities Litigation Reform Act ("PSLRA") as Safe Harbor,[8] Section 11 liability may not be premised on any forward-looking statement that is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. § 77z-2 (c)(1)(A)(I).  Additionally, pursuant to Section B of the relevant PSLRA section, an issuer is not liable for any forward-looking statement unless the plaintiff proves that the statement was made with actual knowledge of its falsity.  15 U.S.C. § 78u-5 (c)(1)(B) ("Section B").

_____

[8] While the PSLRA Safe Harbor codifies the bespeaks caution doctrine, the bespeaks caution doctrine remains a defense in its own right.  *In re Boeing Sec. Litig.*, 40 F. Supp. 2d 1160, 1170 n.6 (W.D. Wash. 1998).

A "forward-looking statement" is one that projects future income or revenues, predicts future economic performance, or discusses management's plans for future operations.  15 U.S.C. § 77z-2(i)(1)(A)-(C).  Statements that review forward-looking statements or discuss the assumptions underlying them qualify as forward-looking statements as well.  15 U.S.C. § z-2(i)(1)(E)-(F).  A present tense statement may also be considered forward-looking if "the truth or falsity of the statement cannot be discerned until some point in time after the statement is made."  *S. Ferry LP #2 v. Killinger*, 399 F. Supp. 2d 1121, 1131 (W.D. Wash. 2005); *Splash*, 160 F. Supp. 2d at 1067-68.

Cautionary language renders forward-looking statements inactionable when they are "meaningful."  Cautionary language is meaningful if it discloses risks and thereby affects the reasonableness of reliance on the misstatements.  *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005)(citing *In re Worlds of Wonder*, 35 F.3d 1407, 1414 (9th Cir. 1994).  In other words, cautionary language is "meaningful" if it renders the alleged misstatements immaterial.  *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir. 1996).  The bespeaks caution doctrine is thus a corollary to materiality.  2 Thomas Lee Hazen, The Law of Securities Regulation § 7.3(1) (5th Ed. 2005).

The PSLRA implies that "whether a statement qualifies for the safe harbor is an appropriate inquiry on a motion to dismiss."  *Splash*, 160 F. Supp. 2d at 1067.  While the bespeaks caution doctrine is a proper subject of consideration on a motion to dismiss, *Emplrs.*

*Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (2004), the Ninth Circuit has consistently held that dismissal of a complaint on the basis of the bespeaks caution doctrine is only appropriate when there is "sufficient 'cautionary language or risk disclosure [such] that reasonable minds could not disagree that the challenged statements were not misleading." *Livid*, 416 F.3d at 947 (quoting *In re Stac*, 89 F.3d at 1409).[9]

The SCAC alleges that Metropolitan and Summit relied on the sale of securities to fund business operations and to pay interest and dividends on previously issued securities. SCAC ¶¶ 64, 148. The Individual Defendants argue that the Registration Statements disclosed the fact that Metropolitan and Summit might use the proceeds of securities sales to service existing debt. In support of this argument, the Defendants cite the following disclosure, found in each of the nine Registration Statements:

> Use of proceeds. We will use the proceeds from the sales of [this security] to invest in receivables and to make other investments, which may include investments in existing subsidiaries, new business ventures or to acquire other companies. *We may also use the proceeds [of securities sales] to pay principal and/or interest on investment certificates, pay preferred stock dividends, and for general corporate purposes.*

SCAC ¶¶ 622-627 (emphasis added). As the Defendants argue, the latter sentence does disclose the possibility that Metropolitan and Summit might use the proceeds of the securities sale to service existing

---

[9]The Defendants argue that both the common law bespeaks caution doctrine and the statutory safe harbor provisions render certain misrepresentations inactionable. In view of the close similarity between these two defenses, the Court will use the term "safe harbor" to refer to both for the sake of simplicity.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 47

debt.  However, to suggest that an event is a possibility when it is, in fact, a certainty is necessarily misleading.  *Westinghouse,* 90 F.3d at 710; *In re Prudential Sec. Inc. Ltd P'ship Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996).  A reasonable investor reading the foregoing paragraph could believe that the issuing company intended to use the proceeds of the securities sale to invest in receivables or other companies.  The service of existing debt appears as a secondary possibility.  The Court is not persuaded that the cautionary language of the second sentence negates the alleged misrepresentation in the first to a material extent.  Reasonable minds could disagree as to whether the cautionary language was meaningful.

The Individual Defendants further argue that the Registration Statements, in combination with the annual reports incorporated therein, disclosed that Metropolitan and Summit "would *in fact* use investment proceeds to service their debt." (emphasis added).  Certain Individual Defs.' Joint Mem. In Supp. of Mot. to Dismiss Pursuant to Rule 12(b)(6) at 33.  In support of this argument, the Defendants rely primarily upon Metropolitan's Annual Report (K-1) for FY 2001.  The Annual Report warns investors,

> the Consolidated Group's ability to repay interest and principal on debt securities and preferred stock dividends that become due in the future and other outstanding obligations depends in part on the success of its future public or private offerings of debt and equity securities.

Metro. Mortgage & Sec. Co., Annual Report (Form 10-K) at 28 (December 31, 2001).  This statement is prefaced by the observation, "The Consolidated Group generates cash flow primarily from payments received on Receivables and other investments, the sale of annuities

and life insurance, the sale or securization of receivables, credit borrowings and the sale of debt or equity securities." *Id.* at 5.  The Annual Report thus presents the sale of securities as one of multiple sources of income.  This is very different from the almost total reliance on the sale of securities alleged by the Plaintiffs.  Read in context, the language cited by the Defendants is not sufficiently material to cause a reasonable investor to rethink his or her purchase of the securities.[10]

The SCAC also alleges that Metropolitan and Summit failed to disclose several key factors concerning their commercial lending practices.  Although Metropolitan's Annual Reports for 2000 and 2001 revealed many of the standard risks associated with Metropolitan's shift to commercial lending, including Metropolitan's inexperience in originating commercial loans, the language cited by the Individual Defendants on pages 33-35 of their brief fails to touch on the substance of the SCAC's allegations.  For instance, the SCAC alleges that the companies failed to disclose the fact that they originated extremely risky loans in order to book paper profits.  The SCAC also alleges that the companies failed to comply with loan origination practices prevalent in the commercial lending industry.  SCAC ¶ 628(b).  The documents cited by the Defendants mention neither of these risks.  Accordingly, the Court is not persuaded that a reasonable investor would necessarily view Metropolitan's warnings

_____

[10]The same reasoning applies to the language from Summit's 2002 Registration Statements quoted by the Defendants on page 35 of their brief.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 49

regarding its commercial lending practices as significantly altering the total mix of available information.

