THE HONORABLE FRED VAN SICKLE

1

2  CARL J. ORESKOVICH (Bar No. 12779)
   ETTER, McMAHON, LAMBERSON,
3  CLARY & ORESKOVICH, P.C.
   Bank of Whitman, Suite 210
4  618 W. Riverside Avenue
   Spokane, WA 99201
5  Telephone: 509-747-9100
   Facsimile: 509-623-1438
6
7  JULIA B. STRICKLAND (Pro Hac Vice)
   MARY D. MANESIS (Pro Hac Vice)
   BRIAN C. FRONTINO (Pro Hac Vice)
8  GEORGE S. AZADIAN (Pro Hac Vice)
   STROOCK & STROOCK & LAVAN LLP
9  2029 Century Park East, Suite 1800
   Los Angeles, California 90067-3086
10 Telephone: 310-556-5800
   Facsimile: 310-556-5959
11
   Attorneys for Defendant
12 Roth Capital Partners, LLC

13

14             UNITED STATES DISTRICT COURT

15            EASTERN DISTRICT OF WASHINGTON

16

17 In re METROPOLITAN SECURITIES          No. CV-04-0025-FVS
   LITIGATION
18                                        CLASS ACTION

19                                        DECLARATION OF MARY D.
                                          MANESIS IN SUPPORT OF
20                                        DEFENDANT ROTH CAPITAL
   THIS DOCUMENT RELATES TO:              PARTNERS, LLC'S OPPOSITION TO
21 ALL ACTIONS                            PLAINTIFFS' MOTION TO
                                          EXCLUDE LARRY Y. DANN, PH.D.
22
                                          **ORAL ARGUMENT REQUESTED**
23
                                          Hearing Date:    December 16, 2009
24                                        Hearing Time:    9:00 a.m.

25

26

27

28
   DECLARATION OF MARY D. MANESIS                STROOCK & STROOCK & LAVAN LLP
   (Case No. CV-04-0025-FVS)                       2029 Century Park East, Suite 1800
                                                  Los Angeles, CA 90067   (310) 556-5800

   LA 51202063v1

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1    I, Mary D. Manesis, hereby declare as follows:

2    1.    I am an attorney with the law firm Stroock & Stroock & Lavan LLP,

3    counsel for Roth Capital Partners, LLC ("Roth") in the above-captioned matter. I

4    have personal knowledge of the facts set forth in this declaration, and if called as a

5    witness, I could and would competently testify to such facts. I submit this

6    declaration in support of Roth's Opposition to Plaintiffs' Motion to Exclude Larry Y.

7    Dann, Ph.D.

8    2.    Attached hereto as Exhibit 1 is a true and correct copy of the Expert

9    Report of Jane D. Nettesheim dated June 26, 2009.

10    I declare under penalty of perjury under the laws of the United States of

11    America that the foregoing is true and correct.

12    Dated this 30th day of October 2009, at Los Angles, California.

13

14

15                                                          Mary D. Manesis

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF MARY D. MANESIS          - 1 -
(Case No. CV-04-0025-FVS)

LA 51202063v1

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, CA 90067    (310) 556-5800

CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2009 I electronically filed the foregoing document described as:  DECLARATION OF MARY D. MANESIS IN SUPPORT OF DEFENDANT ROTH CAPITAL PARTNERS, LLC'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE LARRY Y. DANN, PH.D. with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record on the CM/ECF for this litigation.

/s/  Mary D. Manesis

Mary D. Manesis

DECLARATION OF MARY D. MANESIS
(Case No. CV-04-0025-FVS)

– 2 –

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, CA 90067    (310) 556-5800

LA 51202063v1

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1

## CERTIFICATE OF SERVICE

2   I hereby certify that on October 30, 2009 I electronically filed the foregoing

3   document described as:

4   DECLARATION OF MARY D. MANESIS IN SUPPORT OF DEFENDANT
    ROTH CAPITAL PARTNERS, LLC'S OPPOSITION TO PLAINTIFFS'
5   MOTION TO EXCLUDE LARRY Y. DANN, PH.D.

6   I electronically filed this document with the Clerk of the Court using the

7   CM/ECF system, which will send notification of such filing to the following:

8   George S Azadian          gazadian@stroock.com,cdusi@stroock.com

9   James K Barbee            jim@golbeckroth.com

10  Philip S Beck             anne.doyle@bartlit-beck.com,
11                            susan.dandrea@bartlit-beck.com

12  Ronald L Berenstain       rberenstain@perkinscoie.com,
                              jstarr@perkinscoie.com

13  Steve W Berman            steve@hbsslaw.com,heatherw@hbsslaw.com,
14                            carrie@hbsslaw.com

15  Alison Killen Blair       ablair@orrick.com

    Brian D Buckley           bbuckley@fenwick.com,kroth@fenwick.com,
16                            doconnor@fenwick.com

17  Elizabeth J Cabraser      ecabraser@lchb.com

18  Kelly P Corr              kcorr@corrcronin.com,dpatterson@corrcronin.com
19                            reception@corrcronin.com

20  James P Cusick            jcusick@orrick.com

21  Christopher G Emch        emchc@foster.com,pateb@foster.com

    Timothy J Filer           filet@foster.com,howej@foster.com
22
    Erin K Flory              erin@hbsslaw.com,jon@hbsslaw.com
23
    Steven Fogg               sfogg@corrcronin.com,hpowell@corrcronin.com
24
    Brian C. Frontino         bfrontino@stroock.com,lacalendar@stroock.com
25
    E Joseph Giometti         jgiometti@orrick.com,jcopoulos@orrick.com,
26                            pbenetz@orrick.com

27  Peter Jennings Grabicki   pjg@randanco.com,nlg@randanco.com,
                              scc@randanco.com
28

DECLARATION OF MARY D. MANESIS    – 3 –
(Case No. CV-04-0025-FVS)

LA 51202063v1

| 1 | Gary I Grenley | ggrenley@grebb.com |
| 2 | Richard M Heimann | rheimann@lchb.com,lsimms@lchb.com |
| 3 | Kenneth P Herzinger | kherzinger@orrick.com |
| 4 | David D Hoff | dhoff@tousley.com,btaylor@tousley.com |
| 5 | Lester C Houtz | lester.houtz@bartlit-beck.com,<br>anne.doyle@bartlit-beck.com |
| 6 7 8 | James E Howard | howard.james@dorsey.com,<br>summers.shawn@dorsey.com,<br>hall.michelle@dorsey.com |
| 9 | John M Hughes | john.hughes@bartlit-beck.com |
| 10 | Bradley B Jones | bjones@gth-law.com,<br>sthomas@gth-law.com,glane@gth-law.com |
| 11 | Stellman Keehnel | stellman.keehnel@dlapiper.com,<br>nina.marie@dlapiper.com |
| 12 13 | Kenneth G Kieffer | kkieffer@gth-law.com,lhoober@gth-law.com |
| 14 | James Bernard King | jking@ecl-law.com,kschulman@ecl-law.com |
| 15 | Christopher D Landgraff | chris.landgraff@bartlit-beck.com |
| 16 | Christopher Lind | chris.lind@bartlit-beck.com,<br>anne.doyle@bartlit-beck.com |
| 17 | Mary D Manesis | mmanesis@stroock.com,cdusi@stroock.com |
| 18 | J. Scott McBride | scott.mcbride@bartlit-beck.com |
| 19 | James P McNeill, III | mcnej@foster.com |
| 20 21 | Jeffrey S Miller | milje@foster.com,kellie@foster.com,<br>hickc@foster.com, snydd@foster.com |
| 22 | Meredith Moss | mmoss@orrick.com |
| 23 | John Degnan Munding | munding@crumb-munding.com,<br>brittany@crumb-munding.com |
| 24 | Robert J Nelson | rnelson@lchb.com |
| 25 | Kevin Daniel O'Rourke | kevin@southwellorourke.com |
| 26 27 | Carl Joseph Oreskovich | carl@ettermcmahon.com,<br>roni@ettermcmahon.com |
| 28 | | |

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

DECLARATION OF MARY D. MANESIS     – 4 –
(Case No. CV-04-0025-FVS)

LA 51202063v1

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

| | | |
|---|---|---|
| 1 | Andrew K Polovin | andrew.polovin@bartlit-beck.com,anne.doyle@bartlit-beck.com |
| 2 | Mark Roth | mark@golbeckroth.com |
| 3 | Stephen Michael Rummage | steverummage@dwt.com,jeannecadley@dwt.com |
| 4 | | |
| 5 | Darrell W Scott | scottgroup@mac.com,ssimatos@mac.com |
| 6 | F Mike Shaffer | fshaffer@gth-law.com,ksnyder@gth-law.com |
| 7 | James M Shaker | shaker@ryanlaw.com,callahan@ryanlaw.com |
| 8 | Daniel F Shea | dfshea@hhlaw.com |
| 9 | Kim D Stephens | kstephens@tousley.com,bkinsey@tousley.com |
| 10 | Julia B Strickland | jstrickland@stroock.com,lacalendar@stroock.com,tmitchell@stroock.com |
| 11 | | |
| 12 | Michael S Strube | sstrube@orrick.com,gjohnson@orrick.com |
| 13 | Earl M Sutherland | esutherland@rmlaw.com,jlading@rmlaw.com |
| 14 | Paul H Trinchero | ptrinchero@grebb.com |
| 15 | Fabrice Vincent | fvincent@lchb.com,dclevenger@lchb.com |
| 16 | Leslie Richard Weatherhead | lwlibertas@aol.com,emilyr@wkdtlaw.com,janetj@wkdtlaw.com |
| 17 | Tyler S Weaver | tyler@hbsslaw.com,jeniphr@hbsslaw.com,bonneym@hbsslaw.com |
| 18 | | |
| 19 | Diana Lynn Weiss | dweiss@orrick.com |
| 20 | Charles S Wright | charleswright@dwt.com,terriray@dwt.com |
| 21 | | |
| 22 | | /s/ Mary D. Manesis |
| 23 | | Mary D. Manesis |

/s/ Mary D. Manesis
Mary D. Manesis

DECLARATION OF MARY D. MANESIS     – 5 –
(Case No. CV-04-0025-FVS)

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, CA 90067   (310) 556-5800

LA 51202063v1

# EXHIBIT 1

EXHIBIT 1 PAGE 6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re METROPOLITAN SECURITIES LITIGATION | No. CV-04-025-FVS CLASS ACTION |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

EXPERT REPORT OF JANE D. NETTESHEIM
RE: CLASS DAMAGES UNDER SECTION 11 OF THE SECURITIES ACT OF 1933

June 26, 2009

EXHIBIT 1 PAGE 7

## Table of Contents

I.      Background and Qualifications .................................................................. 1

II.     Scope of Engagement .............................................................................. 2

III.    Metropolitan and Summit Securities ........................................................ 3

IV.     Description of the MIS Database .............................................................. 5

V.      Assumptions ........................................................................................... 6

    A.      General Assumptions ...................................................................... 6

    B.      Assumptions Regarding Bankruptcy Distributions and Related Settlements .............. 7

VI.     Analysis of Section 11 Damages ............................................................ 10

    A.      Value of the Securities at Suit Date (January 20, 2004) ........................... 10

    B.      Per-Security Damages—Metropolitan Debentures and Summit Investment
Certificates ........................................................................... 15

    C.      Per-Security Damages—Metropolitan Preferred Stock .............................. 17

EXHIBIT /  PAGE 8

## I.     Background and Qualifications

1.     I am a financial economist and vice president of Stanford Consulting Group, Inc. ("SCG"). Since 1981, SCG has provided economic research and expert testimony for business and securities litigation and regulatory and legislative proceedings. All SCG professionals hold masters or doctoral degrees in business, economics or operations research, and senior consultants have testified as experts in these fields. I have a B.A. in biology from the University of Colorado and an M.B.A. from the University of Hawaii. I completed the coursework in the Ph.D. program in finance at the London Business School, University of London. I taught managerial economics for one semester in the undergraduate program in the business school at the University of Hawaii. I taught corporate finance in the MBA programs at the City University of London for one term and at the University of San Francisco for one semester. My curriculum vitae, including a list of publications, and the list of the expert testimony I have provided by deposition or at trial are attached as Exhibits 1 and 2.

2.     The fees charged for this project are the standard hourly rates of employees of SCG. My current hourly rate is $495. For work on this matter through June 26, 2009, the total number of hours worked by staff at SCG, including myself, is approximately 468 hours. For work on this matter through April 2009, the total fees and expenses billed to Plaintiffs' counsel is $105,027.[1]

3.     Since 1990, I have served as a consultant and expert in the areas of market efficiency, materiality, causation and damages in many securities class actions. I have analyzed various data sources for information about security holdings and trading activity for different types of market participants. I have examined the relationship between security price movements and changes in

---

[1] Fees and expenses incurred in May 2009 will be invoiced in late June 2009.

EXHIBIT 1  PAGE 9

market and industry indices for a number of securities in a variety of industries. I have examined

the relationship between information releases and changes in security prices for a number of

companies in a variety of industries. I have prepared numerous memoranda, reports, and

testified based on the results of these analyses.

## II.     Scope of Engagement

4.     I have been retained by Counsel for the Class Representatives and the certified Class in

this class action to provide an estimate of damages incurred by all persons or entities who

purchased or otherwise acquired certain investment debentures and preferred stock issued by

Metropolitan Mortgage & Securities Company, Inc. ("Metropolitan") and investment certificates

issued by Summit Securities, Inc. ("Summit") (collectively, together with their subsidiaries, the

"Metropolitan Group") pursuant to registration statements that became or were effective during

the period from February 13, 2001, through December 15, 2003 (the "Class Period") under

Section 11 of the Securities Act of 1933 ("Securities Act").

