1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF WASHINGTON

3

4

5                                          No. CV-04-25-FVS

6
     In re METROPOLITAN SECURITIES
7    LITIGATION

8                                          **AMENDED** ORDER DENYING
                                           CROSS MOTIONS FOR SUMMARY
9                                          JUDGMENT WITH RESPECT TO
                                           NEGATIVE CAUSATION
10

11

12        **THIS ORDER** modifies the following sections of court record number

13   922:  page 10, line 3; page, 13, lines 11 and 12; page 14, lines 1 and

14   7.

15        **BACKGROUND**

16        The plaintiffs purchased securities that were issued by

17   Metropolitan Mortgage & Securities Co., Inc., ("Met"), and Summit

18   Securities, Inc. ("Summit").  Met and Summit issued the securities

19   pursuant to four registration statements.  Each registration statement

20   incorporated a financial statement.  The companies' respective

21   financial statements for Fiscal Year ("FY") 2000 were audited by

22   PricewaterhouseCoopers ("PwC").  Their respective financial statements

23   for FY 2001 were audited by Ernst & Young ("E&Y").

24        The plaintiffs have hired Harris L. Devor to review PwC's and

25   E&Y's work.  In his opinion, they committed a number of errors.  For

26   one thing, they allegedly allowed Met and Summit to overstate their

ORDER - 1

stockholders' equity in their FY 2000 and FY 2001 financial statements. (Rule 26 Statement of Harris L. Devor at 11-15.) For another thing, PwC and E&Y allegedly did not challenge Met's and Summit's failure to maintain internal controls that, according to Mr. Devor, were necessary in order to substantiate the value of their assets. *Id.* at 112-16. Finally, PwC and E&Y allegedly did not challenge Met's and Summit's practice of accruing interest on loans that had been delinquent for 90 or more days. *Id.* at 117. Taken together, say the plaintiffs, PwC's and E&Y's errors permitted Met and Summit to falsely present themselves as healthy companies when, in fact, they were desperately ill.

During the Summer and Fall of 2003, the value of the plaintiffs' securities collapsed. The plaintiffs filed suit on January 20, 2004. They seek relief pursuant to § 11 of the Securities Act of 1933. 15 U.S.C. § 77k. Section 11 "creates a private remedy for any purchaser of a security if 'any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *In re Daou Systems, Inc.*, 411 F.3d 1006, 1027 (9th Cir.2005) (quoting 15 U.S.C. § 77k(a)). "Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). An accountant's potential liability under § 11 is not as broad. *Id.* at 381 n.11, 103 S.Ct. 683 (citing 15 U.S.C. § 77k(a)(4)).

"Section 11 of the 1933 Act permits an action against an accountant based on material misstatements or omissions in a registration statement, but only as to those portions of the statement that purport to have been prepared or certified by the accountant." *Monroe v. Hughes*, 31 F.3d 772, 774 (9th Cir.1994).

The plaintiffs may recover damages from PwC and E&Y in the event they prevail under § 11.  The measure of damages is:

> **the difference between the amount paid for the security** (not exceeding the price at which the security was offered to the public) **and (1) the value thereof as of the time such suit was brought**, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought[.]

15 U.S.C. § 77k(e) (emphasis added).  However, § 11(e) creates an affirmative defense:

> **[I]f the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security** resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, **such portion of or all such damages shall not be recoverable.**

15 U.S.C. § 77k(e) (emphasis added).  Typically, courts refer to the defendant's burden as that of proving "negative causation." *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 340 (2d Cir.1987).  Proving

ORDER - 3

negative causation is a heavy, but not insurmountable, burden. *Id.* at 340-41. The parties have filed cross motions for summary judgment with respect to negative causation.

**STANDARD**

Rule 56(c) provides in part, "[J]udgment . . . should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." At trial, PwC and E&Y will bear the burden of persuasion with respect to the affirmative defense established by 15 U.S.C. § 77k(e). They will be required to prove "the depreciation in value [alleged by the plaintiffs] resulted from factors other than the material misstatement[s] in the registration statement[s]." *Akerman*, 810 F.2d at 340. The fact PwC and E&Y will bear the burden of persuasion at trial shapes the parties' respective burdens at this stage in the proceedings. *See Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir.2000) (hereinafter "*Nissan Fire & Marine*"). In order for the plaintiffs to qualify for summary judgment, they must demonstrate no rational juror could find for the auditor defendants. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir.2007). In order for PwC and E&Y to qualify for summary judgment, they must prove a rational juror would be compelled to find for them. *See id.* If a rational juror could find for PwC and E&Y, but would not be compelled to do so, a jury issue exists.

