UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

No. CV-04-25-FVS

In re METROPOLITAN SECURITIES
LITIGATION

ORDER GRANTING AND
DENYING ROTH CAPITAL
PARTNERS' MOTION FOR
SUMMARY JUDGMENT

**THIS MATTER** came before the Court for oral argument on January 5, 2010, based upon Roth Capital Partners' motion for summary judgment.

**BACKGROUND**

Metropolitan Mortgage & Securities Co., Inc., ("Met"), and Summit Securities, Inc. ("Summit") sold securities through Metropolitan Investment Securities, Inc. ("MIS"). MIS was governed by the rules established by the National Association of Securities Dealers ("NASD"). Since MIS was a wholly-owned subsidiary of Summit, and since it was affiliated with Met, MIS had to hire a qualified independent underwriter ("QIU") to recommend the maximum offering price for equity securities or the minimum yield for debt securities. MIS retained Roth Capital Partners, LLC, ("Roth") to serve as its QIU. In that capacity, Roth participated in the preparation of a number of registration statements Met and Summit filed with the Securities and Exchange Commission ("SEC"). The plaintiffs purchased securities

ORDER - 1

pursuant to four registration statements with respect to which Roth
served as the QIU.  By the end of 2003, the securities had lost all,
or nearly all, of their value.  The plaintiffs filed an action during
January of 2004.  They seek damages from Roth under § 11 of the
Securities Act of 1933.  15 U.S.C. § 77k(a).  Roth moves for summary
judgment on a number of issues.

**MISSTATEMENTS AND/OR OMISSIONS**

The plaintiffs allege the offering materials contain multiple
misstatements and/or omissions.  Roth argues it may not be held liable
for five of them.  One alleged misstatement and/or omission is located
in a section of a prospectus that is entitled "RISK FACTORS."  The
plaintiffs challenge the accuracy of the following statement, "We will
rely, in part, on our subsidiaries to make payments to us in order for
us to make payments on the certificates."  A second alleged
misstatement and/or omission is located in a section of a prospectus
that is entitled "USE OF PROCEEDS."  The plaintiffs challenge the
prospectus' description of the manner in which the proceeds of the
offering will be used by Met and Summit.  A third alleged misstatement
and/or omission is located in a section of a prospectus that is
entitled "PLAN OF DISTRIBUTION."  The plaintiffs challenge the
accuracy of the following statement, "[S]ales will only be made in
compliance with the suitability standards listed in Rule 2720 of the
NASD Conduct Rules."  A fourth alleged misstatement and/or omission is
located in a Form 10-K.  The plaintiffs allege it failed to disclose
the existence of a lawsuit.  A fifth alleged misstatement and/or

ORDER - 2

omission is located in a Met registration statement that was filed on March 27, 2003.  The plaintiffs challenge the accuracy of the following statement, "If MIS is unable to continue selling our" securities, "our business would be harmed."

The plaintiffs deny they are conceding summary judgment with respect to any of the alleged misstatements and/or omissions listed above.  Nevertheless, they have not discussed the third, fourth or fifth alleged misstatements and/or omissions.  Their silence is dispositive.  If a nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party is entitled to summary judgment.  *See Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir.2000) (hereinafter "*Nissan Fire & Marine*").  Roth is entitled to summary judgment with respect to the third, fourth and fifth alleged misstatements and/or omissions.[1]

What about the first and second alleged misstatements and/or

[1]Nor is there much the plaintiffs could have said concerning the fourth and fifth alleged misstatements and/or omissions.  As for the fourth, Summit disclosed the existence of the lawsuit in a section that is entitled "SERVICING, COLLECTION AND DELINQUENCY EXPERIENCE."  The next to the last sentence in the last paragraph states, "In August of 2001, Summit filed litigation against [Hawaii Forest Preservation LLC] and related parties in the State of Hawaii where Summit seeks recovery of amounts due under the Timber Harvesting Agreement."  As for the fifth alleged misstatement and/or omission, the plaintiffs appear to concede the March 27, 2003, registration statement does not fall within the scope of their § 11 claim against Roth.

ORDER - 3

omissions?  Roth argues it is entitled to protection under the "safe
harbor" provisions of the Private Securities Litigation Reform Act of
1995 ("PSLRA"), Pub.L. No. 104-67, 109 Stat. 743 (1995).  The PSLRA
shelters "forward looking statements" in certain situations.  15
U.S.C. § 77z-2(c)(1).  By way of example, Roth may not be held liable
for a forward looking statement that is accompanied by "meaningful
cautionary statements identifying important factors that could cause
actual results to differ materially from those in the forward-looking
statements[.]"  15 U.S.C. § 77z-2(c)(1)(A)(i).  Again by way of
example, Roth may not be held liable for a forward looking statement
if the plaintiffs fail to demonstrate the statement was made or
approved by an executive officer with actual knowledge the statement
was false or misleading.  *See* 15 U.S.C. § 77z-2(c)(1)(B)(ii).