Finally, the SCAC alleges that Metropolitan and Summit frequently departed from their commercial underwriting criteria.  As a result, the companies failed to evaluate borrowers or appraise collateral. SCAC ¶ 628(c).  The Individual Defendants argue that the companies' Annual Reports warned investors that real estate could prove to be inadequate as collateral.  The Registration Statements further cautioned, "if existing underwriting standards insufficiently evaluate the risk of losses on receivables, it could lead to losses."  SCAC ¶¶ 624-25.  However, such boilerplate warnings do not alter the total mix of information upon which a reasonable investor would rely. *Westinghouse,* 90 F.3d at 707.  Consequently, reasonable minds could disagree as to whether the challenged statements were misleading. Dismissal on the basis of the bespeaks caution doctrine is therefore inappropriate and the Court need not reach the Plaintiffs' argument concerning Section B.

**2.    Disclosures in SEC filings concerning conflicts of interest**

EY argues that the Plaintiffs' Section 11 claim against it should be dismissed because the Registration Statements adequately disclosed the fact that Sandifur controlled both Metropolitan and Summit.[11]  An alleged misstatement or omission is immaterial, and therefore

---

[11]EY further argues that the Registration Statements adequately disclosed the risks associated with Metropolitan's shift to commercial lending and the Met Group's reliance on the proceeds of securities offerings.  These issues were addressed in the previous section in the context of the bespeaks caution Doctrine.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 50

1   inactionable under Section 11, if it was adequately disclosed.  *In re*

2   *Stac*, 89 F.3d at 1405-09.

3        The SCAC alleges that the Met Group, although presented as a

4   group of affiliated, independent companies, was in truth a sole

5   proprietorship controlled by Sandifur.  SCAC ¶¶ 95-113.  The audit

6   reports prepared by the Accountant Defendants' reported transactions

7   between various Met Group companies as if the transactions were

8   conducted at arms length when they were, in fact, self dealing.  SCAC

9   ¶ 114.  The SCAC further alleges that the Accountant Defendants

10  abrogated GAAP principles by failing to apply heightened scrutiny to

11  these related party transactions and by issuing unqualified audit

12  opinions in spite of rampant conflicts of interest.  SCAC ¶¶ 348, 372.

13       These alleged misrepresentations remain actionable.  As EY

14  observes, the Registration Statements do disclose the fact that

15  Sandifur exercised control over the Met Group, the existence of

16  related party transactions, and the resulting potential for conflicts

17  of interest.  However, the Plaintiffs' claims against the Accountant

18  Defendants do not rest upon their alleged failure to reveal the fact

19  that conflicts of interest might exist.  Rather, the Plaintiffs'

20  claims against the Accountant Defendants rest upon the accountants'

21  failure to adjust their auditing and reporting practices in view of

22  the Met Group's ownership structure and the resulting conflicts of

23  interest.  The disclosures identified by EY thus do not render the

24  Plaintiffs' conflict of interest claims inactionable and dismissal on

25  this basis is inappropriate.

26

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO
DISMISS- 51

### H.    Transactions that Occurred After the Effective Dates of the Registration Statements

Section 11 imposes liability for misstatements and omissions that were false or misleading at the time the registration statement in question became effective.  15 U.S.C. § 77k.  Transactions or events that occurred after a registration statement's effective date therefore cannot provide a basis for Section 11 liability.  *In re BankAmerica Corp. Sec. Litig.*, 78 F. Supp. 2d 976, 992 (E.D. Mo. 1999); *Kaplan*, 49 F.3d at 1373; *In re Keegan Mgmt. Co. Sec. Litig.*, 794 F. Supp. 939, 946 (N.D. Cal. 1992).

The latest Registration Statement at issue in this case became effective on August 13, 2002.  Consequently, the four Representative Transactions identified in the SCAC that occurred after August 13, 2002, cannot form the basis for liability against any of the Defendants.  Similarly, neither the Neighborhood, Inc. nor the Malouf/Rams Hill transaction may provide a basis for liability against Turner.  The Neighborhood, Inc. transaction occurred between June 16, 2002, and September 2002.  SCAC ¶¶ 586-592.  The Malouf/Rams Hill transaction occurred between April 2002 and August 2003.  SCAC ¶¶ 578-585.  Both of these time periods postdate the last Summit Registration Statement at issue and Turner is identified as a Summit Individual Defendant.  Therefore, the Plaintiffs' Section 11 claim against Turner is dismissed to the extent that it is premised on the Neighborhood, Inc. and Malouf/Rams Hill transactions.

The Court's ruling on these matters does not preclude the Plaintiffs from seeking to introduce evidence of these representative

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 52

1  transactions as proof of issues other than liability.

2  **I.    Disclosure of Internal Control Deficiencies**

3  EY argues that it should be dismissed from the present action

4  because it had no duty to disclose the alleged deficiencies in

5  Metropolitan's internal controls.  Failure to disclose deficiencies in

6  an issuing company's internal controls is immaterial for the purposes

7  of Section 11 when the auditor expanded its audit and disclosed the

8  deficiencies to management.  *Monroe v. Hughes*, 31 F.3d 772, 775 (9th

9  Cir. 1994).  Additionally, a false certification of GAAS compliance is

10  only material under Section 11 to the extent that the misrepresentation

11  renders the financial statements inaccurate.  *N.J. and Div. of Invest.*

12  *v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1147 (D. Kan. 2004); *In re*

13  *Seracare Life Scis., Inc. Sec. Litig.*, No. 05-CV-2335-H, 2007 WL

14  935583, at *9, *13 (S.D. Cal. Mar. 19, 2007).