5.     My estimates are based on an assumption that the allegations contained in the

Consolidated and Fourth Amended Class Action Complaint for Violation of the Securities Act of

1933 and Washington Securities Act, dated June 2, 2008 (the "Complaint") are true. Plaintiffs

allege that in addition to rendering false and misleading pricing and yield opinions on

Metropolitan and Summit securities, defendant "Roth [Capital] … negligently failed to identify

and correct numerous additional false and misleading statements in the registration statements"[2]

and that "[a]s a result of the [auditors] negligence, both the audited and unaudited financial

statements that were incorporated in the registration statements of Metropolitan and Summit

---

[2]   Complaint, ¶6

EXHIBIT ___ PAGE 10

during the Class Period contained untrue statements of material fact and omitted material facts required to be stated therein or necessary to make the statements therein not misleading."[3]

6.      My opinions are based upon my professional knowledge and experience, as well as on a review of documents and information relevant to this matter, and analyses described in this report and its exhibits.  Documents received from Counsel and other sources that were relied upon in preparing this report are listed in Exhibit 3.  Specific documents, data, and other information that I have relied upon as a basis for my opinions are cited in this report and its exhibits.  Such documents and information are typically relied upon by financial experts in securities class actions or by financial economists in their research.  Analyses which are bases for my opinions are described in this report and its exhibits, and results of those analyses are contained in this report and its exhibits.

7.      The opinions offered in this report are subject to refinement.  They are also subject to revision based on new or additional information that may be provided to or obtained by me in the course of this matter, including the report of Plaintiffs' accounting expert, which is not yet complete.

### III.    Metropolitan and Summit Securities

8.      The following is a list of relevant securities for claims in this action arising under Section 11 and the registration statement Effective Period during which acquisitions of such securities are included in damages.[4]

---

[3] Complaint, ¶7.

[4] According to instructions from Counsel, which I understand is based on the Order Denying Motion To Certify The State Claims Class, dated January 6, 2009, securities listed in the Complaint at ¶28 that are not included in my calculations of damages include: Metropolitan Preferred Stock, Series G and Series H; Summit Preferred Stock, Series R, Series S-3 and Series T;

*Footnote continues on next page…*

- 3 -



| Issue Description | S2 Filing Dates | S2 Effective Dates | Effective Period End Dates[5] | Incorporated Annual Financial Statements[6] | MIS Product Codes |
|---|---|---|---|---|---|
| Summit Investment Certificates | | | | | |
| Series B | 1/26/01 | 2/13/01 | 1/31/02 | FY00 | Investment: ICB |
| | 1/18/02 | 2/13/02 | 1/31/03 | FY00, FY01 | Installment: IC2 |
| Series B-1 | 1/18/02 | 2/13/02 | 1/31/03 | FY00, FY01 | Discount: ICZ1 |
| Metropolitan Investment Debentures | | | | | |
| Series III | 2/21/01 | 5/11/01 | 4/30/02 | FY00 | Investment: IN3 |
| | 4/8/02 | 4/29/02 | 4/30/03 | FY00, FY01 | Installment: IS3 |
| Series III-A | 2/21/01 | 5/11/01 | 4/30/02 | FY00 | Advisor: IN4 |
| | 4/8/02 | 4/29/02 | 4/30/03 | FY00, FY01 | Discount: INZ1 |
| Metropolitan Preferred Stock | | | | | |
| Series E-7 | 11/8/01 | 12/20/01[7] | 8/12/02[8] | FY00 | PE7 |
| | 7/18/02 | 8/13/02 | 7/31/03 | FY00, FY01 | |

and Summit Investment Certificates, Series B-1, IA Investment (product ICC) with S2 filing date January 18, 2002, effective date February 13, 2002. (According to Counsel, product ICC was registered but never sold. In the MIS database (described below) there is one purchase transaction (Transaction Type = BUY) for product ICC for $3,804.02 that occurred on July 22, 2002, for account number 2005218JT002. The debenture balance including principal, compound interest, accrued interest as of February 4, 2004, was $3,883.68. This purchase is not included in damages.)

[5] The Effective Period end date was obtained from the registration statement (SEC Form S-2) and/or Prospectus for each security. If the Effective Period for a registration statement of a security ends after the Effective Date of subsequent registration statement for that same security, the most recent Registration Statement is considered the effective registration statement during the overlapping time period.

[6] Defendant PricewaterhouseCoopers, LLP ("PWC") was the independent auditor for Metropolitan and Summit during the Class Period until June 12, 2001. PWC audited and/or certified FY 2000 financial statements for Metropolitan and Summit. Defendant Ernst & Young, LLP ("E&Y") was the independent auditor for Metropolitan and Summit from June 12, 2001 until January 22, 2004. E&Y audited and/or certified FY 2001, 2002 and quarterly FY 2003 financial statements for Metropolitan and Summit. (Complaint, ¶¶24–25.)

The Metropolitan and Summit fiscal year ends on September 30 of each calendar year.

[7] Order Granting In Part and Denying In Part Defendants' Motions To Dismiss, dated November 5, 2007, pp. 31–33.

[8] In the SEC Form S2 registration statement for the PE7 securities filed November 8, 2001, the date of the end of the effective period is blank. Here, the day prior to the Effective Date of the subsequent registration statement is used for the Effective Period end date.

EXHIBIT ___ PAGE 12

## IV.    Description of the MIS Database

9.    Data from Metropolitan Investment Securities, Inc. (the "MIS Database") was provided.

Based on a review of the transcript of the deposition of Tes Strunk, it is my understanding that

the MIS database contains accountholder information and historical transaction data for all

investors who bought or sold Metropolitan / Summit securities through MIS[9] through the end of

---

[9] There are four unique MIS databases that were provided in Microsoft Access database format, which are briefly summarized below. Herein, unless otherwise specified, these four databases are collectively referred to as the "MIS Database."

   i.   The "Investor Database" contains account-level information for past and current Metropolitan/Summit investors as of December 2005. The account number is a unique variable in this database (there can be more than one account for an individual investor).

   ii.  The "Stock Database" contains the total amount of preferred stock (in shares and dollars) held by Metropolitan/Summit investors for each preferred stock series, and information on dividend payouts and reinvestments as of December 31, 2005. An investor can hold multiple series of preferred stock.

   iii. The "Debenture Database" contains data on the debentures and investment certificates held by Metropolitan/Summit investors. It contains both open and closed (redeemed) securities with detailed information about each debenture/certificate, such as the account number, the debenture certificate number, when the debenture was purchased, the maturity date, the coupon rate, payment frequency, sale date (if sold), and balances as of February 4, 2004 (the principal amount, compound interest and accrued interest).

   iv.  The "History Database" contains MIS historical transaction data for the Metropolitan/Summit debentures and preferred stock from 1989 through December 2005. It contains the account number, product ID (identifying the Metropolitan/Summit security), and detailed transaction-level information, such as, transaction type (*e.g.*, buy, sell, withdraw, transfer, compound interest, reinvested dividends), transaction date, and transaction amount.

The MIS database also includes data for Metropolitan and Summit securities other than those securities included in the Class. It also includes data for securities issued by Western United Holding Company (identified with "65" in the field "Company"), which are not part of the Class.

This information was derived from the Deposition of Tes Strunk, dated July 29, 2008 (the "Strunk Deposition") and Exhibits to the Strunk Deposition.



2005.[10]  The MIS database serves as the basis for calculating Section 11 damages.

10.     MIS was a wholly owned subsidiary of Summit and was the exclusive seller for the public securities offerings of Metropolitan and Summit throughout the Class Period.[11]  The MIS database captures all transactions in the securities at issue in this report, with the exception of certain secondary market transactions in the Metropolitan Preferred Stock Series E-7 ("PE7"), which was listed on the American Stock Exchange ("AMEX") in January 2002—transactions on the AMEX exchange or other secondary market exchanges would not be reflected in the MIS database.

## V.     Assumptions

### A.     General Assumptions

11.     In formulating my opinions in this matter I have been asked by Counsel for Plaintiffs to make, and I have made, the following assumptions:

- Damages are limited to those persons or entities who acquired Metropolitan / Summit securities pursuant to a prospectus or registration statement identified above.

- The first lawsuit on behalf of the purchasers of the Metropolitan and Summit Securities was filed on January 20, 2004 (the "Suit Date").[12]

- Securities acquired during the Effective Period of the registration statement that are eligible for damages, remain eligible for damages in the event such security changes ownership *via* a transfer (reissue) from one accountholder to another accountholder.

---

[10] Transactions after MIS shut down primarily include transfers from MIS to other brokerage firms, changes of ownership, and transfers out of MIS IRA accounts in 2005.  (Strunk Deposition, pp. 24–26.)

[11] Complaint, ¶39.

[12] Complaint, ¶540.

EXHIBIT  1  PAGE 14

In other words, if a debenture was purchased during the Effective Period, and that security is subsequently reissued/transferred to another account of the same individual or to an individual who subsequently suffered a loss on that security, such loss is included in the calculation of Section 11 damages.[13]

- Reinvested interest/dividends incur damages in the same way as the original investment, *i.e.*, reinvested interest/dividends are treated, for the purpose of calculation of damages, as incremental new investments in the relevant security and are included in the calculation of damages.

- Excluded from the Class are five investors that opted out from the Class.[14]

### B.     Assumptions Regarding Bankruptcy Distributions and Related Settlements

12.     Damages may be mitigated through any payments received by Class members as part of the Metropolitan/Summit bankruptcy proceedings or any related judgments or settlements

---

[13] For transfers of ownership of a security from one account to another, there are two transactions recorded in the MIS History Database. The account from which the security is being transferred has a transaction with a Transaction Type of "CRS—Closeout of debenture by reissue" or "DRW—Draw of funds from a debenture" for debentures, and "SRS— Stock sold by reissue" for the preferred stock. The associated transaction for the account to which the security was transferred has a Transaction Type "BRS—Buy of stock or debenture *via* a reissue." A new Transaction ID is assigned to the security in the event of a transfer of ownership. Approximately 11,300 BRS transactions (for products included in the Class, and including transactions prior to the Effective Period) were matched with the associated CRS/DRW/SRS transactions using the Transaction Date, Transaction Amount and Sequence Number (3,867 of these were December 15, 2005 IRA close out transactions).

Transfer also includes transaction with Transaction Type "XFR—Non-taxable transfer of asset from primary owner to secondary or joint owner." Both the account from which and the account to which the security is being transferred have a transaction with a transaction type = XFR. The transactions are matched by the Transaction Date and Transaction Amount.

(See Strunk Deposition, pp. 23–25, 48–55.)

[14] MTPL1-EXCL00001.pdf; MTPL1-EXCL00002.pdf; MTPL1-EXCL00003.pdf; MTPL1-EXCL00004.pdf; MTPL1-EXCL00005.pdf.


EXHIBIT 1 PAGE 15

derived from claims involving the securities at issue in this case.  It is my understanding that, to date, the following distributions have been made or will be made to creditors and preferred shareholders as part of the bankruptcy proceedings and other related litigated matters.  (See Exhibit 4 for a summary of the settlement distributions.):

- September 2006, first bankruptcy distribution to creditors: Metropolitan debenture holders received 9.226% of par value; Summit investment certificate holders received 5.9645% of par value.[15]

- July 2008, second bankruptcy distribution to creditors: Metropolitan debenture holders received 9.96% of par value; Summit certificate holders received 5.96% of par value.[16]

- Third distribution to creditors: It is my understanding that a third distribution is expected in the next eighteen months and it is estimated that the final total recovery to Metropolitan debenture holders will be 30% of face value and to Summit certificate holders will be 30% of face value.  Any such distribution should offset damages.  For purposes of my damages analysis I have assumed distribution on June 30, 2010.

- Broker Settlement: In May 2006, approximately 700 Metropolitan / Summit investors who sued their brokers received approximately $4.75 million as part of a settlement of an Interpleader Action involving insurance policies issued to Metropolitan and

---

[15] Letter from Maggie Lyons, Plan Administrator, to "All Creditors of Metropolitan Mortgage & Securities, Co. Inc. or Summit Securities, Inc.," dated September 12, 2006.

[16] *The Spokesman-Review*, "Met investors to get $45 million: Third payout likely in $2.3 billion financial collapse," July 27, 2008. This news article is attached at Exhibit 7.

Summit.[17]  The settlement is assumed to have been distributed across all Metropolitan

and Summit debt and preferred stock securities proportionately to the principal

amount outstanding (or, for the stock, the amount paid) as of the date of the

bankruptcy filing (February 4, 2004).

- AWC Settlement: On October 28, 2003, the Company issued a press release stating

    that MIS had reached an agreement with the NASD (a "Letter of Acceptance, Waiver

    and Consent," or "AWC") to settle alleged violations of the NASD's rules by MIS,

    where MIS would pay a $500,000 fine to the NASD and make restitution to certain

    investors.[18]  According to Counsel, the amount refunded under the restitution account

    totaled $2.341 million, and was distributed to investors who purchased Metropolitan

    and Summit securities between January 2001 and March 2003.  For purposes of this

    analysis, this settlement amount is allocated to all securities purchased during that

    period proportionately to the principal amount outstanding (or, for the stock, the

    amount paid) as of the date of the bankruptcy filing (February 4, 2004).