ORDER - 4

**RULING**

PwC's and E&Y's joint request for summary judgment is based, in large part, upon principles of loss causation. The term "loss causation" is associated with actions arising under § 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (hereinafter "*Dura*"). In *Dura*, the Supreme Court emphasized, "A private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss." *Id.* at 338, 125 S.Ct. 1627. Courts usually refer to this requirement as "loss causation." *Id.* The § 10(b) plaintiff's burden of proving "loss causation" is the "mirror image" of the § 11 defendant's burden of proving "negative causation." *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2005 WL 375314, at *6 (S.D.N.Y. Feb. 17, 2005) ("the negative causation defense in Section 11 and the loss causation element in Section 10(b) are mirror images"). In *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1422-23 (9th Cir.1994) (hereinafter "*WOW*"), the Ninth Circuit drew upon the concept of loss causation in order to determine whether a § 11 defendant was entitled to summary judgment on its defense of negative causation. Thus, cases discussing loss causation provide useful guidance regarding negative causation.

The plaintiffs place great weight upon *WOW*. While *WOW*'s explanation of negative causation has never been overruled, a word of caution is in order. *WOW* was decided before *Dura*. As a result, *WOW* should be read in light of *Dura* and the cases that have interpreted

it.  One of the more important is *Lentell v. Merrill Lynch & Co.*, 396
F.3d 161 (2d Cir.2005).  In *Lentell*, the Second Circuit "described the
two requirements necessary to establish loss causation: 1) the loss
must be foreseeable, and 2) the loss must have been caused by the
materialization of the concealed risk."  *In re Flag Telecom Holdings,
Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir.2009) (citing *Lentell*, 396
F.3d at 173).

     The first element of loss causation is foreseeability.  The term
"foreseeability" is based, to some extent, upon the tort-law concept
of proximate cause.  *Lentell*, 396 F.3d at 172 (citation omitted).
"[A] misstatement or omission is the 'proximate cause' of an
investment loss if the risk that caused the loss was within the zone
of risk *concealed* by the misrepresentations and omissions alleged by a
disappointed investor."  *Id.* at 173 (emphasis in original) (citation
omitted).  One of the critical considerations is whether the
defendant's misstatements or omissions prevented a reasonable investor
from perceiving the true risk of the investment.  If the information
misstated or omitted by the defendant was such that a reasonable
investor would have perceived a zone of risk associated with the
investment had he known the true state of affairs, and if the
investor's loss ultimately falls within the zone of risk that was
hidden from him by the defendant's misstatements or omissions, then
the defendant's misstatements or omissions may be deemed a foreseeable
cause of the investor's loss.  *Lentell*, 396 F.3d at 173-74 (quoting
*Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 188 (2d Cir.2001)

ORDER - 6

(quoting *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 235 (2d Cir.2000) (Jacobs, J., concurring in the mandate))).

The second element of loss causation is the materialization of the risk. A § 10(b) plaintiff must prove the defendant's misstatement or omission was revealed to the public and the public reacted adversely to the revelation. *In re Williams Securities Litigation-WCG Subclass*, 558 F.3d 1130, 1137-38 (10th Cir.2009). There are many ways in which the relevant truth may emerge in the marketplace. By way of illustration, a company may disclose to the public, either directly or indirectly, that a previously concealed risk exists. *Id.* at 1138. Again by way of illustration, a previously concealed risk may materialize. *Id.*

PwC and E&Y question whether *WOW*'s discussion of negative causation is consistent with the authorities cited above. It is necessary, therefore, to carefully review *WOW*. In that case, a toy company offered securities for sale to the public. 35 F.3d at 1411. The prospectus incorporated financial statements that had been certified by the company's accountant. *Id.* at 1412-13. The plaintiffs purchased securities from the company. Shortly thereafter, the company began to report losses. The losses mounted to the point the company decided to file for bankruptcy. *Id.* at 1411. A number of investors commenced a lawsuit. They sought damages from the accountant under § 11. *Id.* at 1421. In essence, they alleged the accountant's determinations regarding certain sales practices allowed the toy company to "'pump up' revenue figures without completing