     As explained above, the first alleged misstatement and/or
omission is located in the "RISK FACTORS" section of a prospectus.  It
says, "We will rely, in part, on our subsidiaries to make payments to
us in order for us to make payments on the certificates."  The
plaintiffs allege the statement is false because Met's and Summit's
insurance subsidiaries were barred by law from making "upstream"
payments.  In evaluating the plaintiffs' allegation, the first thing
to note is the disputed statement sets forth Met's and Summit's plan
to receive payments from their insurance subsidiaries in the future.
"[P]lans and objectives . . . for future operations" are forward
looking statements.  15 U.S.C. § 77z-2(i)(1)(B).  Pre-PSLRA cases held
an underwriter may seek protection for forward looking statements.  *In*

ORDER - 4

*re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1415-21 (9th Cir.1994) (extending the "bespeaks caution" doctrine, which was codified by the PSLRA, to an underwriter).  There is nothing in the PSLRA indicating Congress intended to modify this rule.  Consequently, Roth is entitled to summary judgment if it demonstrates the above-quoted sentence is accompanied by meaningful cautionary statements or if the plaintiffs fail to demonstrate an executive officer approved the sentence with actual knowledge it was false.

The text following the disputed sentence contains cautionary language.  "To use money for dividends, these insurance companies must obtain permission from the insurance commission in their state of domicile.  If our subsidiaries stopped making payments to us, we may be unable to pay the full amounts owed to you on the certificates."  The plaintiffs argue the preceding statements were insufficiently cautionary.  According to the plaintiffs, it would have been difficult for the insurance subsidiaries to obtain permission to make payments to their parent companies and, even if they had obtained permission, the amount of money they could have paid would have been minimal in view of insurance regulations limiting such payments.  The Court assumes the plaintiffs' factual allegations are true.  Even so, it is questionable whether a rational jury could find the disputed language was inadequate.  The prospectus provides no assurance state regulators will authorize the insurance subsidiaries to make "upstream" payments to Met and Summit; this despite informing potential investors such authorization is required.  Nevertheless, assuming a rational jury

ORDER - 5

could find the disputed language was inadequate, the plaintiffs must demonstrate an executive officer approved the disputed language knowing it was false.  The plaintiffs argue a rational jury could draw such an inference from the record.  They cite interviews of Met's and Summit's officers.  Although the notes of the interviews are difficult to read, they seem to suggest the officers were aware the insurance subsidiaries were closely regulated.  Given the officers' awareness, say the plaintiffs, a rational jury could infer they knew the disputed language was false.  The problem with the plaintiffs' position is this:  It is one thing to demonstrate the officers knew the insurance subsidiaries were closely regulated; quite another thing to demonstrate they knew the subsidiaries would not be able to make significant payments to their parent companies.  The plaintiffs have submitted a declaration from C. Paul Sandifur, Jr.  He owned or controlled the common stock of both Met and Summit, and he played a pivotal role in the events that led to the companies' demise.  There is nothing in his declaration from which a rational jury could infer he knew the insurance subsidiaries could not make the payments described in the prospectus.  Absent such evidence (or something like it), the inference requested by the plaintiffs is unwarranted.  A rational jury would be unable to find the officers who approved the disputed language knew it was false.

The second of the five alleged misstatements and/or omissions is located in a section that is entitled "USE OF PROCEEDS."  In essence, the registration statement claimed 80% of the proceeds would be used

to fund new investments and 20% of the proceeds would be used to develop real estate the companies held or acquired.  The plaintiffs allege those representations were false.  In the plaintiffs' opinion, Met and Summit had to sell securities in order to stay in business.  This allegation is supported by Mr. Sandifur's declaration.  Thus, were the 80%/20% statement the only statement concerning the use of proceeds, the plaintiffs would have a compelling argument; but, as Roth points out, the "USE OF PROCEEDS" section contains cautionary language.  "To the extent internally generated funds are insufficient or unavailable, proceeds of this offering may be used for retiring maturing investment debentures and notes, preferred stock dividends and for general corporate purposes, including debt service and other general operating expenses."  The preceding statement provided a meaningful warning to potential investors.  In light of the warning, investors had notice that proceeds might be applied in a manner other than the 80%/20% split set forth in the section.

In sum, Roth is entitled to summary judgment on all five statements listed above.  Insofar as the first statement is concerned (*i.e.,* "will rely"), it is because a rational jury would be unable to find the officer who approved the language knew it was false.  Insofar as the second statement is concerned (*i.e.,* "use of proceeds"), it is because a rational jury would be unable to find it lacked meaningful cautionary language.  Insofar as the third, fourth and fifth statements are concerned, it is because the plaintiffs did not attempt to establish the existence of genuine issues of material fact.

ORDER - 7

Consequently, the plaintiffs may not obtain damages from Roth based upon the statements listed above.