15  This case is distinguishable from *Monroe* in two respects that may

16  render the internal control deficiencies material.  First, the *Monroe*

17  court premised its ruling on the fact that the auditor took additional

18  steps to ensure the reliability of the audit report despite the alleged

19  failures in internal controls.  Unlike the auditing firm in *Monroe*, EY

20  neither expanded its audit nor took additional precautions to ensure

21  the accuracy of the audit reports.

22  Second, the Plaintiffs give two reasons that the alleged

23  deficiencies were material.  The Plaintiffs allege that the

24  deficiencies were "serious enough to preclude an unqualified audit

25  report for FY 2001."  SCAC ¶¶ 414, 751-52.  They also allege that EY

26  approved and published "untrue and misleading audited financial

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO
DISMISS- 53

statements." SCAC ¶ 84. These allegations establish two independent reasons that EY's alleged failure to disclose internal control deficiencies could be considered material.

EY further suggests that the claims against it should be dismissed to the extent that they are premised on EY's representation that it conducted its audit in accordance with GAAS and GAAP principles. This argument fails because, whereas the plaintiffs in *Sprint* and *Seracare* did not dispute the accuracy of the financial statements, the Plaintiffs allege that EY approved false and misleading financial statements. Given this allegation, the Court can not say, as a matter of law, that the alleged misstatement concerning compliance with GAAS was immaterial. EY will therefore not be dismissed.

## VI. SECTION 12

Section 12(a)(2) of the 1933 Act provides investors with a private cause of action against anyone who sells securities using a prospectus that contains material misstatements or omissions. 15 U.S.C. § 77l(a)(2). Scienter is not a required element of a Section 12 action. *Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1034 (2d Cir. 1979).

The Individual Defendants argue that the Section 12 claims against them must be dismissed because the Plaintiffs fail to allege that the Individual Defendants are "sellers." A person is considered a seller if he or she either passed title to the securities or solicited the sale of the securities. *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 537 (9th Cir. 1989); *Pinter v. Dahl*, 486 U.S. 622, 646-648, 108 S. Ct. 2063, 2078, 100 L. Ed. 2d 658, 681-83 (1988). The Ninth Circuit has not addressed whether the officers and directors of an issuing

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 54

corporation can "solicit" the sale of securities merely by signing a registration statement or prospectus.  The district courts that have addressed this question are split.  *See In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1101 (C.D. Cal. 2003)(citing cases).

The case law is also unclear as to whether a complaint alleging solicitation can withstand a motion to dismiss in the absence of supporting factual assertions.  Several courts have dismissed Section 12 claims that failed to allege facts demonstrating that the defendants solicited the sale of the securities.  *See Maher v. Durango Metals*, 144 F.3d 1302, 1307 (10th Cir. 1998)(affirming dismissal of Section 12 claims where complaint failed to allege any facts demonstrating solicitation); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st Cir. 1996)(holding that conclusory allegations "that each defendant 'solicited and/or was a substantial factor in the purchase'" did not sufficiently allege seller status); *In re Worlds of Wonder Sec. Litig.*, 694 F. Supp. 1427, 1435 (N.D. Cal. 1988)(same).  However, at least one district court has found that the allegation that the defendants signed the prospectus was sufficient factual allegation to withstand a motion to dismiss.  *Degulis v. LXR Biotechnology*, 928 F. Supp. 1301, 1315 (S.D.N.Y. 1996).  The Third Circuit has also suggested that allegations of direct solicitation are allegations of fact entitled to deference on a 12(b)(6) motion.  *Westinghouse Sec. Litig.*, 90 F.3d at 717.

The Court determines that neither the signing of a prospectus, nor the unsupported assertion of solicitation is sufficient to qualify an individual as a "seller" for the purposes of Section 12.  As the Supreme Court reasoned in *Pinter*,

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 55

> Section 11(a) explicitly enumerates the various categories of persons involved in the registration process who are subject to suit under that section, including many who are participants in the activities leading up to the sale. There are no similar provisions in § 12, and therefore we may conclude that Congress did not intend such persons to be defendants in § 12 actions.

486 U.S. at 650 n. 26, 108 S. Ct. at 2080 n.26, 100 L. Ed. 2d at 684 n. 26. Seller status under Section 12 should accordingly be narrowly construed. *Infonet*, 310 F. Supp. 2d at 1101. *See also* Hazen, *supra*, § 7.2. Moreover, the Supreme Court's recent decision in *Twombly* emphasizes the importance of alleging facts at the pleading stage. 127 S. Ct. at 1965-67, 167 L. Ed. 2d at 940-942. Given that solicitation of a sale is a necessary element of a claim brought under Section 12, the contention that "the defendant solicited the sale" must be supported by factual allegations at the pleading stage.

In the present action, the SCAC fails to allege that the Defendants are "sellers" for the purposes of Section 12. As the Individual Defendants observe, the Plaintiffs do not claim that the Individual Defendants passed title to the securities. Instead, they allege that the Individual Defendants "used the prospectuses to solicit the purchase of these securities." SCAC ¶¶678, 697. For the reasons explained above, this language is insufficient. The Plaintiffs will be permitted, however, to amend the SCAC to allege facts demonstrating that the Individual Defendants solicited the sales of the securities.

**VII. SECTION 15**

Section 15 provides investors with a private cause of action against anyone who controls a party liable under Section 11 or Section 12. 15 U.S.C. § 77o. In order to state a prima facie case under

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 56

Section 15,[12] a plaintiff must allege two elements: "(1) a primary violation of a federal securities law and (2) that the defendant exercised actual power or control over the primary violator." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 945 (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000))(internal quotation marks omitted).

The Individual Defendants argue that the Plaintiffs' Section 15 claim against them must be dismissed because the Plaintiffs have failed to allege that they were sufficiently involved in Metropolitan and Summit's day-to-day operations to establish control.  The SEC defines control as, "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person."  17 C.F.R. § 230.405.  A person exercises control over an issuing corporation when he or she oversees day-to-day company operations. *Howard*, 228 F.3d at 1065.  While an individual's status as an officer or director of the issuing corporation is insufficient, standing alone, to demonstrate the exercise of control, *Id.*, an officer or director who has signed an SEC filing does exercise control.  *In re Alstrom*, 406 F. Supp. 2d at 487-88; *Sprint*, 314 F. Supp. 2d at 1144-45.