- Officer/Directors Settlement:  It is my understanding from Counsel that

    approximately $5.4 million has been received on behalf of the Class as part of a

    settlement with certain officers and directors ($4,899,500 was received by Counsel on

    December 22, 2006 and another $486,686.36 was received on October 8, 2008).  For

---

[17] Sources: Counsel; *Associated Press Newswire*, "Two Settlements Reached in Met Mortgage Case," May 18, 2006.  This news article is attached at Exhibit 8.

[18] *PR Newswire*, "Agreement Reached with NASD," October 28, 2003, 5:50 p.m. *The Spokesman-Review*, "Met Mortgage affiliate settles fraud charges; Securities firm admits no wrongdoing, faces $500,000 fine, may have to repay some investors," October 29, 2003.  These news articles are attached at Exhibit 9.

EXHIBIT 1 PAGE 17

purposes of this analysis, these settlement amounts are allocated across all securities in the Class proportionately to the principal amount outstanding (or, for the stock, the amount paid) as of the date of the bankruptcy filing (February 4, 2004).

## VI.    Analysis of Section 11 Damages

13.    Section 11 concerns liability for false or misleading statements in a registration statement, under which damages are calculated as the "difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought ...."[19]

### A.    Value of the Securities at Suit Date (January 20, 2004)

The Metropolitan Debentures and Summit Investment Certificates:

14.    As discussed above, the bankruptcy recoveries distributed to claimants to date total approximately $0.19 per each $1.00 of principal for the Metropolitan Debentures and $0.12 per each $1.00 of principal for the Summit Investment Certificates, with additional distributions expected in the next 18 months that will result in total distributions of approximately $0.30 per

---

[19] 15 U.S.C. § 77k(e).

This report does not address issues of the affirmative defense of negative causation under Section 11, about which I have not yet formed an opinion. It is my understanding from Counsel that the burden of demonstrating negative causation rests with defendants under Section 11, and I intend to respond following defendants' presentation in any expert reports they choose to submit on that issue.

EXHIBIT 1 PAGE 18

each $1.00 of principal for both the Metropolitan Debentures and the Summit Investment Certificates.

15.    There are certain relevant facts useful for determining the value of the Metropolitan Debentures and Summit Investment Certificates as of January 20, 2004, the Suit Date[20]:

- There was no market for the Debentures. Prior to January 2004, the Metropolitan Debentures and Summit Certificates could not be sold but could only be held to maturity and then redeemed by Metropolitan and Summit, respectively, or, on very rare occasions, Metropolitan or Summit would redeem a Debenture or Certificate for a particular investor.[21] Thus, on January 20, 2004, the investors could not sell or otherwise monetize their investments in Metropolitan Debentures and Summit Investment Certificates.

- After the SEC would no longer approve new registration statements for Metropolitan or Summit, the Metropolitan Group was unable to fund interest payments and redemptions and otherwise make good on its contractual promises to the Debenture and Certificate holders.  On December 26, 2003, Metropolitan and Summit announced that they would suspend all interest and principal payments on their debt securities, effective at 5:00 p.m. PT on December 26.[22]  Thus, on January 20, 2004, the investors could not tender for redemption their Debentures or Certificates to Metropolitan or Summit, respectively.

---

[20] On January 20, 2004, the present suit was filed.  That same day E&Y announced its resignation to the Metropolitan Group and withdrew its audited financial statements for FY 2001 and FY 2002 and instructed investors to not rely on them.  On February 4, 2004, Metropolitan/Summit filed for protection under Chapter 11 of the United States Bankruptcy Code.  Complaint ¶¶255, 258.

[21] Strunk Deposition, pp. 44–45, 53.

[22] *PR Newswire*, "Metropolitan Mortgage & Securities to Delist Preferred Stock Company Will Not File Form 10-K as Scheduled," December 26, 2003, 9:06 p.m.  This news article is attached at Exhibit 10.

EXHIBIT 1 PAGE 19

- Several months after the Metropolitan/Summit bankruptcy filing, companies specializing in purchasing securities of distressed, often bankrupt, entities made offers to Metropolitan and Summit debt investors to purchase their Metropolitan Debentures and/or Summit Investment Certificates.  Certain investors sold their Metropolitan/Summit securities to such investment companies.  The first such sales were in August 2004, at approximately $0.05 per $1.00 of principal for both Metropolitan Debentures and Summit Investment Certificates.[23]

- As early as June 2004, individuals involved in the Metropolitan/Summit bankruptcy proceedings publicly disclosed that the expected bankruptcy recovery was 15%–20%.[24]

- On June 8, 2004, the first Examiner's Report for the Metropolitan/Summit bankruptcy was filed ("1st Examiner's Report").  In that report, the Examiner describes a "multitude" of "irregularities and improprieties" relating to the operation of the Metropolitan Group prior to and during the Class Period, regarding, among other things, the lack of effective internal controls, the Group's underwriting and appraisal practices, recognition of losses or loss reserves on loans receivable, "highly suspect" year-end transactions to generate year-end "paper" gains, and conflicts of interest relating to the control of the multiple

---

[23] The first such sales were to Argo Partners, on August 20, 2004 for $0.05 per $1.00 principal for Metropolitan Debentures.  The sale price was $0.05 per $1.00 principal through September 20, 2004 for both Metropolitan Debentures and Summit Investment Certificates.  Starting September 23, 2004, the sale prices increased—the maximum sale price was approximately $0.15 per $1.00 principal during the period September 2005 through July 2006.  Provided by Counsel as Excel file Argo Purchases.xls.

[24] *The Spokesman-Review*, "'Rabbit Transactions' Fueled Demise of Spokane, Wash.-Based Firm," June 9, 2004; *The Spokesman-Review*, "Small Met Recovery Possible; Investors May Get as Little as 15 cents on the Dollar," August 20, 2004.  These news articles are attached at Exhibit 11.

EXHIBIT 1 PAGE 21

members of the Metropolitan Group.[25]  The Examiner determined that the value of the

Metropolitan Group's income and assets had been overstated; for example, there were,

among other deficiencies, many significant appraisals, valuations, and assumptions about

certain commercial real estate projects, commercial real estate loans, and other

receivables that were without adequate basis and served to overstate the Metropolitan

Group's income and assets during the Class Period.

16.    On January 20, 2004, Ernst & Young withdrew its prior audit opinions for FY 2001 and

2002 and told investors not to rely on them or any of the quarterly financial reports for the first

three quarters of FY 2003.  In the absence of properly audited financial statements at any time

during the Class Period, especially on or about January 20, 2004, I look to other information as a

basis for the value of the Metropolitan Debentures and Summit Investment Certificates on

January 20, 2004.  Based on the totality of the information I reviewed, for the purposes of

calculating damages in accordance with Section 11, a non-speculative and quantifiable estimate

of the value of the Metropolitan Debentures and Summit Investment Certificates on the Suit Date

is the total proceeds received as part of the bankruptcy recovery.  These total proceeds are

expected to amount to 30% of the principal amount outstanding as of January 20, 2004.  It

should be noted that even with this valuation, Class members could not realize this value until

many years later, and indeed have not yet realized this value because the third distribution of

bankruptcy proceeds has not yet occurred.  As discussed below, these proceeds, as well as

proceeds from other related settlements and restitutions, offset Section 11 losses for the

Metropolitan and Summit debt securities.

---

[25] *See, e.g.*, 1st Examiner's Report, pp. 249–250.

EXHIBIT 1 PAGE 21

Metropolitan Preferred Stock Series E-7 ("PE7"):

17.     On November 3, 2003, Metropolitan and Summit announced that they were suspending

all dividend payments on their preferred stock.[26]  On December 12, 2003, there was a trading

suspension by the American Stock Exchange ("AMEX"); no preferred shares of Metropolitan or

Summit traded on AMEX after Friday, December 12, 2003.[27]  On December 19, 2003,

Metropolitan announced that it had been advised by the AMEX that trading in the Company's

preferred stock had been suspended indefinitely.[28]  On December 26, 2003, Metropolitan and

Summit announced that preferred stock securities would be delisted from the AMEX exchange

(and planned to do so by December 31).[29]  After December 12, 2003 there was no market for

trading the PE7 stock, and the PE7 stock was rendered worthless by the Suit Date.  A reasonable

estimate of the value of the PE7 stock on the Suit Date, January 20, 2004, is $0.  Proceeds from

related settlements and restitutions offset Section 11 losses for the PE7 stock (investors did not

and will not receive any distribution of bankruptcy proceeds for the PE7 stock).

---

[26] *Dow Jones News Service*, "Metropolitan Mortgage Bd Votes To Temporarily Suspend
Preferred Stk Div Payments," November 3, 2003, 10:46 p.m.  This news article is attached at
Exhibit 12.

[27] According to data received from the AMEX pursuant to subpoena, there are no prices or
volume after December 12, 2003.  Bates AMEX 001–026.

The trading halt as of December 15 also was confirmed in: *PR Newswire*, "Metropolitan
Mortgage & Securities to Delist Preferred Stock Company Will Not File Form 10-K as
Scheduled," December 26, 2003, 9:06 p.m.; *The Spokesman-Review*, "Metropolitan Mortgage
shuts down brokerage," December 16, 2003.  These news articles are attached at Exhibit 13.

[28] *PR Newswire*, "AMEX Suspends Trading in Metropolitan Mortgage & Securities Preferred
Stock," December 19, 2003, 8:09 p.m. That day, the AMEX also suspended trading in the
preferred stock of Summit and subsidiary, Western United Holding Company.  This news article
is attached at Exhibit 14.

[29] *PR Newswire*, "Metropolitan Mortgage & Securities to Delist Preferred Stock Company Will
Not File Form 10-K as Scheduled," December 26, 2003, 9:06 p.m.  See Exhibit 10.

EXHIBIT / PAGE 22

### B.    Per-Security Damages—Metropolitan Debentures and Summit Investment Certificates

18.    For each Class member that purchased Metropolitan debentures or Summit investment certificates pursuant to the registration statement, Section 11 damages per security are calculated as follows:

- For all debentures/certificates purchased[30] during the Effective Period, Section 11 losses are the amount of principal outstanding as of the Suit Date, plus compound interest outstanding as of the Suit Date, plus accrued interest outstanding as of the Suit Date.[31]

---

[30] Debenture purchases are defined by transactions in the History database with a "Transaction Type" = "BUY, Buy of stock or debenture *via* normal business." All BUY transactions have a unique "Transaction ID" associated with them in the history database. For each eligible purchase, subsequent transactions associated with that purchase are identified as any transaction with the same Transaction ID.

Excluded from damages are approximately $6.4 million purchases of Summit Investment Certificates, Series B-1, Discount (product ICZ1) made during the Class Period, but prior to the effective date of the registration statement (*i.e.*, purchases between February 13, 2001 and February 12, 2002, inclusive).

[31] The debenture totals (principal amount, compound interest and accrued interest) are obtained from the Debenture Database.

> Principal amount is the original amount invested by the accountholder that remains unpaid to the investor. The principal amount of debentures originally purchased during the Effective Period will be greater than the principal amount outstanding as of the Suit Date, to the extent that the debentures were, for example, sold, closed out, or there were draws or installment payments against the principal.

> Compound interest is the amount of accumulated interest that has been added to the principal such that interest was earned on the compound interest.

> Accrued interest is the amount of accumulated interest that was not yet added to the principal amount; this is interest accrued on the principal and compound interest amounts since the last coupon/interest date.

These amounts are as of February 4, 2004 (the date Metropolitan/Summit filed for bankruptcy). Because interest and principal payments were halted as of December 2003, the principal amount

*Footnote continues on next page…*

- 15 -

EXHIBIT  1   PAGE  23

- Losses will be offset by any proceeds received and expected to be received as part of the Metropolitan/Summit bankruptcy and any settlements received pursuant to related litigation.[32]

19.    For the purposes of this analysis, prejudgment interest damages have been calculated as follows:

- I have been asked to make two calculations of prejudgment interest: (1) the rate of prejudgment interest is the 1-year U.S. Treasury bill rate from the Suit Date (January 20, 2004) to June 30, 2009, and (2) the rate of prejudgment interest is the last interest rate on the Debenture or Certificate from the Suit Date (January 20, 2004) to the maturity date of the Debenture or Certificate and then the 1-year U.S. Treasury bill rate from the maturity date to June 30, 2009.

- Simple interest from the Suit Date (January 20, 2004) to June 30, 2009, is applied to the amount of principal plus compound interest (but not accrued interest) outstanding as of the Suit Date.[33]  To account for Metropolitan bankruptcy distributions, or a recovery from any settlement, the amount of principal/compound interest is reduced

---

and compound interest as of February 4, 2004 are the same as the amounts as of January 20, 2004, the Suit Date.  Accrued interest is reduced for 15 days between January 20, 2004 and February 4, 2004, using the annual interest rate for each debenture which is obtained from the Debenture Database.

[32] After Metropolitan/Summit declared bankruptcy on February 4, 2004, certain Metropolitan/Summit debt holders sold their securities to various investment firms specializing in distressed debt.  We have been instructed by Counsel to assume that that the rights to proceeds from future claims (including claims associated with class action litigation and bankruptcy distributions) transferred to the purchasers of such debt.

[33] On December 26, 2003, Metropolitan and Summit announced that they would suspend all interest and principal payments on their debt securities, effective at 5:00 p.m. PT on December 26.  See Exhibit 10.

EXHIBIT 1 PAGE 24

by the distribution/recovery amount on the distribution date of the
distribution/recovery payment, and prejudgment interest continues to accrue on the
reduced principal/compound interest amount from the distribution/recovery payment
date to June 30, 2009.