ORDER - 7

actual sales." *Id.* at 1717.  The accountant asserted the defense of
negative causation,  15 U.S.C. § 77k(e), and filed a motion for
summary judgment.  The district court granted the motion because the
toy company had not disclosed the accountant's errors to the public.
*Id.* at 1422.  The Ninth Circuit reversed.  It noted that, during the
six-month period between the public offering and bankruptcy, the toy
company had made public disclosures concerning its mounting losses.
*Id.* at 1422-23.  The disclosures revealed steps the company had taken
in order to properly account for the controversial sales practices.
*See id.*  The plaintiffs presented expert testimony indicating the
company's "disclosures *directly related* to the transactions for which
[the accountant] allegedly made erroneous accounting
determinations[.]"  *Id.* (emphasis in original).  Not only that, but
also the accountant acknowledged the decline in value of the company's
securities "corresponded precisely" to the disclosures.  *Id.*  The
Ninth Circuit held those circumstances created a genuine issue of
material fact.  *Id.* at 1423.  The circuit court explained its holding
more fully in a footnote:

> The plaintiffs contend that [the accountant's] alleged
> errors directly affected the market price of the debentures
> by causing the creation of reserves to account for "false
> sales" and, in some cases, actually enabling WOW to
> consummate transactions it otherwise never would have
> attempted.  That contention states a direct correlation
> between the alleged misstatements (faulty revenue
> recognition) and the loss (the decline in debenture price)
> and, accordingly, is sufficient to nullify [the
> accountant's] "loss causation" defense on summary judgment.

ORDER - 8

*Id.* at 1423 n.5.  The Ninth Circuit's holding regarding negative causation is consistent with *Lentell* and other post-*Dura* cases.  The toy company's accountant allegedly erred by permitting the company to recognize revenue in certain situations.  The alleged error concealed the risk the company might not have enough money-producing sales to repay its debts.  After the plaintiffs purchased their securities, but before the toy company filed for bankruptcy, the company disclosed mounting losses.  Although the company did not admit its accountant had erred, the company did reveal it had created reserves to account for the controversial "sales."  The revelation was directly related to the accountant's alleged error.  Furthermore, the revelation disclosed the existence of a previously concealed risk, and the investors produced evidence indicating the marketplace reacted negatively to the company's disclosures.  Thus, a jury issue existed with respect to whether the investors suffered a foreseeable loss.

Read together, *WOW*, *Dura*, and *Lentell* clarify the law governing PwC's and E&Y's affirmative defense of negative causation.  At trial, they will be required to prove the plaintiffs' alleged losses were caused by a factor or factors other than the market's adverse reaction to the revelation of a risk they allegedly concealed.  Since PwC and E&Y will bear the burden of persuasion at trial, they are entitled to summary judgment only if a rational jury would be compelled to find for them on their affirmative defense.  *See Soremekun*, 509 F.3d at 984.  More precisely, they are entitled to summary judgment only if a rational jury would be compelled to find the plaintiffs' alleged

ORDER - 9

losses were caused by a factor or factors other than the market's adverse reaction to the revelation of a risk they allegedly concealed. The plaintiffs do not bear the burden of persuasion on negative causation.  In order to obtain summary judgment on the issue, they must show that a rational jury would be unable to find for PwC and E&Y.  *See Nissan Fire & Marine*, 210 F.3d at 1102.  More precisely, they must show that a rational jury would be unable to find their alleged losses were caused by a factor or factors other than the market's adverse reaction to the revelation of a risk previously concealed by PwC and/or E&Y.  With these principles in mind, it is appropriate to turn to the evidence presented by the parties.

PwC sold a tax shelter to Met during FY 1999.  The shelter was named the "Foreign Leveraged Investment Program" ("FLIP").  It consisted of series of investments in a Swiss bank and other foreign corporations.  PwC indicated the FLIP would result in an $80 million loss that would generate $28 million in tax savings.  PwC issued a written opinion indicating, on a "more likely than not" basis, Met would be permitted to retain the tax savings generated by the FLIP in the event the Internal Revenue Service ("IRS") challenged the transaction.  The FLIP transaction figured in Met's FY 2000 and 2001 financial statements.  PwC audited the FY 2000 financial statement. E&Y audited the FY 2001 financial statement.  The plaintiffs allege PwC's and E&Y's accounting treatment of the FLIP transaction violated generally accepted accounting principles ("GAAP") and enabled Met to overstate its shareholders' equity during both fiscal years.  As it

ORDER - 10

turned out, the IRS challenged the FLIP transaction.  A newspaper published articles on the 16th and 23rd of August, 2003, disclosing the IRS's action.  During that month, the price of Met's publicly-traded securities dropped dramatically, rebounded some, and began to drop again.