**"EXPERTISED" PORTIONS OF REGISTRATION STATEMENTS**

An underwriter may not be held liable for those parts of a registration statement whose accuracy has been certified by an accountant -- *i.e.*, the "expertised" parts of the registration statement -- if the underwriter "'had no reasonable ground to believe, and did not believe . . . that the statements therein were untrue or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *In re Software Toolworks Inc.*, 50 F.3d 615, 623 (9th Cir.1994) (quoting 15 U.S.C. § 77k(b)(3)(C)).  The plaintiffs acknowledge the rule, but submit Roth's purported reliance upon PwC's and E&Y's accounting determinations was unjustified because Roth was confronted with "red flags" indicating PwC's and E&Y's calculations were incorrect.  By way of example, the plaintiffs cite the accountants' determinations regarding a tax shelter named the "Foreign Leveraged Investment Program" ("FLIP").  The plaintiffs argue Roth should have questioned PwC's and E&Y's determinations.  For one thing, there was the sheer magnitude of the transaction.  According to the plaintiffs, the benefits associated with FLIP constituted 75% of Met's income during Fiscal Year ("FY") 1999.  For another thing, Met's reliance upon the transaction posed troubling questions about the company's future profitability.  According to the plaintiffs, Met would have had to generate 80 million dollars in future profits in

ORDER - 8

order to take advantage of FLIP.  In response, Roth insists the plaintiffs have misstated the nature of a "red flag."  Contrary to the plaintiffs' contention, a red flag is not a circumstance that would cause one expert to question another expert's determinations.  Rather, a red flag is a circumstance that would cause a layman to question an expert's determinations.  A "backdated" is an example of a red flag. *In re Software Toolworks Inc.*, 50 F.3d at 623-24.  One doesn't have to be an expert to realize a "backdated" contract is an harbinger of trouble.  Not so PwC's and E&Y's treatment of the FLIP.  One must be an accountant, or possess considerable knowledge about accounting, in order to evaluate the propriety of their accounting determinations. An underwriter is not required to second guess an accountant's treatment of a tax shelter.  Nor is an underwriter required to perform complex analysis of a company's cash flow in order to evaluate an accountant's determinations.  This is especially true where, as the plaintiffs concede, "[t]he [relevant] information was buried in the financials and difficult for even an experienced analyst . . . to find[.]"  (Plaintiffs' Memorandum Opposing Roth's Motion for Summary Judgment (Ct. Rec. 819) at 13.)

     In sum, Roth was not required to perform complex financial analysis, nor was it required to challenge PwC's and E&Y's accounting determinations.  Instead, Roth was obligated to look for red flags. The plaintiffs have failed to identify any circumstance that should have put a layman on notice that PwC's and E&Y's accounting determinations were untrue or misleading.  As a result, Roth was

ORDER - 9

entitled to rely upon the accounting determinations that are contained in the relevant registrations statements.  Roth is entitled to summary judgment on this issue.

**OVERALL INVESTIGATION**

Roth argues its overall investigation of the registration statements reflected due diligence.  In order to qualify for summary judgment, Roth must demonstrate a rational jury would be compelled to find Roth "'had, after reasonable investigation, reasonable ground to believe and did believe . . . that the statements [in the relevant documents] were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *In re Software Toolworks Inc.*, 50 F.3d at 621 (quoting § 11 of the Securities Act of 1933, 15 U.S.C. § 77k(b)(3)).  The test for due diligence is reasonableness. *Id.* Roth must demonstrate it behaved in the same manner "'a prudent man'" would behave "'in the management of his own property.'" *Id.* (quoting 15 U.S.C. § 77k(c)).

The plaintiffs acknowledge Roth's initial investigation of Met and Summit was thorough.  Nevertheless, the plaintiffs argue Roth did not do an adequate job of "bringing forward" its investigation as the years went by.  In that regard, they cite several alleged omissions.  For example, Met's and Summit's business model changed.  They began aggressively loaning money for high-risk commercial ventures.  Despite the dramatic change in the companies' business model, Roth allegedly did not examine loan files in order to ascertain whether Met and

ORDER - 10

Summit had adequate documentation for the loans they were making. This omission was inexcusable, according to the plaintiffs, because Roth received a report from PwC indicating Met and Summit did not have internal controls that enabled them to assess whether their loan to value ratios were appropriate.  In view of the omissions cited by the plaintiffs (of which the preceding are only examples), Roth is not entitled to summary judgment regarding its overall investigation.

**IT IS HEREBY ORDERED:**

Roth Capital Partners' motion for summary judgment (**Ct. Rec. 784**) is granted in part and denied in part.

**IT IS SO ORDERED.**  The District Court Executive is hereby directed to enter this order and furnish copies to counsel.

**DATED** this   28th   day of January, 2010.


                     s/  Fred Van Sickle
                    Fred Van Sickle
            Senior United States District Judge

ORDER - 11