Whether an individual may be considered a "controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the

---

[12]The standard for imposing liability under Section 15 is substantially the same as that for imposing liability under Section 20(a) of the 1934 act.  As a result, courts rely on Section 20(a) cases in evaluating Section 15 matters.  *In re Calpine Corp. Secs. Litig.,* 288 F. Supp. 2d 1054, 1088 (N.D. Cal. 2003).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 57

defendant's power to control corporate actions." *In re Metawave Communs. Corp. Secs. Litig.*, 298 F. Supp. 2d 1056, 1087 (W.D. Wash. 2003)(quoting *Howard*, 228 F.3d at 1065.)  It is sufficient, at the pleading stage, to identify the defendants' positions and allege that they "'had the power to control and influence [the defendant], which they exercised.'"  *In re Cylink Secs. Litig.*, 178 F. Supp. 2d 1077, 1089 (N.D. Cal. 2001).  In addition, persuasive authority indicates that audit committee members, including outside directors, who sign SEC filings qualify as control persons.  *See In re Enron Corp. Sec. Litig.*, 258 F. Supp. 2d 576, 598 (S.D. Tex. 2003)(citing cases); *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 437 (S.D.N.Y. 2001)(holding that an outside director can be presumed to exercise control over management and policies related to "company reports and SEC registrations that they actually sign").

Applying these principles, the Court finds that the Plaintiffs have alleged that Marcus, Ness, and Snider exercised sufficient control to be named as Defendants.  Marcus is a former Metropolitan Director who signed the Registration Statements that were filed in 2001 and 2002.  He also served as Chairman of the Metropolitan Board of Director's Audit Committee.  SCAC ¶ 22.  Ness formerly served as an officer for both Metropolitan and Summit.  In addition to signing select Registration Statements, Ness served as Controller and Chief Financial Officer for Metropolitan at some point during the class period.  SCAC ¶ 23.  The rationale underlying the conclusion that audit committee members exercise control over the documents they sign would apply with even greater force to a former CFO.  Finally, Snider is a

1  former Metropolitan director who served as Metropolitan's Chief

2  Financial Officer from 1999-2001.  In this capacity, he signed

3  Metropolitan's Registration Statements for securities offered in 2001,

4  2002, and 2003.  SCAC ¶ 25.  Therefore, the Plaintiffs' Section 15

5  claim against the Individual Defendants will not be dismissed.

6  **VIII. WASHINGTON SECURITIES ACT**

7       Under the Washington State Securities Act ("WSSA"), it is unlawful

8  when selling "or purchas[ing]... any security, directly or

9  indirectly... to make any untrue statement of a material fact or to

10  omit [material facts]."  Wash. Rev. Code § 21.20.010.  In order to

11  state a claim, a plaintiff must allege (1) that the defendant was a

12  'seller' of securities under RCW § 21.20.430(1), and (2) that the

13  plaintiff relied on the defendant's alleged misstatements in connection

14  with the sale of securities.  *Hines v. Data Line Sys., Inc.*, 114 Wn.2d

15  127, 134, 787 P.2d 8, 12 (1990).

16       **A.   Federal Preemption**

17       The Individual Defendants argue that the Plaintiffs' WSSA claim is

18  preempted to the extent that it is based on seven of the nine[13]

19  Registration Statements.  Under the Securities Litigation Uniform

20  Standards Act of 1998 ("SLUSA"),[14] Congress preempted class action suits

21

22       [13]There has been no assertion that the Plaintiffs' WSSA
   claim is preempted to the extent that it relies upon the
23   Registration Statements for Summit's Preferred Stock, Series R &
   T, effective February 13, 2001 or Metropolitan's Preferred Stock,
24   Series H and G, effective May 14, 2001.

25       [14]SLUSA provides, in relevant part,
           No covered class action based upon the statutory or
26           common law of any State or subdivision thereof may be

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO
DISMISS- 59

"brought pursuant to state law alleging misrepresentations in connection with the purchase or sale of a covered security." *Patenaude v. Equitable Life Assur. Soc'y of the United States*, 290 F.3d 1020, 1023-24 (9th Cir. 2002). SLUSA thus preempts claims 1) based on state law; 2) brought in the context a "covered class action;" 3) that allege fraud, misstatements, or omissions in connection with the sale of a "covered security." Here, it is undisputed that the present suit is a covered class action[15] and the Plaintiffs' WSSA claims are based on state law.

The disputed issue is whether the Registration Statements concern

---

                  maintained in any State or Federal court by any private party alleging--
                      (1) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or
                      (2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

  15 U.S.C. 77p(b).

    [15]A "covered class action" is,
                  any single lawsuit in which--damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members; or one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members.
15 U.S.C. 77p(f)(2)(A).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 60

"covered" securities.  A "covered" security is one that is either listed on a national exchange or "is a security of the same issuer that is equal in seniority or that is a senior security to a security" that is listed on a national exchange.  15 U.S.C. § 77(r)(b)(1)(B)-(C).  A senior security has "priority over another class as to the distribution of assets or the payment of dividends."  15 U.S.C. § 77(r)(d)(4).

Under this definition, the three securities at issue that were actually listed on a national exchange constitute "covered securities." Specifically, the following three securities were listed on the American Stock Exchange: 1) Metropolitan's Preferred Stock, Series 7, effective November 14, 2001; 2) Summit's Preferred Stock, Series S-3, effective February 13, 2002; and 3) Metropolitan's Preferred Stock, Series E-7, effective August 13, 2002.  SCAC ¶¶ 72-73.  The Plaintiffs' argument that a security must actually be traded on a national exchange, rather than merely listed, is unpersuasive.  While the recent decisions cited by the Plaintiffs do state that a covered security is traded nationally, these cases mention the definition of a covered security in dicta and appear to use the phrase "traded nationally" as shorthand for SLUSA's national listing requirement.  *Kircher v. Putnam Funds Trust*, 126 S. Ct. 2145, 2151, 165 L. Ed. 2d 92, 100 (2006); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 83-84, 126 S. Ct. 1503, 1512, 164 L. Ed. 2d 179, 190-91 (2005);  *Felton v. Morgan Stanley Dean Witter & Co.*, 429 F. Supp. 2d 684, 691 (S.D.N.Y. 2006).  The plain language of SLUSA[16] illustrates that a security need

---

[16] SLUSA provides,
   In general. The term "covered class action" means--

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 61

not actually be traded on a national scale in order to be considered a covered security.