- I also have been asked to include interest for 12 months at the current 1-year U.S.
  Treasury bill rate on the expected proceeds from the third distribution.

20.    A summary of Section 11 losses and associated prejudgment interest for the Metropolitan
Debentures and Summit Certificates is provided in Exhibit 5.

### C.    Per-Security Damages—Metropolitan Preferred Stock

21.    For each Class member that purchased PE7 stock pursuant to the registration statement,
Section 11 damages per security are calculated as follows:

- For all preferred stock purchased during the Effective Period, Section 11 losses are
  the amount paid as of the Suit Date. This is the total amount paid for PE7 stock
  acquired during the Effective Period of the registration statement, and, if sold, less
  proceeds received from such sales.

- Eligible purchases/acquisitions include purchases of PE7 stock directly from MIS
  during the Effective Period, conversions of another security into PE7 stock, and
  dividends reinvested into PE7 stock (regardless of the underlying security from which
  those dividends were received).[34]

---

[34] Eligible purchases are defined as transactions in the History Database with Transaction Type =
"BUY—Buy of stock or debenture *via* normal business" or "BXC—Buy convert of stock from 1
series to another." Dividend reinvestments are identified as Transaction Type = "DVR."

The price per-share for all eligible purchases is par value ($25). The last purchase transaction
date is June 17, 2003.

*Footnote continues on next page...*

EXHIBIT 1 PAGE 25

- Purchases in the secondary market *via* the MIS trading desk or AMEX, including such purchases during the Effective Period, are not eligible for damages.[35]  Purchases on the AMEX exchange are not included in damages.

- There are no damages for PE7 stock purchased during the Effective Period and subsequently sold *via* the MIS trading desk as such PE7 stock was sold at par value.[36]

- It is my understanding that shares transferred from an MIS account to a broker account other than at MIS are indicated as held through CeDe & Co. ("CeDe").[37]  Shares held in CeDe broker accounts also include shares subsequently sold on the AMEX, however specific data on whether shares held in CeDe accounts were subsequently sold on the AMEX, and the dates, amounts and prices of AMEX sales are not available.  AMEX daily price and volume data for the PE7 stock were

---

Included in damages are BUY transactions by transfer agent CeDe & Co. totaling approximately $4.5 million.  It is my understanding from Counsel that these are purchases on behalf of eligible Class members made *via* an investment firm other than MIS.

Excluded from damages are approximately $11.5 million purchases prior to the start of the Class Period, February 13, 2001.  (There are no purchases between the start of the Class Period and the start of the Effective Period, November 14, 2001.)

[35] PE7 Purchases in the secondary market *via* the MIS trading desk are identified as transactions in the History Database with Transaction Type = "BBB—Buys of stock on the Trading Desk (Secondary desk)."

[36] PE7 Sales are identified as transactions in the History Database with Transaction Type = "SEL—Stock sold *via* normal business," and Transaction Type "SBB—Stock sold on the trading desk."  The last PE7 sale transaction occurred on July 2, 2003 when prices for the PE7 were still at par, *i.e.*, $25.

PE7 purchases (Transaction Type = BUY and BXC) are assigned a Transaction ID at the time of purchase, from which all subsequent transactions associated with that security (including transfers, and sales) are identified.

There is no Transaction ID associated with reinvested dividends.  Sales of reinvested dividends are determined on an accountholder level.

[37] Strunk deposition, p. 52.

EXHIBIT / PAGE 26

provided by Counsel. The total reported trading volume for PE7 on the AMEX is 726,700 shares (from January 2002 through December 2003). The total number of PE7 shares held by CeDe is approximately 1.17 million (which includes PE7 shares purchased prior to and during the Effective Period, but only shares transferred to CeDe prior to the delisting of PE7 stock in December 2002). A conservative (maximum) estimate of the percentage of shares held in CeDe accounts that were sold on the AMEX is 62% (0.727 / 1.17).[38]

22.     For the purposes of this analysis, prejudgment interest damages have been calculated as follows

- On November 3, 2003, Metropolitan and Summit announced that they were temporarily suspending the payment of dividends on their preferred stocks.[39] I have been asked to make two calculations of prejudgment interest: (1) the rate of prejudgment interest is the 1-year U.S. Treasury bill rate from November 3, 2003 to June 30, 2009, and (2) the rate of prejudgment interest is the last dividend rate on the PE7 from November 3, 2003 to June 30, 2009.

- For PE7 stock purchases that were not sold, simple interest is applied to the PE7 stock balance from November 3, 2003 (the date Metropolitan stopped paying dividends) to

---

[38] Not all PE7 stock transferred to a CeDe account was sold on the AMEX exchange. PE7 stock transferred to a CeDe account includes transfers by accountholder that subsequently held their PE7 stock in a brokerage account other their MIS account. Furthermore, the AMEX trading volume includes any PE7 stock that was previously sold on AMEX and then re-sold.

For preferred shares transferred to CeDe that are estimated to have been sold on the AMEX, the sales price is assumed to be $25 if sold prior to July 25, 2003, and thereafter is assumed to be the closing price reported by the AMEX.

[39] *Dow Jones News Service*, "Metropolitan Mortgage Bd Votes To Temporarily Suspend Preferred Stk Div Payments," November 3, 2003, 10:46 p.m. See Exhibit 12.

EXHIBIT 1 PAGE 27

June 30, 2009. To account for a recovery from any settlement, the PE7 stock balance is reduced by the recovery amount on the distribution date of the recovery payment, and prejudgment interest continues to accrue on the reduced balance from the recovery payment date to June 30, 2009.

- For PE7 stock purchases sold at a loss, prejudgment interest is equal to simple interest applied to the loss amount from November 3, 2003 (or the date of sale if later) to June 30, 2009.

23.     A summary of Section 11 losses and associated prejudgment interest by for the Metropolitan Preferred Stock Series E-7 is provided in Exhibit 6.

This report accurately reflects my opinions at this time. I declare under penalty of perjury that the foregoing is true and correct. Executed on June 26, 2009, at Redwood City, California.

*Jane D. Nettesheim*

Jane D. Nettesheim

- 20 -

EXHIBIT __1__ PAGE 28

# Exhibit 1

EXHIBIT ___ PAGE 24

# JANE D. NETTESHEIM

702 Marshall Street, Suite 200
Redwood City, California 94063
Telephone: (650) 298-0200
Fax: (650) 298-0210
E-mail: jane@scginc.com

## PROFESSIONAL BACKGROUND

**Stanford Consulting Group, Inc.**
**Vice President**

Economic consultant and testifying expert specializing in finance, intellectual property and insurance economics. Project experience includes:

Cost of capital and required underwriting margin analyses for property/casualty insurers in various states for use in regulatory hearings into appropriate insurer profitability levels in those states.

Study of economic market structure of workers' compensation insurance and analysis of various rating laws.

Analysis of economic damages alleged in numerous class actions as a result of alleged misrepresentation and fraud.

Analysis of economic damages suffered by parties to business litigation involving issues related to product liability, fraud, wrongful contract termination, unfair competition, and business valuation.

Numerous analyses of economic damages to various involved parties in wrongful death litigation, personal injury litigation, and wrongful termination litigation.

Study of auto physical damage and small group health insurance futures proposed for trading by the Chicago Board of Trade, including analysis of the impact of trading in insurance futures on auto and health insurance industry market structure.

Examination of financial structures of holding companies of savings and loan associations and investment portfolios of savings and loan associations.

Analysis of high-yield debt securities, including examination of financial statements, securities' prospectuses and related filings. Performed valuation analyses of below investment grade debt securities.

Analysis of lost revenues and profits in cases of alleged patent infringement and anti-competitive market behavior. Analyses included definition of relevant markets, examination of product differentiation, and appropriate allocation of costs.

Analysis of merger and acquisition issues of an attempted takeover by large foreign interests of foreign company which owns major U.S. property and casualty insurer; including analysis of risk of insurer's investment portfolio, consequences of the proposed altering of that portfolio into riskier stock and equity securities, and appropriate financial structure of an insurance company.

Development and application of economic theory and technology to calculate damages in several large securities litigation cases. The technology incorporates timing of information releases, materiality of information, class period, class certification, trading behavior, and extent of damages.

1

EXHIBIT 1 PAGE 30

Numerous analyses of damages incurred by alleged environmental hazards incorporating past costs and estimates of future costs of maintaining and abating the hazard. Development of econometric models used to estimate change in real asset values due to presence of alleged environmental hazard.

**University of San Francisco**
Visiting Lecturer of Corporate Finance in M.B.A. program.

**London Business School**
Course Tutor for Executive Courses on Securities and International Finance. Involved in various consulting projects.

Applied option pricing theory in pricing interest rate swaps. Applied duration and immunization concepts to constructing and hedging a portfolio of interest rate swaps.

Performed cost of capital analysis for a very large and diversified corporation for use in estimating appropriate share price when privatized by the British government.

Analysis of the risk characteristics of an internationally diversified stock portfolio.

**City University of London**
Visiting Lecturer of Corporate Finance in M.B.A. program.

**Institute of Monetary and Banking Studies, Geneva**
Course Tutor for Executive Courses on Securities and Portfolio Management.

**University of Hawaii**
Visiting Lecturer of Managerial Economics, undergraduate.

**Bank of Honolulu**
Bank operations officer.

**United Bank of Boulder**
Bank operations supervisor.

## EDUCATION

**London Business School**
Completed coursework requirements in program for Ph.D. in finance, 1986-89.

**University of Hawaii**
M.B.A., 1985.
Beta Gamma Sigma.

**University of Colorado**
B.A. in biology, 1978.

## MONOGRAPHS

"Report on the Medical Malpractice Insurance Delivery System in Pennsylvania" with Hofflander, A.E. and Nye, B.F., 47 pp. (2001).

"White Paper -- Small Group Health Insurance Futures," with Hofflander, A.E. and Nye, B.F. Chicago Board of Trade, Chicago, 75 pp. (1991).


EXHIBIT ___ PAGE 91

"White Paper -- Auto Physical Damage Insurance Futures," with Hofflander, A.E., Nye, B.F. and Charlesworth, L.B.  Chicago Board of Trade, Chicago, 92 pp. (1991).

## PRESENTATIONS

"The Medical Malpractice Insurance Delivery System in Pennsylvania," with Alfred E. Hofflander. Presented in January 2002 in Harrisburg, PA.

"A Comparative Evaluation of Workers' Compensation Rating Laws," with Alfred E. Hofflander and Blaine F. Nye. Presented in August 1992 at the American Risk and Insurance Association Annual Meeting in Washington D.C..

"Hedging Risk with Small Group Health Insurance Futures," with Alfred E. Hofflander and Blaine F. Nye. Presented in June 1991 at the International Insurance Society in San Francisco, California.

"The Impact of Insurance Futures on the Insurance Cash Market," with Alfred E. Hofflander and Blaine F. Nye.  Presented in April 1991 at the Risk Theory Seminar at Pennsylvania State University.

"From Three Flowers to Allstate: Evolution of Income Taxation of Captive Insurers," with Alfred E. Hofflander, Blaine F. Nye and M. Rose Kelly. Presented in August 1990 at the American Risk and Insurance Association Annual Meeting in Orlando, Florida.

EXHIBIT 1 PAGE 33

# Exhibit 2

EXHIBIT 1 PAGE 33

## Testimony of Jane D. Nettesheim
June 3, 2009


In Re Comverse Technology, Inc. Securities Litigation, United States District Court, Eastern District of New York, Case No.CV 06-1825 (NGG) (RER), October 29, 2008 (deposition).

In Re LDK Securities Litigation, United States District Court, Northern District of California, Master File No. C-07-05182-WHA, September 19, 2008 (deposition).

The Archdiocese of Milwaukee Supporting Fund, Inc., et al., v. Halliburton Company, et al., United States District Court, Northern District of Texas, Dallas Division, Master Docket No. 3:02-CV-1152-M, October 16, 2007 (deposition).

Dal B. Gurung v. Sheila H. Tsang and Bonnie G. Tsang, Superior Court of the State of California, County of San Francisco, Case No. CGC-06-452511, June 19, 2007 (deposition), November 13, 2007 (trial).

Matthew Serino, et al., v. Kenneth Lipper, et al., Supreme Court of the State of New York, County of New York, Index No. 02/604396, Fredda Levitt, et al., v. Pricewaterhousecoopers, LLP, United States District Court, Southern District of New York, Civ. Action No. 04CV5179, May 23, 2007 (deposition).

Bernadette F. Abramson, et al., v. Gavilan Aviation, Inc., et al., Superior Court of the State of California, County of San Benito, Case No. CV060083, May 10, 2007 (deposition), October 18, 2007 (deposition).

Terry Walker, Individually and On Behalf of All Others Similarly Situated, v. Rent-A-Center, Inc., et al., United States District Court, Eastern District of Texas, Texarkana Division, Case No. 5:02cv3 (DF), April 20, 2006 (deposition).

Sheldon Pekin, Independent Executor of the Estate of Joanne Pekin v. Evanston Northwestern Healthcare Corporation, et al., Circuit Court of Cook County, Illinois, No. 01 L 07946, February 17, 2006 (deposition), August 21, 2006 (deposition).

In Re Retek, Inc. Securities Litigation, United States District Court, District of Minnesota, Master File No. 0:02-CV-4209-JRT/SRN, October 6, 2005 (deposition).

Amber Lindsey v. Integrated Archive Systems, Superior Court of the State of California, County of Santa Clara, Case No. 104CV024249, October 4, 2005 (deposition).