The evidence summarized above is sufficient to defeat PwC's and E&Y's motion for summary judgment with respect to negative causation. The plaintiffs allege PwC's and E&Y's accounting treatment of the FLIP transaction enabled Met to overstate its stockholders' equity in both its FY 2000 and FY 2001 financial statements.  The overstatement significantly altered the total mix of information that was available to potential investors.  *See AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 235 (2d Cir.2000) (Jacobs, J., concurring in the mandate). A person who was evaluating the risk Met would default on its debts would have viewed the company's debt securities more cautiously had he known the stockholders' equity was significantly overstated.  So, too, a person who was attempting to predict the future performance of Met's equity securities.  It follows PwC's and E&Y's alleged accounting error concerning the FLIP transaction concealed the true risks that investors faced.

During August of 2003, information leaked into the marketplace that allegedly indicated the risks associated with Met's securities were greater than investors had realized.  A Spokane newspaper published articles on the 16th and 23rd of August indicating the IRS was challenging the FLIP transaction.  It is true, as PwC and E&Y

observe, that the articles did not disclose the existence of PwC's and E&Y's alleged accounting errors.  However, a "disclosure need not precisely mirror the earlier misrepresentation[.]"  *In re Williams Securities Litigation-WCG Subclass*, 558 F.3d at 1140.  It is sufficient that the disclosure "relate[s] back to the misrepresentation and not to some other negative information about the company[.]"  *Id.; see also Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1063 (9th Cir.2008) ("Plaintiffs adequately pled loss causation in *Daou* because their complaint alleged that the market learned of and reacted to this fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally." (citing *In re Daou Systems, Inc.*, 411 F.3d at 1026)).

     The plaintiffs allege the marketplace reacted adversely to the disclosure of the IRS's response to the FLIP transaction.  There is evidence in the record supporting their allegation.  For example, the share price of Met's publicly-traded securities declined after the newspaper articles appeared.  PwC and E&Y dispute the plaintiffs' assessment of the evidence.  As they point out, other negative information concerning Met and Summit was making its way into the marketplace.  Given the existence of the information cited by PwC and E&Y, a rational juror could find the share price decline that began during August of 2003 was a result of factors other than the revelation of the IRS's decision to challenge the FLIP transaction. That is to say, a rational juror could find for PwC and E&Y on the issue of negative causation; which means the plaintiffs are not

ORDER - 12

entitled to summary judgement.  Nevertheless, a rational juror would not be compelled to find for PwC and E&Y.  A rational juror could find the disclosure of the IRS's decision was a substantial factor in the August decline in the share price of Met's publicly-traded securities; which means PwC and E&Y are not entitled to summary judgment either.

The preceding ruling does not discuss, much less resolve, all of the plaintiffs' theories of loss causation.  There are two reasons why the Court declines to say more.  To begin with, it is unnecessary.  The Court has identified genuine issues of material fact that preclude summary judgment; that is enough to adjudicate the parties' motions.  Furthermore, the plaintiffs' "materialization of the risk" theory raises issues that require further analysis.  The plaintiffs clarified this theory at oral argument.  They submit the errors PwC and E&Y allegedly committed while conducting the FY 2000 and FY 2001 audits created a risk the Securities and Exchange Commission ("SEC") would be unwilling to approve new registration statements submitted by Met and Summit.  According to the plaintiffs, the risk materialized when Summit allegedly was unable to satisfy the concerns the SEC expressed in its 2002 and 2003 "comment" letters.  The problem with the plaintiff's "materialization of the risk" theory is this:  It is questionable whether the risk of delay by the SEC "was within the zone of risk *concealed* by the misrepresentations and omissions alleged by [the plaintiffs]."  *Lentell*, 396 F.3d at 173 (emphasis in original).  It would be one thing if there was evidence indicating PwC and E&Y made misrepresentations regarding the SEC's review of future

ORDER - 13

registration statements.  Such misrepresentations arguably could have deceived investors into discounting the risk of SEC disapproval.  However, there is no evidence PwC and E&Y overstated the likelihood the SEC would approve future registrations statements or understated the financial problems Met and Summit would experience if the SEC refused to do so.  Perhaps the plaintiffs can maintain their materialization theory without such evidence; though the Court is skeptical.  In any event, since it is unnecessary to resolve the issue in order to adjudicate the parties' cross-motions for summary judgment, the Court declines to do so.

**IT IS HEREBY ORDERED:**

1. The plaintiffs' motion for partial summary judgment (**Ct. Rec. 771**) is **denied**.

2. PricewaterhouseCoopers' and Ernst & Young's joint motion for summary judgment (**Ct. Rec. 751**) is **denied**.

**IT IS SO ORDERED.**  The District Court Executive is hereby directed to enter this order and furnish copies to counsel.

**DATED** this   22nd   day of January, 2010.


                    s/ Fred Van Sickle
                   Fred Van Sickle
            Senior United States District Judge

ORDER - 14