Summit's Investment Certificates also constitute covered securities under SLUSA.  Summit's debt structure classifies the Investment Certificates as unsecured debt.  Summit Sec. Inc., Registration Statement Under The Securities Act of 1933 (Form S-2)(January 26, 2001); Summit Sec. Inc., Registration Statement Under The Securities Act of 1933 (Form S-2)(January 18, 2002).  According to Summit's Form S-2/A, August 10, 2000, Summit's 9.5% Notes also ranked equally with unsecured debt.  Consequently, the Investment Certificates rank equally with the 9.5% Notes.  The 9.5% Notes were to be listed on Tier I of the Pacific Exchange.  Summit Sec. Inc., Registration

---

(i) any single lawsuit in which--
(I) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members; or
(II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members; or
(ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which--
(I) damages are sought on behalf of more than 50 persons; and
(II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.

15 U.S.C. § 77p(f)(2)(A).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 62

Statement Under The Securities Act of 1933 (Form S-2)(January 26, 2001); Summit Sec. Inc., Registration Statement Under The Securities Act of 1933 (Form S-2)(January 18, 2002).  The Investment Certificates thus rank equally with a security of the same issuer listed on a national exchange.

Finally, Metropolitan's Investment Debentures constitute covered securities.  The Registration Statements for these instruments identify them as "unsecured debt instruments" that "rank equally with [Metropolitan's] unsecured debt and are subordinate to all of [the secured debt.]"  Accordingly, the Investment Debentures rank equally with Metropolitan's previously issued debentures.  The Plaintiffs acknowledge that Metropolitan listed its previously issued debentures on Tier I of the Pacific Stock Exchange.  SCAC ¶ 66.  In fact, the Plaintiffs allege that Metropolitan listed the previously issued debentures for the express purpose of evading state regulation by "achieving preemption as a covered security under federal law."  SCAC ¶ 65.  Consequently, the Investment Debentures at issue in this case rank equally with a security of the same issuer listed on a national exchange.

In view of the foregoing, the Plaintiffs' WSSA claim is preempted to the extent that it relies on the seven covered securities: 1) Metropolitan's Preferred Stock, Series 7, effective November 14, 2001; 2) Summit's Preferred Stock, Series S-3, effective February 13, 2002; and 3) Metropolitan's Preferred Stock, Series E-7, effective August 13, 2002; 4) Summit's Investment Certificates, Series B, effective February 13, 2001; 5) Summit's Investment Certificates, Series B and B-1,

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 63

1    effective February 13, 2002; 6) Metropolitan's Investment Debentures,

2    Series III and III-A, effective May 11, 2001; and 7) Metropolitan's

3    Investment Debentures, Series III and III-A, effective April 29, 2002.

4    **B.    Statute of Limitations**

5        PwC argues that the Plaintiffs' WSSA claim is barred by the

6    statute of limitations.  As a state law claim, the Plaintiffs' WSSA

7    claim is governed by the statute of limitations set forth in state law.

8    *Pelster v. Walker*, 185 F. Supp. 2d 1174, 1179 (D. Or. 2001)(citing

9    *Bancorp Leasing & Fin. Corp. v. Augusta Aviation Corp.*, 813 F.2d 272,

10   274 (9th Cir. 1987)); *Walker v. Armco Steel Corp.*, 446 U.S. 740,

11   751-53, 100 S. Ct. 1978, 1985-86, 64 L. Ed. 2d 659, 668-669 (1980).

12   Washington law provides a three-year statute of limitations for claims

13   brought under RCW § 21.20.430.  Wash. Rev. Code § 21.20.430(4)(b).  The

14   limitation period begins to run when the fraudulent activity "either

15   was discovered by [the plaintiff] or would have been discovered by him

16   or her in the exercise of reasonable care." *Id.*  Violation of the

17   statute of limitations is an affirmative defense.  Wash. Superior Ct.

18   Civ. R. 8(c).  The Defendants accordingly bear the burden of proof.

19   *Haslund v. City of Seattle*, 86 Wash. 2d 607, 620-621, 547 P.2d 1221,

20   1229-1230 (1976).

21       PwC has failed to show that any portion of the Plaintiffs' WSSA

22   claim is barred by the statute of limitations.  In discussing the WSSA

23   statute of limitations, both PwC and the Plaintiffs have relied on

24   their earlier arguments concerning Section 11's statute of limitations.

25   Consequently, the Court's analysis of the present argument must

26   likewise mirror its previous analysis.  As explained above in Section

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO
DISMISS- 64

V.B.1, PwC and Roth were effectively named as Defendants when the Plaintiffs filed the CAC on December 17, 2004.  The Plaintiffs' WSSA claim would be barred by the statute of limitations if it relied upon facts of which the Plaintiffs received notice prior to December 17, 2001.  For the reasons discussed in Section V.C.2, neither the FAC, nor the Met Group's SEC filings demonstrate that the Plaintiffs received inquiry notice concerning the facts underlying their claims on or before this date.  Therefore, the Plaintiffs' WSSA claim will not be dismissed on the basis of the statute of limitations.

C.    **Professional Defendants' Status as Sellers**

Roth and EY argue that the Plaintiffs' WSSA claims against them should be dismissed because they are not "sellers" under the act.  Only those who "offer" or "sell" securities are liable to the purchaser under the applicable section of WSSA.  Wash. Rev. Code § 21.20.430(1). The term "seller" is construed broadly so as to substantiate the purpose of WSSA, which is to protect investors.  *Haberman v. WPPSS*, 109 Wn.2d 107, 125-26, 744 P.2d 1032, 1049 (1987).  The term "seller" includes any party whose acts are a "substantial contributing factor in the sales transaction."  *Id*. at 131-32, 744 P.2d at 1052.