Robert Mamon v. Children's Hospital of Oakland, et al., Superior Court of the State of California, County of Oakland, Northern Division, Case No. RG03091442, August 4, 2005 (deposition).

EXHIBIT 1 PAGE 34

# Exhibit 3

EXHIBIT 1 PAGE 35

**Exhibit 3**

**Metropolitan**
**Document List**

| Document | Date |
|---|---|
| Argo purchase data from Counsel | 2004 - 2009 |
| Opt outs from Counsel | |
| SEC Filings by Metropolitan Mortgage and Securities Co., Inc. and Summit Securities, Inc. | 1999 - 2004 |
| Letter from Margaret Lyons to all creditors of Metropolitan Mortgage & Securities, Co., Inc. or Summit Securities, Inc. | 9/12/2006 |
| MIS database from Counsel | |
| News articles about Metropolitan Investment from Factiva | |
| Consolidated and Fourth Amended Class Action Complaint for Violation of the Securities Act of 1933 and Washington Securities Act | 6/2/2008 |
| Order Denying Motion to Certify the State Claims Class | 1/6/2009 |
| Order Granting In Part and Denying In Part Defendants' Motions To Dismiss | 11/5/2007 |
| Deposition of Margaret Lyons with exhibits | 4/28/2009 |
| Deposition of Ronald Pellegrino with exhibits | 7/30/2008 |
| Deposition of Tes Strunk with exhibits | 7/29/2008 |
| Examiner's Report in re Metropolitan Mortgage & Securities Co., Inc. and in re Summit Securities, Inc. jointly administered under Case No. 04-00757-W11 United States Bankruptcy Court for the Eastern District of Washington | 6/7/2004 |
| Examiner's Second Report in re Metropolitan Mortgage & Securities Co., Inc. and in re Summit Securities, Inc. jointly administered under Case No. 04-00757-W11 United States Bankruptcy Court for the Eastern District of Washington | (not dated) |

EXHIBIT 1 PAGE 36

## Documents Sent To
## Beth Charlesworth For Review

| Expert | Descripton | BegDocNo | End DocNo |
|--------|-----------|----------|-----------|
| Beth Charlesworth | Tes Strunk Deposition Transcript - Deposition taken in our case. | | |
| Beth Charlesworth | MIS Database | | |
| Beth Charlesworth | Consolidated and Third Amended Class Action Complaint | | |
| Beth Charlesworth | Tes Strunk Deposition Exhibits for Depo. Taken July 29, 2008 In Re: Metropolitan Securities Litigation | | |
| Beth Charlesworth | American Stock Exchange documents | AMEX001 (NYSE001) | AMEX026 (NYSE005) |
| Beth Charlesworth | Declaration of Paul Gompers Concerning Class Certification and Exhibits 1-6 | | |
| Beth Charlesworth | Flowchart of Debenture/Investment Certificate Life Cycle | | |
| Beth Charlesworth | July 30, 2008 Ronald Pellegrino Deposition Exhibits IN Re Metropolitan Securities Litigation | | |
| Beth Charlesworth | July 30, 2008 Ronald Pellegrino Deposition Transcript In re Metropolitan Securities Litigation | | |
| Beth Charlesworth | The following Summit Registration statements from 2002 – Summit Investment Certificates Series B and B1 - February 13, 2002; and Summit Preferred Series S3 - Feb. 13, 2002 | | |
| Beth Charlesworth | Metropolitan Registration Statements from Dec. 01 through August 02: Met Preferred Series E7 Dec. 20, 2001; Met Investment Debentures Series III and IIIA April 29, 2002; and Met Preferred Series E7, August 13, 2002 | | |
| Faye Fort | Metropolitan Mortgage & Securities v. PwC May 23, 2007 Expert Damages Report David Nolte Fulcrum Financial Inquiry LLP | PwC_MSL 00015843 | PwC_MSL 00016023 |

EXHIBIT ____ PAGE 37

| Expert | Description | BegDocNo | End DocNo |
|---|---|---|---|
| Faye Fort | Metropolitan Mortgage & Securities v. PwC May 23, 2007 Errata/Supplemental Damages Report David Nolte Fulcrum Financial Inquiry LLP | PwC_MSL 00016024 | PwC_MSL 00016040 |
| Faye Fort | Metropolitan Mortgage & Securities v. PwC August 1, 2007 Rebuttal Expert Damages Report David Nolte Fulcrum Financial Inquiry LLP | PwC_MSL 00016041 | PwC_MSL 00016054 |
| Faye Fort | Select EY Documents | EY23_0018922 | EY23_0018923 |
| Faye Fort | SEC Comment Letters and Responses | See Attached List | |
| Faye Fort | Select EY Documents | EY03_0011246 | EY03_0011246 |
| Faye Fort | Cover sheet to the SEC Form 108-K and index | | |
| Faye Fort | Select EY Documents | EY03_0011265 | EY03_0011265 |
| Faye Fort | Interpleader Settlement | | |
| Faye Fort | Select EY Documents | EY03_0011251 | EY03_0011251 |
| Faye Fort | Select EY Documents | EY22_0022459 | EY22_0022459 |
| Faye Fort | Select EY Documents | EY22_0022457 | EY22_0022457 |
| Faye Fort | Select EY Documents | EY22_0011721 | EY22_0011721 |
| Faye Fort | Select EY Documents | EY22_0011713 | EY22_0011713 |
| Faye Fort | Select EY Documents | EY22_0076362 | EY_0076362 |
| Faye Fort | Select EY Documents | EY22_0076358 | EY_0076359 |
| Faye Fort | Select EY Documents | EY03_0011254 | EY03_0011254 |
| Faye Fort | November 5, 2007 Order Granting In Part and Denying In Part Defendants' Motion to Dismiss | | |
| Faye Fort | NASD Letter of Acceptance Waiver and Constent dated October 16, 2003 | | |
| Faye Fort | E&Y January 20, 2004 Resignation Letter | EY22_0002500 | EY22_0002503 |

EXHIBIT __1__ PAGE 38

| Expert | Description | BegDocNo | End DocNo |
|--------|-------------|----------|-----------|
| Faye Fort | June 17, 2003 Roth Capital Partners Letter Re: Pricing Recommendations from Roth Capital Partners, Inc. | KR-PL1 001172 | |

EXHIBIT 1 PAGE 24

## SEC COMMENT LETTERS AND RESPONSES

| TAB | LETTER | DATE | BEG BATES | END BATES |
|---|---|---|---|---|
| 1 | **SEC to MET** | **3/23/2001** | NES0048529 | NES0048536 |
| 2 | RESPONSE | 4/6/2001 | NES0048539 | NES0048545 |
| 3 | **SEC to MET** | **4/18/2001** | NES0048546 | NES0048548 |
| 4 | RESPONSE | 5/3/2001 | NES0048549 | NES0048553 |
| 5 | **SEC to WULA** | **11/21/2001** | 2014343 | 2014351 |
| 6 | RESPONSE | 1/23/2002 | KR-PL1000153; KR032059 | KR-PL000161; KR032067 |
| 7 | **SEC to WULA** | **2/14/2002** | 2014361 | 2014365 |
| 8 | RESPONSE | 6/21/2002 | KR-PL1000146; KR032052 | KR-PL000152; KR032058 |
| 9 | **SEC to WULA** | **7/19/2002** | NES0019162 | NES0019165 |
| 10 | RESPONSE | 7/30/2002 | KR-PL1 000929 | KR-PL1 000930 |
| 11 | **SEC to SUMMIT (Summit Comment Letter # 1)** | **10/30/2002** | NES0049939 | NES0049955 |
| 12 | RESPONSE | 2/12/2003 | GTH_DFI025148 | GTH_DFI025161 |
| 13 | **SEC to SUMMIT (Summit Comment Letter # 2)** | **3/7/2003** | NES0049927 | NES0049937 |
| 14 | RESPONSE | 4/7/2003 | KR017117; GTH_DFI025772 | KR017131; GTH_DFI025786 |
| 15 | **SEC to SUMMIT (Summit Comment Letter # 3)** | **4/21/2003** | NES0050089 | NES0050098 |
| 16 | RESPONSE | 5/29/2003 | EY22_0001981 | EY22_0001989 |
| 17 | **SEC to MET (Met Comment Letter # 1)** | **4/24/2003** | NES0019821 | NES0019834 |



## SEC COMMENT LETTERS AND RESPONSES

| TAB | LETTER | DATE | BEG BATES | END BATES |
|---|---|---|---|---|
| 18 | RESPONSE | NONE – as of Nov. 2003, drafting responses with hope of completion prior to filing 10-K in Dec.; likely never completed | *NA* | *NA* |
| 19 | **SEC to SUMMIT (Summit Comment Letter # 4)** | **6/13/2003** | NES0050239 | NES0050248 |
| 20 | SUMMIT LETTER (Materials for 8/20 conference call) | 8/13/2003 | EY22_0050359 | EY22_0050369 |
| 21 | SUMMIT LETTER (Materials for 8/26 conference call) | 8/25/2003 | KR-PL1 002709 | KR-PL 002718 |
| 22 | SUMMIT LETTER (Follow up responses in preparation for 9/5 conference call) | 8/27/2003 – Attached responses MISSING | KR-PL1 002592 | KR-PL1 002592 |
| 23 | SUMMIT LETTER (Follow-up responses as requested in 9/5 conference call) | 9/12/2003 | NES0050179 | NES0050186 |
| 24 | FINAL SUMMIT RESPONSE TO COMMENT LETTER # 4 | 10/1/2003 | KR-PL1 000191; KR059832 | KR-PL1 000197; KR059838 |
| 25 | **SEC to WULA** | **7/8/2003** | NES0001472 | NES0001490 |
| 26 | RESPONSE | NONE – as of Nov. 2003, company was waiting to draft responses until the Metropolitan response had been written; likely never completed | *NA* | *NA* |
| 27 | **SEC to SUMMIT (Additional DPAC Questions from SEC)** | **9/24/2003** | NES0049854 | NES0049859 |
| 28 | RESPONSE | 10/3/2003 | EY23_0000055 | EY23_0000063 |

EXHIBIT 1 PAGE 41

## SEC COMMENT LETTERS AND RESPONSES

| TAB | LETTER | DATE | BEG BATES | END BATES |
|-----|--------|------|-----------|-----------|
| 29 | SUPPLEMENTAL RESPONSE | 10/6/2003 | NES0050120 | NES0050128 |
| 30 | **SEC to SUMMIT**<br>**(Summit Comment Letter # 5)** | **10/29/2003** | NES0020439 | NES0020448 |
| 31 | RESPONSE | NONE - as of Jan. 12, 2004, still drafting responses; likely never completed as lawsuit filed on Jan. 20 | *NA* | *NA* |
| 32 | **SEC to MET**<br>**(re Summit 10/1/03 filing and Met 3/27/03 filing in response to Group's 1/27/04 8-K filing)** | **1/29/2004** | Clearwell Doc Id: 0.7.153.110918 and attachment | Clearwell Doc Id: 0.7.153.110918 and attachment |
| 33 | RESPONSE | NONE - As of February 9, 2004, SEC still had not received a response; likely never filed | *NA* | *NA* |
| 34 | **SEC to MET**<br>**(re Summit 10/1/03 filing and Met 3/27/03 filing in response to Group's 2/6/04 8-K filing)** | **2/9/2004** | METRO 077955 | METRO 077956 |
| 35 | RESPONSE | NONE - Likely never filed | *NA* | *NA* |

EXHIBIT 1 PAGE 42

# Exhibit 4

EXHIBIT 1 PAGE 43

**Exhibit 4**
**Metropolitan**
**Allocation of Settlement Distributions to Class Members**

**Bankruptcy Distributions**

| | Distribution Amount (% of Principal) | | | |
|---|---|---|---|---|
| Distribution Date | 1st Distribution | 2nd Distribution | 3rd Distribution | Total |
| | 9/26/2006 | 7/1/2008 | expected before Dec. 2010 | |
| Metropolitan Debentures | 9.2260% | 9.9600% | 10.8140% | 30.0000% |
| Summit Investment Certificates | 5.9645% | 5.9600% | 18.0755% | 30.0000% |

**Other Settlement Distributions**

| Eligible Claimants | | AWC Settlement | Broker Settlement | Individuals / Officer Settlement | | Total |
|---|---|---|---|---|---|---|
| | | Metropolitan and Summit debt and preferred stock securities purchased between January 2001 and March 2003 | Metropolitan and Summit debt and preferred stock securities | Metropolitan and Summit debt and preferred stock securities included in the Class | | |
| Distribution Date | | 1/1/2004 | 5/17/2006 | 12/27/2006 | 10/8/2008 | |
| Total Distribution Amount | a | $2,341,000 | $4,750,000 | $4,899,500 | $486,686 | $12,477,186 |
| Eligible Securities, Amount Outstanding 2/4/04 | | | | | | |
| Debt Principal | b | $209,173,584 | $395,104,720 [1] | $202,319,849 | | $202,319,849 |
| Share Par Value | c | $69,471,837 | $148,492,268 [2] | $52,320,224 | | $52,320,224 |
| Total | d = b + c | $278,645,420 | $543,596,987 | $254,640,073 | | $254,640,073 |
| Distribution as Percent of Principal / Par | e = a / d | 0.8401% [3] | 0.8738% | 1.9241% | 0.1911% | 3.8292% |

**Total Offset for Settlement Distributions**

| | | |
|---|---|---|
| Metropolitan Debentures | (% of Principal) | 33.8292% |
| Summit Investment Certificates | (% of Principal) | 33.8292% |
| Metropolitan Preferred Stock | (% of Par) | 3.8292% |

[1] The total Debt Principal is the sum of field "DebPrin" in the MIS Debenture Database
[2] The total Share Par Value is the sum of ("Shares" * "ParPPS") in the MIS Investor Database
[3] This distribution amount only offsets Section 11 losses for securities purchased January 2001 through March 2003.