To determine whether an act is a "substantial contributing factor" in a sale, the court evaluates the following factors under the *Haberman* test:

> (1) the number of other factors which contribute to the sale and the extent of the effect which they have in producing it; (2) whether the defendant's conduct has created a force or series of forces which are in continuous and active operation up to the time of the sale, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; and (3) lapse of time.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 65

*Id.*; *Hoffer v. State*, 110 Wn.2d 415, 430, 755 P.2d 781, 789-90 (1988)("Hoffer I"); *Hines*, 114 Wn.2d at 148-49, 787 P.2d at 20; *Herrington v. Hawthorne*, 111 Wash. App. 824, 830-31, 47 P.3d 567, 570-71 (2002); *see generally* Rest. 2d of Torts §§ 432, 433 (1977). Privity between the defendant and the investors is not required.  In order to be liable, the defendant must exhibit "attributes of a seller," or be a "catalyst" to the sale.  *Haberman*, 109 Wn.2d at 131, 744 P.2d at 1052; *Hines*, 114 Wn.2d at 150, 787 P.2d at 11.  Due to the factual nature of the "substantial factor test," its determination is typically inappropriate for resolution on a motion to dismiss.  *See Haberman*, 109 Wn.2d at 132, 744 P.2d at 1052; *Hoffer I*, 110 Wn.2d at 430, 755 P.2d at 790.

The term "seller" also includes professional service providers that offer "something more" than "routine professional services." *Hines*, 114 Wn.2d at 149-50, 787 P.2d at 21.  Washington courts have typically denied motions to dismiss that challenge "seller" status when the defendant is an auditor who prepared statements that were provided to investors.  *See Haberman*, 109 Wn.2d at 119, 744 P.2d at 1045; *Hoffer I*, 110 Wn.2d at 417-18, 755 P.2d at 783.

Two Washington opinions have dismissed claims against professional service providers on the grounds that they could not be considered "sellers."  Both are distinguishable from the present case. The first, *Hines,* is distinguishable because the statements at issue consisted of legal advice presented only to the corporate client. *Hines*, 114 Wn.2d at 132-34, 787 P.2d 11-12.  Moreover, the law firm that provided the advice explicitly barred investors from relying on

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 66

their statements.  *Id.*  The second case, *Stewart v. Steiner*, is likewise distinguishable because the plaintiff investor "expressly warranted... that he... did not rely on" the defendant's representations.  122 Wn. App. 258, 261, 93 P.3d 919, 920 (2004).  Thus, neither *Hines* nor *Stewart* is controlling in the present case.

Washington appellate courts have not addressed a WSSA claim against a Qualified Independent Underwriter (QIU) of stocks.  However, Washington courts look to federal courts for guidance, and the Seventh Circuit has found that a "qualified independent underwriter thus performs the same protective function envisioned by the 1933 Congress when it defined, in section 2(11), those entities who would be subject to section 11 liability."  *Harden v. Raffensperger, Hughes & Co., Inc.*, 65 F.3d 1392, 1403 (7th Cir. 1995).  This analysis indicates that a QIU may qualify as a seller for the purposes of WSSA.

The natural roles of accountant/auditors and QIUs go beyond "routine services" rendered to a client.  *See Haberman*, 109 Wn.2d at 125-26, 744 P.2d at 1049; *Harden*, 65 F.3d at 1403.  They serve the additional role of communicating to investors about corporations and their securities.  The independent auditor goes beyond routine services by "assum[ing] a *public responsibility transcending any employment relationship with the client*."  *U.S. v. Arthur Young & Co.*, 465 U.S. 805, 817-18, 104 S. Ct. 1495, 1503, 79 L. Ed. 2d 826, 836 (1984)(emphasis in original).  The QIU goes beyond routine services by carrying "out the responsibilities of [... evaluating the terms of the offering and thus *serve[s] to protect the investing public*."  37 Fed. Reg. 26,294, 26,295 (1972)(emphasis added).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 67

The Court determines that the Plaintiffs have sufficiently plead Roth and EY's seller status for the purposes of WSSA. Since the Defendants do not qualify for immunity under *Hines*, the fact-intensive question of whether they meet the substantial contributing factor test may not be resolved on a motion to dismiss. *See e.g.*, *Haberman*, 109 Wn.2d at 133, 744 P.2d at 1052 (refusing to dismiss private accounting firm); *Hoffer I*, 110 Wn.2d at 431, 755 P.2d at 790 (refusing to dismiss state auditor); *Hoffer v. State*, 113 Wn.2d 148, 153, 776 P.2d 963, 965 (1989)("Hoffer II")(refusing to dismiss state auditor).  The Plaintiffs have alleged sufficient facts to support the argument that the professional defendants were a substantial contributing factor in the sale of the securities.

**D.   Reliance**

In order to state a cause of action under WSSA, a plaintiff must allege that he or she relied on the misrepresentations at issue. *Hines,* 114 Wn.2d at 134, 787 P.2d at 12.  Where, as here, reliance is not expressly alleged in the complaint, reliance may nevertheless be presumed in several circumstances: 1) when the case is "primarily a case of omissions," 2) when there is "reliance on the market," 3) when the securities are "unmarketable but for the misrepresentation," and 4) based upon common sense.  If the Plaintiffs allege facts indicating that any one of these circumstances existed in the present case, their failure to allege reliance does not require dismissal of the complaint.  *Blackie v. Barrack*, 524 F.2d 891, 906 (9th Cir. 1975).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 68

### 1.    Primarily a case of omissions: the *Affiliated Ute* presumption

Reliance may be presumed when "the case can be characterized as one that primarily alleges omissions." *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999); *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 667 (9th Cir. 2004); *see also Morris v. Intn'l Yogurt Co.*, 107 Wn. 2d 314, 328, 729 P.2d 33, 41 (1986)(citing *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54, 92 S.Ct. 1456, 1472, 31 L. Ed. 2d 741, 761 (1972)).[17]  To determine whether the presumption should apply, the Court must "analytically characterize [the] action as either primarily a nondisclosure case, or a positive misrepresentation case." *Binder*, 184 F.3d at 1064 (citing *Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356, 359 (5th Cir. 1987)).  While the law does not limit this presumption to cases that allege only omissions, the presumption does not apply in "mixed claim" cases where misstatements and omissions are pled equally. *Binder*, 184 F.3d at 1064; *Poulos,* 379 F.3d at 667.