EXHIBIT 1 PAGE 44

# Exhibit 5

EXHIBIT ___ PAGE 45

**Exhibit 5**
**Metropolitan**
**Summary of Section 11 Damages – Metropolitan Debentures and Summit Investment Certificates**

**Summary of Section 11 Losses by Product, Registration Statement**

| Security | Registration Statement Effective Date | Total Principal Purchased during Effective Period | Accrued Interest | Compound Interest | Principal | Losses Excluding Settlement Distributions | Offset to Losses | Section 11 Losses | Prejudgment Interest using T-Bill Rates[1] | Prejudgment Interest using T-Coupon Rate and T-Bill Rates[2] |
|---|---|---|---|---|---|---|---|---|---|---|
| IC2 Summit Cert, Series B, Installment | 2/13/01 | $104,462 | $324 | $82 | $60,800 | $61,206 | $20,588 | $40,638 | $9,524 | $15,507 |
| | 2/13/02 | $227,927 | $792 | $470 | $166,645 | $167,908 | $56,374 | $111,534 | $26,145 | $47,412 |
| IC8 Summit Cert, Series B, Investment | 2/13/01 | $24,517,146 | $219,808 | $1,373,243 | $18,090,536 | $19,689,688 | $6,119,845 | $13,569,843 | $3,056,940 | $5,357,147 |
| | 2/13/02 | $31,359,192 | $276,975 | $1,162,363 | $26,091,713 | $27,521,052 | $8,823,131 | $18,697,921 | $4,271,203 | $8,533,281 |
| IC21 Summit Cert, Series B-1, Discount | 2/13/02 | $4,707,171 | $63,906 | $393,771 | $4,188,313 | $4,645,990 | $1,416,856 | $3,229,134 | $718,999 | $1,490,068 |
| IN3 Metrop. Deb, Series 3, Investment | 5/11/01 | $81,075,278 | $789,255 | $4,548,870 | $81,693,212 | $87,011,338 | $20,850,578 | $46,160,760 | $10,148,886 | $19,581,128 |
| | 4/29/02 | $82,675,054 | $932,746 | $2,812,430 | $72,059,834 | $75,805,010 | $24,354,206 | $51,450,804 | $11,439,805 | $22,781,091 |
| IN4 Metrop. Deb, Series 3-A, Advisor | 5/11/01 | $6,837 | $121 | $0 | $46,837 | $46,958 | $2,311 | $4,647 | $1,042 | $2,333 |
| | 4/29/02 | $178,498 | $4,052 | $8,701 | $171,454 | $182,207 | $57,947 | $124,261 | $27,221 | $60,097 |
| INZ1 Metrop. Deb, Series 3-A, Discount | 5/11/01 | $12,699,180 | $198,890 | $1,798,843 | $11,204,538 | $13,202,072 | $3,786,820 | $9,415,252 | $2,002,979 | $3,757,607 |
| | 4/29/02 | $8,657,041 | $141,838 | $544,443 | $8,328,604 | $9,014,885 | $2,814,835 | $6,200,050 | $1,358,334 | $2,987,136 |
| IS3 Metrop. Deb, Series 3, Installment | 5/11/01 | $250,266 | $751 | $132 | $129,320 | $130,213 | $43,706 | $86,506 | $19,721 | $31,960 |
| | 4/29/02 | $171,276 | $1,134 | $0 | $137,942 | $139,076 | $46,821 | $92,455 | $21,012 | $37,150 |
| **Total** | | $246,639,330 | $2,610,604 | $12,647,149 | $202,319,849 | $217,677,602 | $68,393,798 | $149,183,804 | $33,100,510 | $63,691,917 |

Total Section 11 Losses + Prejudgment Interest:     $182,284,414          $212,876,721

**Summary of Section 11 Losses by Registration Statement**

| Registration Statement Effective Date | Total Principal Purchased during Effective Period | Accrued Interest | Compound Interest | Principal | Losses Excluding Settlement Distributions | Offset to Losses | Section 11 Losses | Prejudgment Interest using T-Bill Rates[1] | Prejudgment Interest using T-Coupon Rate and T-Bill Rates[2] |
|---|---|---|---|---|---|---|---|---|---|
| 2/13/01 | $24,621,611 | $220,132 | $1,379,326 | $18,151,436 | $19,750,894 | $6,140,413 | $13,610,481 | $3,066,464 | $5,372,654 |
| 5/11/01 | $94,031,551 | $969,028 | $6,347,645 | $73,033,908 | $80,350,581 | $20,683,416 | $55,667,165 | $12,170,427 | $22,383,028 |
| 2/13/02 | $35,304,260 | $341,674 | $3,385,604 | $30,439,672 | $32,334,949 | $10,209,361 | $22,038,589 | $5,017,347 | $10,070,761 |
| 4/29/02 | $91,881,878 | $1,079,770 | $3,536,608 | $80,697,833 | $85,241,178 | $27,273,908 | $57,867,568 | $12,846,371 | $23,865,474 |
| **Total** | $246,639,330 | $2,610,604 | $12,647,149 | $202,319,849 | $217,677,602 | $69,393,798 | $149,183,804 | $33,100,510 | $63,691,917 |

Total Section 11 Losses + Prejudgment Interest:     $182,284,414          $212,876,721

[1] T-Bill rates are the 1-year Constant Maturity Rates as of January 20 of each calendar year.
[2] The Coupon rate on each bond is used through the maturity date, then 1-year Constant Maturity rates as of January 20 are used.

EXHIBIT 1 PAGE 46

# Exhibit 6

EXHIBIT 1 PAGE 47

Exhibit 6
Metropolitan
Summary of Section 11 Damages -- Metropolitan Preferred Stock Series E-7 (PE7)

Assumptions:

| | |
|---|---|
| Suit Date | 1/20/2004 |
| Prejudgment Interest: | |
| Start Date | 11/3/2003 |
| End Date | 6/30/2009 |
| Years between Start & End Date | 5.7 |
| Average Annual Interest Rate using T-Bill Rates | 3.118% |
| Average Annual Interest Rate using Dividend Rate | 6.000% |

| | | Registration Effective 12/20/01 | | Registration Effective 8/13/02 | | Total | |
|---|---|---|---|---|---|---|---|
| | | Shares | Amount ($) | Shares | Amount ($) | Shares | Amount ($) |
| **Total PE7 stock acquired during Effective Period** | | | | | | | |
| Purchases | a | 1,034,338 | $25,857,388 | 1,144,634 | $28,600,851 | 2,178,972 | $54,458,238 |
| Reinvested dividends | b | 695 | $17,383 | 201,474 | $5,041,180 | 202,169 | $5,058,563 |
| Total | c = a + b | 1,035,033 | $25,874,771 | 1,346,108 | $33,642,031 | 2,381,141 | $59,516,802 |
| **Total PE7 stock acquired during Effective Period and subsequently sold via MIS** | | | | | | | |
| Sales of purchases | d | 153,294 | $3,832,360 | 119,797 | $2,994,927 | 273,091 | $6,827,287 |
| Sales of reinvested dividends | e | 648 | $16,211 | 14,122 | $353,080 | 14,770 | $369,290 |
| Total | f = d + e | 153,943 | $3,848,570 | 133,919 | $3,348,007 | 287,862 | $7,199,577 |
| **Purchases less sales** | g = c - f | 881,091 | $22,026,200 | 1,212,189 | $30,294,024 | 2,093,279 | $52,320,224 |
| **Shares assumed sold on AMEX [1]** | | | | | | | |
| Par value of transfers to CeDe account | h | | $12,676,673 | | $14,330,630 | | $27,007,302 |
| Market value of shares transferred to CeDe account as of transfer date | i | | $7,694,933 | | $8,433,712 | | $16,128,845 |
| Maximum percent of shares transferred to CeDe account sold on AMEX | j = i / *i | | 62% | | 62% | | 62% |
| Maximum offset to Section 11 losses for shares sold on AMEX | k = i * j | | $4,765,536 | | $5,229,356 | | $9,994,892 |
| **Losses prior to offset for settlement distributions** | l = g - k | | $17,257,664 | | $25,067,668 | | $42,325,332 |
| **Offsets for Settlement Distributions** | | | | | | | |
| Offset to losses from settlement distributions as % of par | m | | 3.83% | | 3.83% | | 3.83% |
| Offset to losses from settlement distributions ($) | n = g * m | | $843,419 | | $1,160,007 | | $2,003,425 |
| **Net Amounts** | | | | | | | |
| Section 11 losses | o = l - n | | $16,414,245 | | $23,907,661 | | $40,321,907 |
| Prejudgment interest using T-Bill rates | p | | $2,953,856 | | $4,290,632 | | $7,244,489 |
| Section 11 losses + Prejudgment Interest | q = o + p | | $19,368,102 | | $28,198,294 | | $47,566,396 |
| Prejudgment interest using dividend rate | r | | $5,699,101 | | $8,278,245 | | $13,977,346 |
| Section 11 losses + Prejudgment Interest | s = o + r | | $22,113,347 | | $32,185,906 | | $54,299,253 |

[1] This assumes that all trading on AMEX was a new sale of shares transferred to CeDe.
The market value of all PE7 stock purchased during the Effective Period and subsequently transferred to AMEX is calculated using AMEX closing prices as of the transfer date.

# Exhibit 7

EXHIBIT 1 PAGE 49



**MET INVESTORS TO GET $45 MILLION; Third payout likely in $2.3 billion financial collapse**

John Stucke
John Stucke Staff writer
300 words
27 July 2008
The Spokesman-Review
SPRV
ALL ZONES
B1
English
© 2008 The Spokesman-Review. Provided by ProQuest Information and Learning. All Rights Reserved.

About $45 million is set to be distributed to investors of Metropolitan Mortgage and Securities Inc. at the end of next week.

It will be the second repayment following the bankruptcy of the $2.3 billion Spokane-based financial conglomerate 4 1/2 years ago.

Maggie Lyons, administrator of the creditors trust borne out of the city's worst financial collapse, wrote in a letter to investors that those Metropolitan noteholders will receive about 10 cents on the dollar.

Investors holding notes in Metropolitan affiliate Summit Securities Inc. will receive about 6 cents on the dollar.

If an investor's notes are held by a brokerage, in most cases the money will be sent to the account. Other investors may receive checks in the mail from Wells Fargo Bank, which is handling the distribution.

A third payout could happen later this year. Lyons has said investors may ultimately collect about 33 cents on the dollar.

She urged investors to keep their addresses and status of note ownership current.

The money was collected through court settlements with accounting firms, the sale of real estate and other assets, and the release of reserves.

Metropolitan's failure hit about 16,000 investors. They held about $470 million in unsecured corporate bonds and about $131 million in preferred stock.

After years of struggles and questionable business dealings, federal investigations and an accounting scandal doomed the firm. One executive was convicted of felonies, and several others, including Chairman and Chief Executive C. Paul Sandifur Jr., settled accusations of fraud brought by the U.S. Securities and Exchange Commission.

ON THE WEB:

See the Metropolitan letter to creditors and read previous coverage at spokesmanreview.com.

Document SPRV000020080806e47r0000m

EXHIBIT 1 PAGE 50

# Exhibit 8

EXHIBIT __1__ PAGE __51__



 **Associated Press**

**Two settlements reached in Met Mortgage case**

564 words
18 May 2006
02:26 PM
Associated Press Newswires
APRS
English
(c) 2006.  The Associated Press.  All Rights Reserved.

SPOKANE, Wash. (AP) - Two settlements in the complicated bankruptcy case of Metropolitan Mortgage & Securities Co. will free up millions of dollars for creditors.

One agreement makes it possible to pay people who hold Met Mortgage debenture bonds between 7 cents and 8 cents on the dollar, said acting chief executive Maggie Lyons. Those holding debenture bonds of sister company Summit Securities Inc. will receive an initial payout of between 3 cents and 6 cents on the dollar.

At Metropolitan, bondholders hold debts of about $364 million. Summit bondholders are owed about $160 million.

The largest bankruptcy case in Spokane County history wiped out the investments of more than 10,000 people, many of them seniors living in the Northwest.

Managers brought in after the ouster of former Met Mortgage executives have sold property and other investments, depositing the proceeds into trust accounts.

But investors couldn't collect money until Met Mortgage reached an accord with Western United Life Assurance Co., its insurance affiliate, that was ordered into receivership by Washington Insurance Commissioner Mike Kreidler two years ago.

Kreidler contended the insurance company was mismanaged by Metropolitan and filed a bankruptcy claim of more than $220 million. Metropolitan attorney Barry Davidson has contended Metropolitan doesn't owe Western United any money.

Both sides agreed recently that the claim could be estimated at $50 million as a way to separate it from bondholders' claims. The deal allow the two sides to continue to battle over the full $220 million, while giving Met Mortgage a number it can use in its reimbursement calculations.

Earlier this week, Met Mortgage said investors would split about $15 million under another settlement.

The deal involves money salvaged from an insurance policy that the company purchased years ago to cover the costs of lawsuits brought against executives and board members.

Instead of lawyers consuming the $20.2 million available in the policy through continued litigation, the settlement would split the cash into four basic pools.