While the Plaintiffs allege that the Defendants made a number of omissions, they also allege that the Defendants made numerous misrepresentations. *See, e.g.*, SCAC ¶ 734.  Consequently, the Plaintiffs' claims do not rest primarily on omissions, so the Affiliated Ute presumption does not apply.

### 2.  Fraud on the market

A presumption of reliance is also available in a fraud on the

---

[17] This presumption is commonly referred to as the "Affiliated Ute Presumption" after the United States Supreme Court decision that discusses its application.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 69

market case where the plaintiff alleges that a defendant made material misrepresentations or omissions concerning a security that is actively traded in an "efficient market." *Basic, Inc. v. Levinson*, 485 U.S. 224, 247, 108 S. Ct. 978, 991, 99 L. Ed. 2d 194, 218 (1988); *Blackie*, 524 F.2d at 906.  The elements required to claim the presumption are:

> (1) that the defendant made public misrepresentations; (2) that the misrepresentations were material; (3) that the shares were traded on an efficient market; (4) that the misrepresentations would induce a reasonable, relying investor to misjudge the value of the shares; and (5) that the plaintiff traded the shares between the time the misrepresentations were made and the time the truth was revealed.

*Basic*, 485 U.S. at 248, 108 S.Ct. at 992, 99 L. Ed. 2d at 219.

Prior to the *Basic* ruling, Ninth Circuit cases extended the presumption of fraud on the market to initial stock offerings as well as open markets.  *See Fortune Sys. Sec. Litig.*, 680 F. Supp. 1360, 1372 (N.D. Cal. 1987); *Arthur Young*, 549 F.2d 686, 695 (9th Cir. 1977). The court in *Arthur Young* explained the extension of the doctrine to initial offerings:

> [j]ust as the open market purchaser relies on the integrity of the market and the price of the security traded on the open market ..., so the purchaser of an original issue security relies, at least indirectly, on the integrity of the regulatory process and the truth of any representations made to the appropriate agencies and the investors....

*Arthur Young,* 549 F.2d at 695.  *Basic* did not overrule the extension of the "fraud on the market" presumption as the Defendants argue it did.  *Basic* was not an initial stock offering case and said nothing to indicate that the "fraud on the market" test should no longer be used in the related context of initial stock offerings as was done in *Arthur Young*.  In fact, investors are probably more deserving of the

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 70

presumption in the context of initial stock offerings because the misstatements are more than one piece in the mix of information affecting the price of the securities; they are the only information upon which the price is based.

Though Washington courts may not have ever expanded the "fraud on the market" doctrine to initial stock offerings, they typically look to federal courts for guidance. *See Morris*, 107 Wn.2d at 328-29, 729 P.2d at 41-42 (relying on a number of circuit court and Supreme Court securities decisions). *See also In Re WPS Secs. Litig.*, 1986-87 Blue Sky L. Rep. (C.H.) ¶ 72,371 (1986).

Following *Arthur*, the "reliance on the market" presumption may apply here. Although perhaps a more appropriate title for the presumption is "reliance on the regulatory process." *Arthur Young,* 549 F.2d at 695. Here, the investors could have relied on the accountant and underwriter's statements that were integral to the certification of the offering and the setting of the price of the securities. The fraud on the market presumption may therefore be applicable in this case.

### 3. Unmarketability but for the misrepresentation

A presumption of reliance also arises when the securities could not have been issued without the defendant's misrepresentations. *Arthur Young*, 549 F.2d at 695; *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 723 (11th Cir. 1987); *In re MDC Holdings Sec. Litig.*, 754 F. Supp. 785, 806 (S.D. Cal. 1990). This presumption may be claimed when the Plaintiff "alleges that a security not traded on the open market could not have been issued but for the fraud of the defendants."

*Kirkpatrick*, 827 F.2d at 723.

Here, the Plaintiffs allege that the misstatements were required for the securities to issue.  They allege that PwC and EY agreed to the use of the financial statements they prepared, thereby giving "their seals of approval that were required for the securities of Metropolitan and Summit to be sold during the Class Period."  SCAC ¶ 5.  The Plaintiffs further allege that Roth was required to "perform due diligence" in order for the securities to issue.  SCAC ¶ 38.  These allegations support the theory that the securities would have been unmarketable but for the alleged misrepresentations.  The Plaintiffs have alleged facts indicating that either the fraud on the market or the unmarketable but the misrepresentation presumption may apply.  Their failure to allege reliance is therefore not grounds for dismissal.

### E.   Tender

PwC and Roth mistakenly argue that the Plaintiffs have failed to state a claim under RCW § 21.20.430 because Plaintiffs have not alleged that they tendered their securities back to the seller or sold them.  While this section of WSSA states that there is no liability where the buyer chooses to retain the stock, it also provides that "[any tender specified in this section may be made at any time before entry of judgment."  Wash. Rev. Code § 21.20.430(6).  Under the plain language of WSSA, the Plaintiffs need not allege tender in their complaint.

### CONCLUSION

The Plaintiffs' SCAC is deficient in that it fails to satisfy the

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 72

pleading requirements of either Federal Rule of Civil Procedure 8(a) or 9(b).  The Plaintiffs have also failed to allege compliance with the statute of limitations, identify affirmative statements rendered misleading by Roth's alleged omissions, or allege facts illustrating that the Met Group's former officers and directors solicited the sale of the securities in question.  The Plaintiffs will be permitted to file a Third Consolidated and Amended Complaint to resolve these deficiencies.

Neither the statute of repose nor the statute of limitations necessitate dismissal of the Plaintiffs' Section 11 claims.  Section 13 of the Securities Act of 1933, rather than Section 804 of the Sarbanes Oxley Act, provides the statute of repose and the statute of limitations applicable to Section 11 claims.  The Plaintiffs effectively filed their Consolidated and Amended Complaint on December 17, 2004, less than three years after the Registration Statements that became effective between December 20, 2001 and April 13, 2002.  Claims based on these five Registration Statements are therefore timely.  The statute of repose does bar the Plaintiffs' claims to the extent that they are based on the four Registration Statements that became effective between February 13, 2001 and May 14, 2001.  The evidence before the Court does not conclusively demonstrate that the Plaintiffs received inquiry notice of the facts underlying their claims more than a year before they filed the CAC.