About 700 investors who sued their brokers will share about $4.75 million; another $5 million will be deposited into Metropolitan's bankruptcy account, which is intended to repay all creditors holding debenture bonds; about $4.9 million will be paid to investors who filed a class-action lawsuit; and about $5.2 million will be used to pay the defense costs of executives.

The settlement also calls for the dismissal of civil complaints filed by investors against all lower-level former Metropolitan executives, including William Smith, Gary Brajcich, Erik Skaggs, John Trimble, Reuel Swanson, the estate of Harold Erfurth, and Elaine Hoskin.

Those executives still facing investor-led lawsuits include former Chairman and Chief Executive Officer C.

EXHIBIT 1 PAGE 52

Paul Sandifur Jr., former President Thomas Turner, former Controller Robert Ness, former Chief Financial Officer William Snider, and former audit committee member and longtime board member Irv Marcus.

Attorney Brad Jones said the settlement has several legal hurdles to clear before it is final, perhaps sometime in the fall. Jones represents investors who filed the class-action lawsuit in early 2004 as the company filed for bankruptcy.

Jones said the class action lawsuit would continue against accounting firms and other professionals. Investors say those companies should have known about financial irregularities and questionable business dealings that sped the company's demise.

----

Information from: The Spokesman-Review,  http://www.spokesmanreview.com

7

Document APRS000020060518e25i002ke

EXHIBIT 1 PAGE 53

# Exhibit 9

EXHIBIT 1 PAGE 54



---

**Agreement Reached with NASD**

245 words
28 October 2003
05:50 PM
PR Newswire
PRN
English
Copyright (c) 2003 PR Newswire Association LLC. All Rights Reserved.

SPOKANE, Wash., Oct. 28 /PRNewswire/ -- Metropolitan Investment Securities, Inc. (MIS) has reached an agreement with the National Association of Securities Dealers (NASD), regarding retail sales practices of certain securities that took place between January of 2001 and March of 2003.

The agreement states that MIS will pay a fine to the NASD and offer a refund to specified clients, if they wish, who invested during that time frame. A special escrow account will be established for the benefit of other investors who invested during that time period. The agreement also states that MIS does not admit or deny any of the NASD's findings.

William Smith, Chief Financial Officer of the Company said, "We are very pleased that we have reached an agreement with the NASD, we've been a member of their organization for about twenty years and we are taking immediate steps to address their issues. This now means we have completely resolved this matter to the NASD's and to our satisfaction."

The fine to be paid NASD is $500,000 and the amount to be refunded, if all clients elect to do so, could range up to approximately $2.8 million.

As part of the agreement, MIS is limited with respect to the public statements that it can make regarding the agreement.

Web site: http://www.metmtg.com/

Document PRN0000020031028dzas008ew

EXHIBIT 1 PAGE 55



---

MAIN NEWS
**Met Mortgage affiliate settles fraud charges ; Securities firm admits no wrongdoing, faces; $500,000 fine, may have to repay some investors**

John Stucke   Staff writer
807 words
29 October 2003
The Spokesman-Review
SPRV
SPOKANE
A1
English
Copyright (c) 2003 Bell & Howell Information and Learning Company. All rights reserved.

An affiliate of Spokane-based Metropolitan Mortgage and Securities Inc. has been censured and fined $500,000 and may have to pay millions of dollars more in restitution to investors whom regulators say were deceived.

The condemnation and penalties were acknowledged for the first time Tuesday. They are part of a settlement last Thursday between Metropolitan Investment Securities Inc. (MIS) and the National Association of Securities Dealers (NASD), the private-sector enforcer of federal investment laws.

According to the NASD, the company committed fraud when it downplayed the risk of investing in Met Mortgage and its sister Idaho company, Summit Securities Inc., from January 2001 through March 2003.

About 35,000 investors are holding $580 million worth of Summit and Met Mortgage preferred stocks and debentures, which are bonds backed by little more than a company's promise to repay.

Met Mortgage has reported losses of $25.5 million so far this year. Although it posted a profit last year, it lost money the previous two years. But Metropolitan has not missed an interest payment on debentures in its 50-year history.

Metropolitan chief financial officer William Smith said Tuesday that the company cannot comment on the continued safety of the investments nor can the company offer any advice to worried investors or those who feel they were misled.

The company did not admit or deny any wrongdoing.

"We are very pleased that we have reached an agreement with the NASD," Smith said. "We are taking immediate steps to address their issues."

Many investors are seniors living in the Inland Northwest, vulnerable targets for MIS-registered representatives who told them in meetings that investments in Met Mortgage and Summit were "solid, conservative, dependable and immune from market volatility," according to the settlement.

Far from being solid investments, they "involved significant risk," the settlement states.

The company sells new bonds and stocks to raise enough cash to help meet maturing debts. The money also helps pay for real estate deals that often deliver handsome returns.

Met Mortgage was founded in 1953 and operates as a diversified financial firm that buys, holds and sells promissory notes and real estate. It also operates an insurance company.

It has been successful. Metropolitan has about 370 employees and operates from the Metropolitan Financial Center, a downtown highrise visible for miles.

The company's good fortunes have benefited Spokane through civic projects such as the Met Theater.

Smith declined to comment on whether Met Mortgage and Summit would turn to an outside brokerage firm to sell more debentures and stocks while MIS tries to solve the crisis. The NASD action calls into question

EXHIBIT 1 PAGE 56

Summit plans to raise $100 million by selling more stocks and bonds.

Without more money, the companies may face a cash crunch.

Smith declined to say if such problems may force either or both companies to seek bankruptcy court protection from creditors. He also declined to say if the companies controlled by Spokane magnate C. Paul Sandifur Jr. are attempting to find outside investors that could provide an infusion of cash.

"Everything we do is to serve the client and make the company successful," he said.

As part of the settlement, MIS may be forced to pay $2.8 million in restitution to certain investors. Smith declined to specify which investors may qualify.

Also, the company was ordered to put $1 million in escrow to refund the money of other disgruntled investors, if necessary.

The NASD notified MIS of its concerns earlier this year and launched the subsequent investigation.

It determined that at one time MIS had about 200 representatives selling Met Mortgage and Summit investments to people who were unsophisticated and dependant on MIS sellers for advice.

Furthermore, many of these representatives were inadequately supervised, poorly trained and inexperienced, according to the NASD. They failed to alert investors to the risks of investing in Met Mortgage and Summit.

The NASD also questioned the company's high-profile investment strategy.

For example, signs in Spokane flashing Met advertisements, such as "Tired of Low Bank Rate? Compare Ours," were misleading and omitted the investment risk, the NASD alleged.

Some employees wrongly characterized the investments as low to moderate risk. They focused on positive features of the investments, such as the company's longevity and history of interest payments.

Some customers put 20 percent of their net worth into Met and Summit, contrary to sound investment advice.

The NASD noted that MIS had just one supervisor overseeing all of the registered representatives selling investments. That, the settlement states, was inadequate.

"MIS management was often unable or unwilling to take effective supervisory action in the face of red flags indicating improper sales practices," the settlement stated.

Document SPRV000020031031dzat0001b

EXHIBIT 1 PAGE 57

# Exhibit 10

EXHIBIT 1 PAGE 58



**Metropolitan Mortgage & Securities to Delist Preferred Stock Company Will Not File Form 10-K as Scheduled**

502 words
26 December 2003
09:06 PM
PR Newswire
PRN
English
Copyright (c) 2003 PR Newswire Association LLC. All Rights Reserved.

SPOKANE, Wash., Dec. 26 /PRNewswire-FirstCall/ – Metropolitan Mortgage & Securities Co., Inc. today announced that, in order to facilitate the trading of its Series E-7 preferred stock on the Over-the- Counter Bulletin Board (OTCBB), it plans to delist the preferred stock from trading on the American Stock Exchange (AMEX) and will file the requisite applications with AMEX and the Securities and Exchange Commission (SEC) by December 31, 2003. Trading in the Company's preferred stock had been halted by AMEX as of December 15, 2003, and the Company was notified on December 22, 2003 that AMEX planned to begin the process of delisting the stock. AMEX's decision to delist was pursuant to Sections 1003 and 1009 of the AMEX's Company Guide. Specifically, the AMEX conveyed to the Company the AMEX's belief that continued listing raised public interest concerns and that the Company did not comply with the listing or other agreements with AMEX.

As a result of the delisting, the securities may be eligible for trading on an alternate exchange such as the OTCBB or the National Quotation Bureau, thus potentially enabling shareholders to buy and sell shares.

At the same time, Metropolitan said that it will not file its Annual Report on Form 10-K with the SEC until February 1, 2004 at the earliest. The Company said its auditor, Ernest & Young, will not be able to complete its audit review by the original December 29, 2003, deadline because, among other reasons, the Company is believed to have incurred losses in excess of those disclosed in its June 30, 2003, Form 10-Q report, and a review of those results has yet to be completed.

The Company also said it would suspend all payments, including interest and principal, on Metropolitan debentures and notes, effective 5:00 pm, Pacific time, on December 26, 2003.

Finally, Metropolitan said that, in order to provide additional autonomy for its insurance subsidiary, Western United Holding Company, C. Paul Sandifur, Jr. has resigned as an officer and director of Western Holding and its wholly-owned subsidiary Western United Life Assurance Company. John Van Engelen, previously senior vice president of Western United Holding Company, has been elected president, CEO and chairman of the insurance holding company.

Metropolitan Mortgage & Securities Co., Inc., incorporated in the State of Washington and headquartered in Spokane, had assets in excess of $1.7 billion at June 30, 2003.

The forward-looking statements in this release concerning future events are subject to certain risks and uncertainties that could cause actual results to differ materially from expectations. These and other risks are set forth in Metropolitan's reports filed with the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended.

Document PRN0000020031227dzcr000b5

EXHIBIT  1  PAGE 59

# Exhibit 11

EXHIBIT 1 PAGE 60



---

**'Rabbit Transactions' Fueled Demise of Spokane, Wash.-Based Mortgage Firm**

By John Stucke, The Spokesman-Review, Spokane, Wash.
Knight Ridder/Tribune Business News
1,009 words
9 June 2004
The Spokesman-Review (KRTBN)
KRTSR
English
Copyright (C) 2004 KRTBN Knight Ridder Tribune Business News

Jun. 9--Investors burned by unscrupulous sales practices and fraudulent financial reports at Metropolitan Mortgage & Securities Inc. may find payback by reaching into the deep pockets of prestigious accounting firms and wealthy former executives, according to a court-ordered investigation.

Special examiner Samuel Maizel sharply criticized Ernst & Young LLP for auditing practices that failed to reveal a doomed company.

The report, released Tuesday, also had harsh words for C. Paul Sandifur Jr., the Spokane power-broker who steered the $2 billion company inherited from his father into bankruptcy.

Maizel accused Sandifur of running a "virtual fiefdom" where he directed his inner circle of business advisers to concoct financial schemes to appear profitable even as the business collapsed.

Attempts to interview Sandifur failed Tuesday.

Maizel said in the report that Sandifur declined to be interviewed by the examiner's team. The former CEO threatened to invoke his Fifth Amendment right against self-incrimination had Maizel issued a subpoena.

Tens of thousands of investors, mostly senior citizens living in the Northwest, stand to lose more than a half-billion dollars invested with Metropolitan.

It's among the biggest financial disasters in Spokane history and has some of the hallmarks of recent accounting scandals within Enron Corp. and Adelphia Communications that undermined investor confidence in the financial markets.

Maizel's report provided examples of how Metropolitan, unable to earn a profit on its vast portfolio of investments and loans, fell into a pattern of making 11th-hour business deals designed to turn losses into profits at the end of year.

Sandifur once called these year-end tricks "rabbit transactions," because they were akin to pulling a rabbit out a hat, the report says. He later banned the nickname as inappropriate.

The report suggests that substantial dividends Sandifur paid to himself while the company teetered "may be recoverable as fraudulent transfers or illegal dividends."

Maizel and his team of accountants and other professionals spent 45 days digesting thousands of files, interviewing dozens of former and current Metropolitan employees and deposing key Metropolitan officials. The examiner's team could be paid up to about $900,000 for the work.

The effort culminated Tuesday in a 260-page report that includes thousands of pages of exhibits that reveal Metropolitan strategies average investors were never told.

Among them:

-- That Metropolitan cherry-picked real estate appraisals that allowed it to inflate loan and property values.

-- That the firm used inter-company transactions to hide losses and prevent certain loans from going into default.

EXHIBIT 1 PAGE 61

— And that Metropolitan was essentially a "deal house" where employees were paid extra to close as many transactions as possible, irrespective of quality.

As an example of these suspect year-end dealings, Maizel highlighted a timber/real estate deal in Hawaii.

Called the Koa Timber Property, two Metropolitan affiliates loaned $9.33 million to developers who wanted to log rare Koa wood.

Separately, Metropolitan acquired timber harvesting rights on the land for $2.5 million.

Two months later, just before the end of the year, Metropolitan sold its timber harvesting rights to one of the affiliates for $13.1 million.

The result: The year-end deal gave Metropolitan a $10.7 million profit on the transaction.

Several government agencies are investigating Metropolitan, including the U.S. Attorney's Office in Portland which has convened a federal grand jury to probe the company's stock and bond sales.

Other agencies looking into Metropolitan include the Federal Bureau of Investigation, the U.S. Securities and Exchange Commission, and the Washington Attorney General's Office.