The SCAC sufficiently alleges that the Plaintiffs' securities are traceable to the Registration Statements at issue.  The SCAC also alleges that no aftermarket trading of the Met Group's securities

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 73

occurred.  Consequently, the Plaintiffs were not required to allege reliance in their complaint in order to state a claim under Section 11.  The Plaintiffs will be required, however, to file an amended certification for each proposed class representative tracing the representative's securities.

The Met Group's disclosures in its public filings were not sufficient to bespeak caution to a reasonable investor concerning the Met Group's total reliance on the sale of securities, the risks associated with the Met Group's commercial lending practices, or the Met Group's frequent departures from its commercial underwriting criteria.  Similarly, the publicly available documents cited by the Defendants did not disclose the Accountant Defendants' failure to account for the conflicts of interest created by the Met Group's ownership structure.

EY's failure to reveal the deficiencies in the Met Group's internal controls is potentially material, making dismissal of EY inappropriate at this juncture.  Likewise, dismissal of Marcus, Ness, and Snider would be inappropriate because the SCAC adequately alleges that they exercised control over the Met Group's day-to-day operations.

Finally, the Plaintiffs' WSSA claim will be dismissed to the extent that it relies on the seven Registration Statements preempted by SLUSA.  However, the Plaintiffs may proceed with the WSSA claim based on the two remaining Registration Statements.  WSSA's statute of limitations does not bar the Plaintiffs' claims.  The Plaintiffs have sufficiently alleged that Roth and EY acted as "sellers" for the

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 74

purposes of WSSA, and they are not required to allege tender at the pleading stage.  Although the Plaintiffs have not alleged reliance, reliance may be presumed, either because the Plaintiffs relied on the regulatory process or because the securities would have been unmarketable in the absence of the Defendants' alleged misrepresentations.  Accordingly,

**IT IS HEREBY ORDERED:**

1. Pricewaterhousecoopers, LLP's Motion to Dismiss Plaintiff's Consolidated and Second Amended Class Action Complaint, **Ct. Rec. 420**, is **GRANTED IN PART** and **DENIED IN PART.**

2. Ernst & Young, LLP's Motion to Dismiss, Or, In the Alternative, Motion to Strike Portions of the Second Amended Consolidated Class Complaint, **Ct. Rec. 412**, is **GRANTED IN PART** and **DENIED IN PART.**

3. Roth Capital Partners, LLP's Motion to Dismiss Consolidated and Second Amended Class Action Complaint, **Ct. Rec. 430**, is **GRANTED IN PART** and **DENIED IN PART.**

4. Certain Individual Defendants' Joint Motion to Dismiss Pursuant to Rule 12(b)(6), **Ct. Rec. 426**, is **GRANTED IN PART** and **DENIED IN PART.**

5. The Plaintiffs may file a Third Consolidated and Amended Complaint that complies with the requirements of Federal Rule of Civil Procedure 8(a).  If the Plaintiffs continue to seek relief under Section 11 of the Securities Act of 1933, the Section 11 claims, as well as the factual allegations supporting the Section 11 claims, should be stated with particularity as required by Federal Rule of

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 75

Civil Procedure 9(b).

6. The Plaintiffs' Third Consolidated and Amended Complaint may also:

    a) Allege compliance with the statute of limitations governing actions brought under Section 11 of the 1933 Securities Act;

    b) Identify any affirmative statements rendered misleading by the omissions of Roth Capital Partners, LLC's alleged in Paragraphs 634(a), 634(b), 659, and 660 of the Plaintiffs' Second Consolidated and Amended Complaint, Ct. Rec. 407; and

    c) Allege facts demonstrating that the Individual Defendants solicited the sales of securities at issue in this litigation.

7. Count XI of the Plaintiffs' Consolidated and Amended Complaint is dismissed to the extent that it is premised on the following registration statements:

    a) Summit Investment Certificates, Series B, effective February 13, 2001;

    b) Summit Preferred Stock, Series R & T, effective February 13, 2001;

    c) Metropolitan Investment Debentures, Series III and III-A, effective May 11, 2001; and

    d) Metropolitan Preferred Stock, Series H and G, effective May 14, 2001.

8. Count XIII of the Plaintiffs' Consolidated and Amended Complaint is dismissed to the extent that it is premised on the following registration statements:

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 76

        a) Summit Investment Certificates, Series B, effective
February 13, 2001;

        b) Summit Preferred Stock, Series R & T, effective February
13, 2001;

        c) Metropolitan Investment Debentures, Series III and III-A,
effective May 11, 2001; and

        d) Metropolitan Preferred Stock, Series H and G, effective
May 14, 2001.

    9.   Count I of the Plaintiffs' Consolidated and Amended Complaint
is dismissed as against Defendant Ness to the extent that it is
premised on the following registration statements:

        a) Metropolitan Investment Debentures, Series III and III-A,
effective May 11, 2001;

        b) Metropolitan Preferred Stock, Series H and G, effective
May 14, 2001; and

        c) Metropolitan Preferred Stock, Series E-7, effective
February 13, 2002.

    10. Count X of the Plaintiffs' Consolidated and Amended Complaint
is dismissed to the extent that it is premised on the following
registration statements:

        a) Summit Investment Certificates, Series B, effective
February 13, 2001;

        b) Metropolitan Investment Debentures, Series III and
III- A, effective May 11, 2001;

        c) Metropolitan Preferred Stock, Series E-7, effective
February 13, 2002;

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO
DISMISS- 77

d) Summit Investment Certificates, Series B and B-1, effective February 13, 2002;

e) Metropolitan Preferred Stock, Series E-7, effective February 13, 2002;

f) Metropolitan Investment Debentures, Series III an III-A, effective April 29, 2002; and

g) Metropolitan Preferred Stock, Series E-7, effective August 13, 2002.

11. The Plaintiffs shall file an amended certification for each proposed class representative tracing the representative's securities to one or more of the registration statements at issue at least **fourteen (14) days** before the filing of any motion for class certification.

**IT IS SO ORDERED.**  The District Court Executive is hereby directed to enter this order and furnish copies to counsel.

**DATED** this _5th_ day of November, 2007.

_s/ Fred Van Sickle_
Fred Van Sickle
United States District Judge

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS- 78