Mike Shaffer, a class-action attorney representing some investors, said Maizel's report raised important questions about Ernst & Young, the Big Four accounting firm that quit as Metropolitan's independent auditor in January.

"Ernst & Young had a very special responsibility to bondholders in this case," he said. "Metropolitan was the kind of company where the normal checks and balances of the corporate world were absent.

"Unfortunately, (Ernst & Young) placed a greater importance on the fees paid by Metropolitan than in protecting investors."

Officials at Ernst & Young were unavailable for comment.

The firm is now a target of an unfolding legal strategy to wring money out of any firm or individual who may be responsible for the financial collapse, according to attorneys representing the company and creditors.

Ernst & Young became Metropolitan's auditor in 2001. It quit in January after determining that executives made "material misstatements" about the company's financial condition. Tom Turner, president of Metropolitan's Idaho sister company, Summit Securities Inc., was fired shortly afterward.

The auditors told Maizel they had concerns about Sandifur and Michael Agostinelli, Metropolitan's general counsel, who was fired in April.

Two lawyers involved with Metropolitan's bankruptcy say bondholders could recover 15 cents to 20 cents on the dollar if the company is liquidated.

Bill Romney, the chief restructuring officer directing Metropolitan through bankruptcy, found the report an accurate portrayal of what went wrong.

"It seems consistent with what I've seen," he said. Metropolitan hired Romney this year to preserve what was left of its crumbling business.

The firm's three insurance subsidiaries have been taken over by state regulators in Washington, Idaho and Arizona. About 87 percent of the assets of Metropolitan and Summit are held by the tightly regulated insurance companies.

Jim Odiorne, deputy insurance commissioner in Washington, said the largest of these companies, Western United Life Assurance Co., could be rehabilitated within a year.

Former Summit president Turner cooperated with Maizel. Turner answered questions for 14 hours without a lawyer present, the examiner said.

"Whatever people say about the guy, he's in there answering questions," Maizel said. "He was very forthright — and his testimony was helpful."

———

To see more of The Spokesman-Review, or to subscribe to the newspaper, go to
http://www.spokesmanreview.com

(c) 2004, The Spokesman-Review, Spokane, Wash. Distributed by Knight Ridder/Tribune Business News.

Document KRTSR00020040611e0690008e

EXHIBIT     1   PAGE  63



---

**Small Met recovery possible; Investors may get as little as 15 cents on dollar**

John Stucke Staff writer
Spokane
806 words
20 August 2004
The Spokesman-Review
SPRV
ALL ZONES
A1
English
Copyright (c) 2004 Bell & Howell Information and Learning Company. All rights reserved.

Investors in bankrupt Metropolitan Mortgage & Securities Co. could recover as little as 15 cents on the dollar, a devastating loss of wealth for the thousands of people who entrusted their savings to a company that's now plagued by accounting scandals and federal investigations.

The executive hired from outside to run Metropolitan after it filed for bankruptcy protection said Thursday the recovery depends on the successful sale of notes and property, especially beachfront lots in Hawaii that could be worth tens of millions.

"We've just begun to market the assets, and based on that alone, we estimate (a return) of 15 to 20 percent," said Bill Romney, Metropolitan's chief restructuring officer.

The number, which could mean total losses to investors of nearly $500 million, does not take into account other potential sources of money that creditors are pinning their hopes on: suing the auditors that were charged with ensuring Metropolitan's books were honest, and selling the company's three insurance subsidiaries. Investors could recover more, depending on how successful those strategies are.

Romney said those strategies are part of the company's plan of reorganization. A draft of the plan is circulating among attorneys this week, along with a disclosure statement that serves as a sort of prospectus for creditors to consider before deciding whether to vote for or against the plan. The draft of the plan may be released by the end of the month.

There are thousands of creditors, many of whom are seniors living in the Northwest.

Attorneys involved in the case said they can't comment on the merits of the plan.

But several had said earlier that a claim against Metropolitan's former auditors, accounting firms Ernst & Young LLP and PriceWaterhouseCoopers LLP, would be a tough legal fight.

Ernst and Young resigned as Metropolitan's outside auditor in January after determining that executives lied about real estate transactions designed to inflate profits and deceive regulators and investors. Ernst & Young also disavowed nearly three years of its audits, saying it couldn't trust Metropolitan's books.

Another unknown is the value of the company's three insurance affiliates, which now are under the control of regulatory officials in the three states in which they're based.

Idaho regulators have indicated a willingness to consider the sale of Old Standard Life Insurance. Arizona officials have taken a similar position on Old West Insurance.

However, Washington's insurance commissioner's office remains committed to rehabilitating Western United Life Assurance Co. and returning that company to creditors, Romney said. Before Metropolitan unraveled and filed for bankruptcy protection, former Chief Financial Officer Bill Smith estimated that about 87 percent of the company's assets were held within that subsidiary, known as WULA.

The insurance commissioner's office took over WULA in March, saying it wanted to protect policyholders and separate the tightly regulated company from Metropolitan.

Many of the problems afflicting Metropolitan were outlined in a scathing report by independent examiner Samuel Maizel.

EXHIBIT 1 PAGE 64

Filed in June, Maizel's report blamed former Metropolitan CEO C. Paul Sandifur Jr. of operating a financial house of cards that finally collapsed under government scrutiny.

Maizel also scrutinized accounting irregularities and questionable real estate deals that may be the basis of any legal claim against outside accountants. He has asked the bankruptcy court for another 60 days to further investigate the actions of accountants, as well as potential claims against Sandifur and other executives and officers.

Also, the examiner expects to look at the legal liability of Metropolitan's Denver-based law firm, Kutak Rock LLP, which continues to do legal work for Metropolitan. That work included drafting the reorganization plan and the disclosure statement, according to Kutak Rock's own billing statement charging Metropolitan more than $160,000 in attorney's fees from February through May.

Today, lawyers will argue in federal Bankruptcy Court in Spokane over Maizel's request to continue the examination of Metropolitan. The two creditors' committees involved in the case oppose more investigation. The first round cost about $900,000. Another 60 days could cost equally as much and creditors' attorney P.J. Grabicki said the next phase of investigation targeting accounting firms should be done by the lawyers who potentially could sue Ernst & Young on behalf of the investors.

Supporting Maizel's request, however, is the U.S. Securities and Exchange Commission and the Washington State Attorney General's Office.

SIDEBAR: AT A GLANCE WHAT'S NEXT Today, lawyers will argue in federal Bankruptcy Court in Spokane over independent examiner Samuel Maizel request to continue the examination of Metropolitan.

Business writer John Stucke can be reached at (509) 459-5419, or by e-mail at johnst@spokesman.com.

Document SPRV000020040821e08k00029

EXHIBIT 1 PAGE 65

# Exhibit 12

EXHIBIT 1 PAGE 66



## Dow Jones Newswires

**Metropolitan Mortgage Bd Votes To Temporarily Suspend Preferred Stk Div Payments**

11 words
3 November 2003
10:46 PM
Dow Jones News Service
DJ
English
(c) 2003 Dow Jones & Company, Inc.

Document DJ00000020031104dzb400012

EXHIBIT  1  PAGE 67

# Exhibit 13





---

**Metropolitan Mortgage & Securities to Delist Preferred Stock Company Will Not File Form 10-K as Scheduled**

502 words
26 December 2003
09:06 PM
PR Newswire
PRN
English
Copyright (c) 2003 PR Newswire Association LLC. All Rights Reserved.

SPOKANE, Wash., Dec. 26 /PRNewswire-FirstCall/ -- Metropolitan Mortgage & Securities Co., Inc. today announced that, in order to facilitate the trading of its Series E-7 preferred stock on the Over-the- Counter Bulletin Board (OTCBB), it plans to delist the preferred stock from trading on the American Stock Exchange (AMEX) and will file the requisite applications with AMEX and the Securities and Exchange Commission (SEC) by December 31, 2003. Trading in the Company's preferred stock had been halted by AMEX as of December 15, 2003, and the Company was notified on December 22, 2003 that AMEX planned to begin the process of delisting the stock. AMEX's decision to delist was pursuant to Sections 1003 and 1009 of the AMEX's Company Guide. Specifically, the AMEX conveyed to the Company the AMEX's belief that continued listing raised public interest concerns and that the Company did not comply with the listing or other agreements with AMEX.

As a result of the delisting, the securities may be eligible for trading on an alternate exchange such as the OTCBB or the National Quotation Bureau, thus potentially enabling shareholders to buy and sell shares.

At the same time, Metropolitan said that it will not file its Annual Report on Form 10-K with the SEC until February 1, 2004 at the earliest. The Company said its auditor, Ernest & Young, will not be able to complete its audit review by the original December 29, 2003, deadline because, among other reasons, the Company is believed to have incurred losses in excess of those disclosed in its June 30, 2003, Form 10-Q report, and a review of those results has yet to be completed.

The Company also said it would suspend all payments, including interest and principal, on Metropolitan debentures and notes, effective 5:00 pm, Pacific time, on December 26, 2003.

Finally, Metropolitan said that, in order to provide additional autonomy for its insurance subsidiary, Western United Holding Company, C. Paul Sandifur, Jr. has resigned as an officer and director of Western Holding and its wholly-owned subsidiary Western United Life Assurance Company. John Van Engelen, previously senior vice president of Western United Holding Company, has been elected president, CEO and chairman of the insurance holding company.

Metropolitan Mortgage & Securities Co., Inc., incorporated in the State of Washington and headquartered in Spokane, had assets in excess of $1.7 billion at June 30, 2003.

The forward-looking statements in this release concerning future events are subject to certain risks and uncertainties that could cause actual results to differ materially from expectations. These and other risks are set forth in Metropolitan's reports filed with the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended.

Document PRN0000020031227dzcr000b5

EXHIBIT 1 PAGE 69



MAIN NEWS
**Metropolitan Mortgage shuts down brokerage**

John Stucke  Staff writer
390 words
16 December 2003
The Spokesman-Review
SPRV
SPOKANE
A12
English
Copyright (c) 2003 Bell & Howell Information and Learning Company. All rights reserved.

Metropolitan Mortgage & Securities Inc. shut down its brokerage firm Monday after punishing fines and restrictions rendered it a liability.

About 12 people lost their jobs and 70 registered dealers with Metropolitan Investment Services (MIS) will need to affiliate with a different brokerage.

The closure may have triggered the suspension of Metropolitan stock on Monday. No preferred shares of Metropolitan and related companies traded on the American Stock Exchange.

"We're uncertain why," said Metropolitan spokeswoman Mary Keller.

A representative of AMEX could not be reached Monday.

The closure of MIS follows an October settlement that forced MIS to pay fines and restitution of about $4 million.

More importantly, the settlement with the National Association of Securities Dealers Inc. stripped the ability of MIS to sell debentures and preferred stock of its parent companies, which relied on MIS as their sole brokerage.

The restrictions have pushed Met Mortgage and Summit Securities Inc. into a cash crunch. Unable to issue stocks and bonds, the companies are struggling to raise money for debt refinancing or new investment. They have hired outside investment advisers to help steer them through the problems.

Keller said Monday that the Spokane financial firm owned by C. Paul Sandifur Jr. was still working on affiliating with a new brokerage.

Metropolitan stockholders have had their MIS accounts transferred to a Southern California investment house called Mutual Securities Inc.

Company executives have said letters are being sent to investors with pertinent information and contact numbers.

The holders of Metropolitan and Summit debentures will continue to receive periodic statements regarding their investments.

Investors can call Metropolitan with questions, Keller said.

Although the companies have suspended dividend payments on preferred stocks, the company has made no such announcements regarding its debentures.

Deb Bortner, chief of Washington state's securities division, urged investors to remain calm.

"There's really nothing any of the bondholders can do right now," she said. "People bought an unsecured piece of debt.

"On the other hand, this is a company with a lot of really valuable assets that can be sold."

EXHIBIT _1_  PAGE 70

The company claims to have assets of about $1.9 billion.

"Even if the company can't turn it around," Bortner said, "this company has assets and people are not going to end up with nothing."

Document SPRV000020031218dzcg0000k

# Exhibit 14

EXHIBIT____1___PAGE__72



**AMEX Suspends Trading in Metropolitan Mortgage & Securities Preferred Stock**

247 words
19 December 2003
08:09 PM
PR Newswire
PRN
English
Copyright (c) 2003 PR Newswire Association LLC.  All Rights Reserved.

SPOKANE, WASH., Dec. 19 /PRNewswire-FirstCall/ — Metropolitan Mortgage & Securities Co., Inc. said today that it has been advised by the American Stock Exchange (AMEX) that trading in the company's preferred stock has been suspended indefinitely.

The company said that AMEX expressed concerns about the closure of Metropolitan Investment Securities, Inc. (MIS) and about the concerns expressed by the National Association of Securities Dealers (NASD) with respect to the sales practices of MIS in the Acceptance, Waiver and Consent between the NASD and MIS. Additionally, AMEX expressed a desire to review the company's annual report on Form 10-K which has not yet been filed. The AMEX has not indicated when, or if, trading would resume.

Metropolitan Mortgage & Securities Co., Inc., incorporated in the State of Washington and headquartered in Spokane, has assets in excess of $2.0 billion. Founded in 1953 by the late C. Paul Sandifur, Sr., today Metropolitan is lead by his son, C. Paul Sandifur, Jr.

The forward-looking statements in this release concerning future events are subject to certain risks and uncertainties that could cause actual results to differ materially from expectations. These and other risks are set forth in Metropolitan's reports filed with the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended.

Document PRN0000020031220dzck000m9

EXHIBIT 1 PAGE 73